# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:20-cv-248-FL**

MARY TOWANDA WEBSTER-REED,
individually and as representative of the
Estate of Brandon Lovell Webster, et al.

                    *Plaintiffs*,

        v.

SCOTT ANTHONY COLLINS, *in his
individual capacity*,

                    *Defendant*.

## DECLARATION OF PAUL E. SMITH

Paul E. Smith, under penalty of perjury, deposes and says:

　1.　　I am an attorney practicing law in North Carolina.

　2.　　I graduated from Columbia Law School in 2012.  Before joining Patterson Harkavy LLP, I served as a law clerk to the Honorable N. Carlton Tilley of the United States District Court for the Middle District of North Carolina.  I have been licensed to practice in North Carolina since 2012.  I began as an associate at Patterson Harkavy LLP in 2013 and became a partner in 2018.

　3.　　I am admitted to practice in each of the three federal district courts in North Carolina and the Fourth Circuit Court of Appeals.  My practice focuses on civil rights and constitutional law, as well as employment, labor, and appellate litigation.  I practice in state and federal court and regularly litigate cases in the Eastern District of North Carolina.  I regularly attend and present at CLE's on topics including constitutional law.  I am active in the North Carolina Advocates for Justice, including in the civil rights section.

- 1 -

4.      I regularly represent plaintiffs in cases brought under 42 U.S.C. § 1983 based on law enforcement officers' violations of the Fourth Amendment, including cases involving traffic stops, police shootings, and other uses of excessive force.  *See, e.g.*, *Centeno v. Tripp*, No. 4:20-cv-33 (E.D.N.C.); *Betton v. Knowles*, No. 4:15-cv-04638 (D.S.C.); *Frails v. Riley*, No. 5:15-cv-665-FL (E.D.N.C.).  I have litigated numerous appeals resulting in published opinions regarding law enforcement officers' Fourth Amendment obligations.  *See, e.g.*, *State v. Tripp*, 2022-NCSC-78, 873 S.E.2d 298 (2022); *State v. Reed*, 373 N.C. 498, 838 S.E.2d 414 (2020); *State v. Stanley*, 259 N.C. App. 708, 817 S.E.2d 107 (2018).

5.      I represent the Plaintiffs in this case with my partners Narendra Ghosh and Brad Bannon, and attorney Ira Braswell of the Braswell Law Firm.  I began work on the case in early March 2021, when Patterson Harkavy began consulting with Mr. Braswell regarding possible joint representation.  My partners and I agreed to represent the Plaintiffs in the present litigation in May 2021.  A copy of our representation agreement is attached as Exhibit A.

6.      We filed notices of appearance on May 24, 2021, and soon thereafter served initial interrogatories, requests for production of documents, and requests for admission on Defendant Collins.  We also served subpoenas *duces tecum* on nine third parties including the NC State Highway Patrol, NC State Bureau of Investigations, Brunswick and Columbus County Sheriffs' Departments, and Brunswick and Columbus County District Attorneys' Offices.

7.      Over the next several months, there were numerous disputes over the sufficiency of Collins's discovery responses, which at times reached the point where Plaintiffs' counsel began preparing motions to compel.  However, the parties were eventually able to resolve each of these disputes without turning to the Court.  There were also several disputes over the adequacy of third parties' subpoena responses, which also required significant follow-up, and

which were also resolved without resorting to the Court. Plaintiffs' counsel had originally planned to begin depositions in October 2021, but were forced to postpone them until 2022 given delays in securing complete responses to our discovery requests and subpoenas.

8. In particular, subpoenas issued to the State Highway Patrol did not initially result in the production of a scene reconstruction prepared by the Highway Patrol. After review of the Highway Patrol's initial production revealed the possible existence of undisclosed documents, and after extensive follow-up, the reconstruction report was eventually produced to Plaintiffs' counsel on October 7, 2021. The report was consistent with Plaintiffs' contention that Defendant Collins had not been in the trajectory of Mr. Webster's truck at key points during the encounter.

9. On September 21, 2022, Plaintiffs filed a comprehensive Amended Complaint.

10. In December 2021, Plaintiffs designated four experts: Dr. Jonathan L. Arden, MD, an expert in forensic pathology (see Exhibit B); Charles Drago, an expert in police practices (see Exhibit C); Edward E. Hueske, a bullet trajectory expert (see Exhibit D); and William A. Williams, an expert in scene reconstruction (see Exhibit E).

11. Preparation of these experts required significant time and financial resources. This was especially the case for expert Williams, who required access to the Civietown Minimart parking lot for an entire night so that he and his staff could recreate the exact location of all relevant actors at the moments leading up to and at the time of the shooting. Mr. Williams' methodology was significantly more comprehensive and accurate than that employed by the Highway Patrol. Mr. Williams' work resulted in a scene reconstruction placing Defendant Collins notably outside the trajectory of Mr. Webster's truck at crucial moments of the encounter, including at the moments Collins fired his gun. (See Exhibit E.)

12.     Plaintiffs took six depositions in January and February 2022, including depositions of Collins, his supervisors, and the Deputy Commander of the Highway Patrol. These depositions resulted in the development of favorable testimony. While the Highway Patrol claimed to have absolved Collins of any wrongdoing after the shooting, his supervisor and the Deputy Commander of the Highway Patrol each testified that if Collins fired or decided to fire his gun at the location shown in the State's reconstruction, he acted contrary to the Highway Patrol's internal policies and their understanding of the Fourth Amendment.

13.     The Highway Patrol had a $1,000,000 indemnification obligation to Defendant Collins under N.C. Gen. Stat. § 143-300.6, and had purchased an insurance policy providing for an additional $2,000,000 of coverage. Defendant Collins' personal assets were negligible. Neither the Plaintiffs nor the Defendant identified any opportunities for financial recovery outside the $3,000,000 in coverage from the Highway Patrol and its insurance carrier.

14.     The parties held their first mediation on March 4, 2022, which failed. The parties held a second mediation on March 31, 2022. After a full day of negotiations, the parties agreed to resolve the case for payment of $2,200,000. See Exhibit F. I believe Plaintiffs' decision to agree to the settlement was correct and that this settlement was eminently reasonable. While I believed Plaintiffs' excessive force claims against Collins were extremely strong, resolving the claims before summary judgment eliminated any risk the Court would not find Plaintiffs' evidence sufficient. As in almost all police misconduct cases, Plaintiffs faced the risk that the Court would find Collins entitled to qualified immunity and public official immunity, which would preclude recovery. As in every jury case, Plaintiffs faced the risk that the jury would find against their claims by crediting Collins' account of the events. And even if the jury found for Plaintiffs, they faced the risk it would award only a small amount in damages because the

- 4 -

economic loss from Webster's death was hard to quantify. More significantly, even if Plaintiffs fully prevailed at trial and the jury awarded a large amount in damages, Plaintiffs' recovery was capped at $3 million. Moreover, in pursuing their claims all the way to judgment—which might have included an interlocutory appeal on qualified immunity—Plaintiffs would have spent much more time waiting for the recovery and would have incurred additional litigation expenses, further reducing the ultimate recovery. We therefore determined resolving Plaintiffs' claims for $2,200,000 before the filing of dispositive motions was the best decision for Plaintiffs.

15. At the time of the settlement, the claims at issue were the wrongful death claims brought on behalf of Mr. Webster's estate and the single claim for negligent infliction of emotional distress on behalf of Mr. Webster's mother, Plaintiff Webster-Reed. The parties have agreed to divide the amount payable to the Plaintiffs with 95% of the Plaintiffs' share going to Mr. Webster's estate, and 5% going to Ms. Webster-Reed. I believe this division is fair and reasonable given the relative strength and weaknesses of these claims.

16. Our representation agreement with the Plaintiffs included a contingent attorney's fee of 40% of any recovery. I believe that a 40% contingency fee is reasonable in this case. Patterson Harkavy LLP typically charges a 40% contingency fee in civil rights cases settled after or near the close of discovery. A 40% contingent attorney's fee is customary in civil rights cases given their factual and legal complexity, and given the risks posed by the various immunities available to public officer defendants under state and federal law.

17. I contemporaneously kept track of my hours in order to ensure they were recoverable under 42 U.S.C. § 1988. A detailed accounting of my hours is attached as Exhibit G. I helped evaluate the merits of the case before accepting representation, had numerous meetings and conferences with the Plaintiffs and other witnesses over the course of the litigation, was

involved in all aspects of the discovery process, had primary responsibility for amending the pleadings, had primary responsibility for identifying and assisting expert witnesses, prepared for and attended all depositions, prepared for and attended both mediations, and assisted with preparing the motion to approve the settlement.

18.     Plaintiffs Mary Towanda Webster-Reed and Aldridge Reed are the co-representatives of Mr. Webster's estate.  They incurred $7,523.85 in funeral expenses.  See Exhibit H.  Mr. Webster was unmarried at the time of his death and was survived by three minor children, K.W. (date of birth March 31, 2009), B.W. (date of birth August 21, 2017), and Z.L. (date of birth May 12, 2019).

19.     Patterson Harkavy LLP has advanced $75,638.72 in expenses litigating this case, all of which I believe were reasonably necessary to effectively litigate the case.  A detailed accounting of our expenses is attached as Exhibit I.

20.     Working in conjunction with the minor beneficiaries' guardians ad litem, Plaintiffs retained Matthew Thompson, a Board Certified Specialist in Estate Planning and Probate Law at Ward & Smith, to draft trust instruments for the minor beneficiaries.  Mr. Thompson's fee for drafting each trust and related materials was $4,000, with his total fee being $12,000.  See Exhibit J.  Each trust will pay from its funds $4,000 for its share of Mr. Thompson's fee for drafting the trust instrument.

21.     Attached as Exhibit K is a detailed Disbursement Statement showing how the settlement funds will be disbursed if the settlement is approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

This the 22nd day of March, 2023.

_____
Paul E. Smith

# Exhibit A

Bradley Bannon
Christopher Brook
Burton Craige
Narendra K. Ghosh
Jonathan R. Harkavy
Michael G. Okun
Trisha S. Pande
Henry N. Patterson, Jr.
Paul E. Smith

*Of Counsel:*
Nahomi Harkavy

# Patterson | Harkavy
## LLP

ATTORNEYS AT LAW

Chapel Hill • Greensboro

## FEE AGREEMENT and AUTHORITY TO REPRESENT

This Agreement is made and entered into by and between Mary Towanda Webster-Reed, individually and in her capacity as personal representative of the estate of Brandon Lovell Webster, and Ryan Smithwick, in her capacity as Guardian ad Litem for minor children Brandon Webster, Jr., K.W., and A.R. (the "Clients"), and Patterson Harkavy LLP and Braswell Law, PLLC (the "Law Firms").

1. The Law Firms will represent the Clients in claims for damages from the wrongful death of Brandon Lovell Webster, against North Carolina State Trooper Scott Collins and/or any individuals or entities who the Law Firms determine may be liable for Webster's death, including in Case No. 7:20-cv-00248 (E.D.N.C.). The Law Firms are not obligated to represent Clients in any other legal matter absent a separate written agreement specifically authorizing that representation.

2. It is agreed that, in full compensation for its services, the Law Firms shall receive fees according to the following:

   a. If claims are resolved on a monetary basis, Clients shall pay to Law Firms the greater of: (i) 40% of the gross recovery; or (ii) an award of attorneys' fees issued by the Court or other tribunal attributable to the services provided to Clients by Law Firms.

   b. "Gross recovery" means the total pre-tax recovery, including any interest, punitive damages, award of attorneys' fees, and the value of benefits received.

   c. If no monetary recovery is obtained, the Clients will not be required to pay the Law Firms for any legal fees.

3. The total attorneys' fee shall be divided between the Law Firms as follows:

   a. If recovery is obtained before the first deposition occurs, 40% to Patterson Harkavy and 60% to Braswell Law;

   b. If recovery is obtained after the first deposition and before the end of substantial discovery (defined as 30 days prior to the end of the discovery period), 55% to Patterson Harkavy and 45% to Braswell Law;

   c. If recovery is obtained after the end of substantial discovery but before the filing of a summary judgment brief for plaintiffs, 65% to Patterson Harkavy and 35% to Braswell Law;

100 Europa Drive, Suite 420, Chapel Hill, North Carolina 27517
Phone: 919-942-5200 • Fax: 866-823-3971 • www.pathlaw.com

Case 7:20-cv-00248-FL   Document 80-3   Filed 03/23/23   Page 10 of 124

d. If recovery is obtained after the filing of a summary judgment brief for plaintiffs but before either the filing of a brief for plaintiffs in the Fourth Circuit or the final pretrial conference, 70% to Patterson Harkavy and 30% to Braswell Law; and

e. If recovery is obtained after either the filing of a brief for plaintiffs in the Fourth Circuit or the final pretrial conference, 75% to Patterson Harkavy and 25% to Braswell Law.

4. Following execution of this agreement, Patterson Harkavy will advance all expenses it determines are necessary for their pursuit of Clients' claims, including but not limited to filing and/or recording fees, court reporter fees, courier services, expert fees, investigative expenses, deposition costs, trial preparation expenses, and other incidental expenses incurred on Clients' behalf, except that each Law Firm will advance travel expenses by each Firm's employees. If a monetary recovery is obtained, Clients will reimburse all expenses incurred by Law Firms. Expenses shall be paid from the remainder of any monetary recover after the attorneys' fee is paid pursuant to paragraph 2.

5. Law Firms agree to give this matter proper care and attention to the best of their knowledge and ability. Clients acknowledge that Law Firms have made no guarantees or promises concerning the outcome of this matter. Clients acknowledge that any estimate of projected fees and expenses is rendered as a convenience to Clients, with the understanding that such fees and expenses are not predictable with any certainty.

6. Following the execution of this agreement, Patterson Harkavy shall proceed as lead counsel. Lead counsel shall be responsible for directing the course and conduct of the litigation and ensuring that the matter is prosecuted in a timely and professional manner. Lead counsel shall also determine the assignment of specific tasks to other attorneys participating in the case. Law Firms agree to work cooperatively and to keep each other apprised of all developments in the case, including communications with the Clients, courts, and opposing counsel.

7. Clients agree to be truthful and cooperative with the Law Firms and promptly provide any and all information relevant to this litigation. Clients will cooperate fully in any proceedings in connection with the litigation, including but not limited to attending scheduled meetings and hearings, answering interrogatories, and appearing for depositions. Clients will inform the Law Firms of any relevant developments, including changes in address, telephone number, email address, or employment.

8. Clients represent that they have not previously filed for bankruptcy, and are not presently engaged in bankruptcy proceedings. If Clients contemplate filing for bankruptcy while being represented by Law Firms, the Clients shall consult with Law Firms before filing for bankruptcy.

9. Clients acknowledge and understand that Law Firms' attorneys are not accountants and will not provide tax advice. Clients understand that it is Clients' responsibility to seek tax advice from an accountant to the extent that Clients desire tax advice. To ensure compliance with the rules imposed by the IRS, we inform you that any federal tax advice contained in any communication

100 Europa Drive, Suite 420, Chapel Hill, North Carolina 27517
Phone: 919-942-5200 • Fax: 866-873-3971 • www.pathlaw.com

Case 7:20-cv-00248-FL   Document 80-3   Filed 03/23/23   Page 11 of 124

(including any attachments) to Clients is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

10. Clients may discharge the Law Firms by written notice. If that occurs, the Law Firms will retain a lien on any proceeds from this matter in an amount to be determined by the amount and value of the work performed by the Law Firms before the discharge.

11. The Law Firms retain the right to withdraw as counsel if the Law Firms determine that Clients' claims are without sufficient merit to warrant going forward, Clients fail to pay amounts due under this Agreement, or if because of a breakdown in the attorney-client relationship, the Law Firms can no longer take necessary steps to pursue the case to a satisfactory conclusion.

I have fully read this agreement and understand its contents. I hereby grant authority to Patterson Harkavy LLP and Braswell Law, PLLC to represent me in claims regarding the wrongful death of Brandon Webster.

This the __th day of May, 2021.

Mary Towanda Webster-Reed

PATTERSON HARKAVY LLP
by Paul E. Smith

Ryan Smithwick

BRASWELL LAW, PLLC
by Ira Braswell

100 Europa Drive, Suite 420, Chapel Hill, North Carolina 27517
Phone: 919-942-5200 • Fax: 866-873-3971 • www.pathlaw.com

# Exhibit B

# ARDEN FORENSICS

Arden Forensics, PC
1390 Chain Bridge Road #105
McLean, VA 22101

333 Las Olas Way, #CU1
Fort Lauderdale, FL 33301

703.749.0227 Office
703.563.6059 Fax

jlardenmd@ardenforensics.com
www.ardenforensics.com

**Jonathan L. Arden, MD**
President

9 December 2021

Narendra K. Ghosh, Esq.
Patterson Harkavy
100 Europa Drive, Suite 420
Chapel Hill, NC 27517

### *Report of Consultation*
*Re: Webster-Reed (Estate of Brandon Lovell Webster), et al., v. Scott Anthony Collins*
*(US District Court, Eastern District of North Carolina, No. 7:20-cv-248-FL)*

Dear Mr. Ghosh:

**Introduction**
I have prepared this expert witness report in accordance with the Federal Rules of Civil Procedure, Rule 26(a)(2)(B).

You have asked me to provide consultation in the field of forensic pathology, which I have practiced for more than 35 years. After receiving my MD degree from the University of Michigan in 1980, I completed training in anatomic pathology at the New York University Medical Center (1980-1983) and in forensic pathology at the Office of the Chief Medical Examiner for the State of Maryland (1983-1984). I have been certified in both anatomic and forensic pathology by the American Board of Pathology since 1985. I am currently licensed to practice medicine in five states. I spent most of my career as a government-employed medical examiner, including nine years with the Office of Chief Medical Examiner for the City of New York where I finished as First Deputy Chief Medical Examiner, and more than five years as the Chief Medical Examiner of Washington, DC. I am currently president of Arden Forensics, PC, a consulting practice in forensic pathology and medicine, and I hold a part-time appointment as a Forensic Pathologist in the Office of the Chief Medical Examiner for the State of West Virginia. My full *curriculum vitae*, including list of publications, is attached.

I have testified as an expert witness in various state and federal courts, as well as in grand juries and depositions, a total of more than 900 times. A log of my testimonial appearances for the past four years is attached.

My fees are $550.00 per hour for review of materials and consultation, and $5,500.00 per day for court testimony. My full fee schedule is attached. My fees are not contingent upon the outcome of any case in which I consult.

**Materials Reviewed**
I have reviewed the following materials regarding the above-captioned case:
- Medical records of Brandon Lovell Webster from Novant Health Brunswick Medical Center Emergency Department (WEBSTER 000707-782)
- Brunswick County Sheriff's Office Incident/Investigation Report, Use of Force Report, Crime Scene Log and Evidence Inventory and Transfer Receipt (all under OCA No. 190018), and CFS Reports (Nos. 19-000409 and 19-000411) (WEBSTER 000440-459)
- Phone video (Jones, P) (2019-00004 Jones, P Phone Video.mp4)
- Surveillance video (excerpt) (20450500.avi)
- Photograph of driver's side of truck (MMR_0290.JPG)
- NC State Bureau of Investigation ("SBI") Interview Notes of Toren Antone Utke (SBI-SUBP. - 000209-211)
- SBI Interview Notes of Barbara Ann Roberson (SBI-SUBP. - 000212-213)
- SBI Interview Notes of Mary Towanda Reed (SBI-SUBP. - 000179-182)
- SBI Interview Notes of Scott Anthony Collins (SBI-SUBP. - 000265-266)
- SBI Notes re Autopsy of Brandon Lovell Webster (SBI-SUBP. - 000165-171)
- Report of Investigation by Medical Examiner, NC Office of the Chief Medical Examiner, for Brandon Lovell Webster, No. 19-1500 (SHP Disc. - 000133-136)
- Autopsy Report for Brandon Lovell Webster from Coastal Pathology Associates, PA, Autopsy No. ME19-1 (SHP Disc. - 000001-6)
- Autopsy photographs of Brandon Lovell Webster (source not identified) (LK1_0001-65)
- Toxicology Report for Brandon Lovell Webster from the NC Office of the Chief Medical Examiner (SHP Disc. - 000140-142)
- First Amended Complaint. (Document 36 Filed 09/23/21)

I have also relied upon my education, training, knowledge and experience as a physician, forensic pathologist, and a medical examiner.

**Synopsis of Pertinent Facts**
(Note: This synopsis summarizes the facts pertinent to the discrete issues and opinions discussed below. As such, it is not, and is not intended to be, a complete summary of the events of the fatal shooting of Brandon Lovell Webster.)

Brandon Lovell Webster was a 28-year-old man who was driving a pickup truck on the night of 1/1/2019 in Shallotte, NC. NC State Highway Patrol Trooper Scott Anthony Collins followed the truck in his vehicle into a local store parking lot. Trooper Collins exited his vehicle and drew his pistol; while standing on the driver's side of the truck, when Mr. Webster drove away, the Trooper discharged his weapon twice at the driver's door, at about 8:54 PM. The photograph of the driver's side of the truck shows multiple fractures of the side-window glass into small fragments, as well as an apparent bullet defect just below the windowsill, at about the front edge of the dashboard.

Mr. Webster had sustained a gunshot wound in the incident. He drove the truck to his mother's house. His mother (Mary Towanda Reed) and her husband returned to the house to discover that Mr. Webster had been shot. In her SBI Interview, Ms. Reed indicated that Mr. Webster was "trying to walk but having difficulty." She and her husband decided to drive Mr. Webster to the hospital, which required the assistance of Mr. Webster's younger brother to carry him to the car. Ms. Reed related that during the drive to the hospital, Mr. Webster would not lay still, and

"continually told them he knew he was going to die." Mr. Webster lost consciousness as they reached the hospital.

Mr. Webster arrived at the emergency department at 9:52 PM. He was unconscious and unresponsive, with no pulses; he had gunshot wounds to his left forearm and left side of his torso. Resuscitative efforts restored heartbeat at times that was not sustained; he did not breathe spontaneously, and his pupils remained fixed and dilated (i.e., unresponsive to light and enlarged). He was pronounced dead in the emergency department at 10:28 PM.

The medical examiner took jurisdiction over the death of Mr. Webster. An external examination was done at the emergency department by the county medical examiner. An autopsy was performed the next day on behalf of the medical examiner by a pathologist at a hospital in Jacksonville, NC. The Autopsy Report described a perforating gunshot wound that entered the "back of the left forearm" below the elbow and exited on the "lateral" aspect of the forearm. The Autopsy Report also described a gunshot wound that entered the left lateral chest, causing internal injuries including bruising of the left lung, transection of the junction of the esophagus and stomach, perforation of the right lung, disruptions of left ribs 7 and 8 and right rib 6, and severe internal bleeding in the body cavities. A deformed, copper jacketed bullet was recovered in the soft tissues beneath the skin of the right side of the back. The autopsy pathologist opined that the gunshot wounds to the forearm and the torso were consistent with being caused by one bullet "if the elbow is raised across the body," but he also stated that "two separate bullet wounds cannot be excluded from the autopsy findings only." Postmortem toxicological testing detected caffeine and nicotine in the blood of Mr. Webster, but no alcohol or drugs were detected. The NC Office of the Chief Medical Examiner certified the cause of death as "gunshot wound to the left chest" and the manner of death as homicide.

**Analysis and Opinions**
Mr. Webster died as a result of the gunshot wound to the left side of his chest. That gunshot wound caused internal injuries, most importantly perforation through his right lung, with severe internal bleeding and collapse of the lungs. The blood loss compromised his circulation, and the collapse of the lungs compromised his respiratory function. The combination of blood loss and respiratory compromise was the mechanism of death resulting from the gunshot wound. The manner of death was correctly certified as homicide. The manner of death is defined as the circumstantial explanation for how the cause of death occurred. The manner of death of homicide is death by injury "at the hands of another." In this instance, Mr. Webster was fatally shot by Trooper Collins, which fulfills the definition of a manner of death of homicide.

I agree with the opinion expressed by the autopsy pathologist that the gunshot wounds of the forearm and torso are consistent with having been caused by one bullet, but that wounding by two bullets cannot be excluded. The entrance wound in the torso appears to be slightly large and irregular, i.e., has atypical features, which is consistent with being caused by a bullet that has interacted with an intermediate target (e.g., passing through the forearm) before entering. However, the smaller, rounder wound on the inner forearm is consistent with being the entrance wound of the arm, and the larger, more irregular wound more to the side of the forearm is consistent with being the exit wound of the arm (both as described in the Autopsy Report). The autopsy pathologist stated that the two wounds could be caused by one bullet if the elbow was "raised across the body," without specifying the positioning in any detail. One of the autopsy photographs provided (file number LK1_0032.JPG) shows a probe inserted through the forearm wound track, continuing into the torso entrance wound, but the probe shows a bullet path entering the forearm through the wound designated as the exit and exiting through the wound designated as the entrance. Simply having the elbow "raised across the body" does not position

the arm to align the two wound paths. The paths may align if the forearm is down along the left side of the torso (approximately where the torso entrance wound is), with the elbow bent and the palm facing up. Regardless, Mr. Webster suffered two gunshot wounds, irrespective of whether they were caused by one bullet or two.

I shall primarily address the issue of conscious pain and suffering experienced by Mr. Webster after having been shot by Trooper Collins. Mr. Webster sustained gunshot wounds that damaged soft tissues of his arm and torso; those injuries would have been very painful. He also had fractures (characterized as "disruptions" in the Autopsy Report) of three ribs (involving both sides). Fresh rib fractures are extremely painful, especially on movement, including breathing or coughing, that levers the ribs at the fracture sites. In addition to the acute, severe pain that Mr. Webster experienced directly from the physical injuries caused by the gunshot wounds, he was progressively losing blood internally, causing evolving hemorrhagic shock, while simultaneously having his lungs collapse both from the injury and compression by the accumulating blood in the chest cavities. As hemorrhagic shock progressed due to increasing blood loss, Mr. Webster's heart would beat faster and stronger (i.e., he would feel his heart pounding). As his blood pressure decreased from the blood loss, he would have felt weak, and would have become increasingly dizzy, confused, and sweaty ("cold and clammy"). As his lungs progressively collapsed, he would have had to work harder to breathe, and he would have experienced not being able to breathe adequately, a sensation called air hunger, which is recognized to be disturbing and terrifying. Importantly, Mr. Webster did not suffer any injuries to his brain that would have rendered him unconscious rapidly, so he was able to experience all the pain, discomfort and fright resulting from the effects of his gunshot wounds. Because he did not have any injuries to major blood vessels, his bleeding was a slower process, as was the eventual collapse of his lungs, so the experience of enduring shock, respiratory compromise, and physical pain was prolonged before he lost consciousness. The prolongation of his conscious pain and suffering was confirmed by the observations related by Ms. Reed, who described that Mr. Webster was having difficulty walking when she returned to the home, and that he had to be carried to the car to drive him to the hospital. In the car, she described that he would not lay still; agitation is another unpleasant and disturbing result of decreasing blood pressure and oxygenation caused by blood loss and respiratory insufficiency. In fact, Mr. Webster recognized that he was going to die, as Ms. Reed said he continually told them during the ride. Mr. Webster was shot at about 8:54 PM, and arrived at the emergency department at 9:52 PM. He lost consciousness as they arrived at the hospital (i.e., shortly before 9:52 PM), so he experienced severe conscious pain and suffering for just under an hour before he lost consciousness.

All opinions in this report are expressed with reasonable medical certainty. I reserve the right to amend any statements or opinions if presented with additional significant information, as well as the right to rebut opinions expressed within my areas of expertise.

Yours truly,
Arden Forensics, PC

By: Jonathan L. Arden, MD, F-NAME, FCAP
    President

att.

4

# ARDEN FORENSICS

Arden Forensics, PC
1390 Chain Bridge Road #105
McLean, VA 22101

333 Las Olas Way #CU1
Ft. Lauderdale, FL 33301

703.749.0227 Office
703.563.6059 Fax
jlardenmd@ardenforensics.com
www.ardenforensics.com

**Jonathan L. Arden, MD**
President

***Curriculum vitae* of Jonathan L. Arden, MD**

## Employment

| | |
|---|---|
| **5/08–Present** | **Forensic Pathologist (Part-time)** |
| | **Office of the Chief Medical Examiner** |
| | **State of West Virginia** |
| **1/06-Present** | **President, Arden Forensics, PC** |
| **3/04-Present** | **Consultant in Forensic Pathology and Medicine** |
| **12/03- 7/05** | **Medical Examiner, Northern Virginia Region (Part-time)** |
| **4/98-10/03** | **Chief Medical Examiner** |
| | **Office of the Chief Medical Examiner** |
| | **Washington, DC** |
| **3/89-4/98** | **Office of Chief Medical Examiner, City of New York** |
| | **New York, NY** |
| 7/96-4/98: | First Deputy Chief Medical Examiner |
| 7/91-7/96: | Acting First Deputy Chief Medical Examiner |
| 8/89-6/91: | Deputy Chief Medical Examiner |
| 3/89-7/89: | Deputy Medical Examiner |
| **2/86-2/89** | **Assistant Medical Examiner** |
| | **Office of the Chief Medical Examiner, State of Delaware** |
| **7/84-2/86** | **Deputy Medical Examiner-Pathologist** |
| | **Office of the Medical Examiner** |
| | **Suffolk County, New York** |

## Graduate Medical Training

| | |
|---|---|
| 7/83-6/84 | Resident in Forensic Pathology |
| | Office of the Chief Medical Examiner, State of Maryland |
| 7/80-6/83 | Resident in Anatomic Pathology |
| | New York University Medical Center |

## Education

University of Michigan Medical School: **MD**, 1980
University of Michigan: **BS** with High Distinction, 1976
The Johns Hopkins University, 1972-1974

**Medical Licensure**

| | |
|---|---|
| West Virginia | 2008 |
| Maryland | 2005 |
| Virginia | 2003 |
| District of Columbia | 1998-2006 |
| Delaware | 1986-2001; 2005-2017 |
| New York | 1982 |
| Florida | 2020 |

**Board Certification**

1985    Diplomate, American Board of Pathology, Anatomic and Forensic Pathology

**Professional Memberships**

National Association of Medical Examiners (NAME)
       Chairman of the Board of Directors, 2020
       President, 2019
       Vice President, 2018
       Board of Directors, 2002-2008, 2018-2020
       Executive Committee, 2006-2008, 2018-2020
Consortium of Forensic Science Organizations (CFSO)
       Board of Directors representing NAME, 2020-present
       Secretary, 2020-present
College of American Pathologists (CAP)
Medical Society of Virginia
Medical Society of the District of Columbia, 1998-2003

**Academic Appointments**

Clinical Assistant Professor of Pathology, George Washington University School of Medicine, 1998-2003
Clinical Assistant Professor of Pathology, State University of New York Health Sciences Center at
       Brooklyn, 1989-1998
Clinical Assistant Professor of Forensic Medicine, New York University School of Medicine, 1989-1998

**Selected Professional Activities**

Editorial Board, *Academic Forensic Pathology*, appointed 2017-2021
Special Guest Editor, *Academic Forensic Pathology*, Volume Six, Issue One, March 2016, "Postmortem
       Changes"
Subject matter expert (representing National Association of Medical Examiners and working with RTI
       International) to develop web-based training program in forensic science, 2010-2011
Identification of the Missing focus group of the National Center for Forensic Science, National Institute of
       Justice (representing National Association of Medical Examiners), 2006-2007
Chair, Uniform Definitions and Standards Work Group, Center for Substance Abuse and Treatment's
       Project on Co-Occurring Disorders and Other Emerging Issues in Opioid Treatment, Substance
       Abuse and Mental Health Services Administration, US DHHS (representing National Association
       of Medical Examiners), 2004-2005
Environmental Clearance Committee for the Curseen-Morris Postal Facility (co-sponsored by US
       Environmental Protection Agency and DC Department of Health), 2003
Government of the District of Columbia:
       Child Fatality Review Committee, 1998-2003
       Mental Retardation and Developmental Disabilities Administration
        Fatality Review Committee, Chair, 2000-2003
       Emergency Preparedness Task Force and Emergency Preparedness Committee, 2001-2003
       Mayor's Health Policy Council, 1998-2003

Metropolitan Washington Council of Governments, Bio-terrorism Task Force, 2001-2003
Medical Society of the District of Columbia, Family Violence Task Force, 2000-2003
National Association of Medical Examiners, Interim Meeting, Program Chair, February 1997
New York State Commission on Domestic Violence Fatalities, 1996-1997
American Board of Pathology, Forensic Pathology Test Committee, 1992-1997
City of New York, Administration for Children's Services/Human Resources Administration, Child Fatality
    Review Panel, 1989-1998
City of New York, Criminal Justice Child Abuse Task Force, 1996-1998
New York City Multidisciplinary Child Fatality Review Team, Project Director, 1995-1998
Physician Assistant Program, The Brooklyn Hospital-Long Island University, Pathology Course Director,
    1991-1997

## Selected Continuing Medical and Other Education

National Association of Medical Examiners, Annual and Interim Meetings (attended almost all for more
    than 20 years)

Fourth Annual Prescriptions for Criminal Justice Forensics, Fordham University School of Law, June 7,
    2013

26th Annual Forensic Anthropology Course, Maryland Office of Chief Medical Examiner, June 3-6, 2013

43rd Annual Forensic Dental Identification and Emerging Technologies Course of the Armed Forces
    Institute of Pathology, March 12-16, 2007

22nd Annual Washington Neuroradiology Course of the Armed Forces Institute of Pathology, February 17-
    18, 2007

15th Annual Anatomic Pathology Review Course of the Armed Forces Institute of Pathology, April 17-23,
    2005

## Selected Lectures and Presentations

"Forensic Pathology in the Criminal Courts: Understanding and Evaluating Injuries," Vermont Defender
    General Seminar, June 18, 2021

"Anatomy of a Homicide; Corpses and Causes of Death, Forensic Pathology in the Criminal Courts,"
    guest lecturer, The George Washington University Law School, Washington, DC, March 22, 2021

"Medical Examiner/Coroner Workforce Shortages and Pipeline," National Opioid and Emerging Drug
    Threats Policy and Practice Forum, National Institute of Justice, Washington, DC, July 18, 2019

"Anatomy of a Homicide; Corpses and Causes of Death, Forensic Pathology in the Criminal Courts,"
    guest lecturer, The George Washington University Law School, Washington, DC, March 29, 2019

"It Walks Like a Duck, Quacks Like a Duck But it's a Horse: The Process of Second Opinion Consultation,
    Independent Diagnosis of an Unusual Presentation of a Rare Disease Process, and Truth-seeking by
    Experts in an Adversarial System," E. Matshes and J.L. Arden (presenting author), presented at the
    National Association of Medical Examiners Annual Meeting, October 2018

"Medicolegal Consulting/Private Practice Forensics Workshop," J. Melinek, K. Sperry, J.L. Arden, *et al.*,
    Moderator of Panel Discussion, presented at the National Association of Medical Examiners Annual
    Meeting, October 2018

"High-Profile Deaths: Experiences and Lessons," presented at the World Association for Medical Law
    Annual World Congress, Los Angeles, CA, August 10, 2016

"Postmortem Changes and Time of Death," "The Forensic Postmortem Exam," "Death Investigation – Standards and Best Practices," "Writing the Death Certificate," presented at the West Virginia Office of the Chief Medical Examiner 2014 Forensic Death Investigation Training Course, Sutton, WV, March 17-19, 2014

"Anatomy of a Homicide; Corpses and Causes of Death, Forensic Pathology in the Criminal Courts," guest lecturer, The George Washington University Law School, Washington, DC, February 3, 2014

"Anatomy of a Homicide; Corpses and Causes of Death, Forensic Pathology in the Criminal Courts," guest lecturer, The George Washington University Law School, Washington, DC, February 4, 2013

"Postmortem Changes and Time of Death," "Sudden Natural Deaths," "Environmental Deaths," "Drugs & Alcohol Deaths," "Immersion Deaths," "Fire/Thermal Deaths," "Sharp/Blunt Injuries," "Asphyxia," "Transportation-Related Deaths," "Early Childhood Deaths," "Completing the Death Certificate/Writing Death Investigation Reports." presented at the West Virginia Office of the Chief Medical Examiner 2012 Forensic Death Investigation Training Course, Charleston, WV, October 22-24, 2012

"The Analyst at the Morgue – Helping Families Deal with Traumatic Bereavement," presented at the American Psychoanalytic Association Community Symposium, co-presentation with Bruce Sklarew, MD, June 15, 2012

"Forensic Pathology in the Criminal Courts: Advances, New Issues, Common Mistakes and Pitfalls (and Maybe More)," presentation to the Judges of the District of Columbia Superior Court, March 28, 2012

"Anatomy of a Homicide; Corpses and Causes of Death, Forensic Pathology in the Criminal Courts," guest lecturer, The George Washington University Law School, Washington, DC, January 30, 2012

"Postmortem Changes and Time of Death," "Sudden Natural Deaths," "Forensic Pathology I and II," "Early Childhood Deaths," "Writing Death Investigation Reports." presented at the West Virginia Office of the Chief Medical Examiner 2011 Forensic Death Investigation Training Course, Sutton, WV, October 24-26, 2011

"Sudden Unexplained Infant Death," authored and presented web-based training course in conjunction with RTI International, March-April 2011

"Postmortem Changes and Time of Death," "Sudden Natural Deaths," presented at the West Virginia Office of the Chief Medical Examiner 2010 Forensic Death Investigation Training Course, Sutton, WV, October 25, 2010

"Postmortem Changes and Time of Death," "Sudden Natural Deaths," and "Investigation of Early Childhood Deaths," presented at the West Virginia Office of the Chief Medical Examiner 2009 Forensic Death Investigation Training Course, Sutton, WV, October 5-6, 2009

"Death Investigation," presented at the South Carolina Coroner's Association 2009 Training Conference, Litchfield Beach, SC, June 10, 2009

"Forensic Pathology," presented at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA, January 9, 2009

"The Role of the Forensic Pathologist in Homicide and Capital Defense," lecture given at the Yale Law School Capital Punishment Clinic, New Haven, CT, December 9, 2008

"Fatal Dissection and Rupture of a Coronary Artery Bypass Vein-Graft: Implications for ME Jurisdiction and Practice," presented at the National Association of Medical Examiners Annual Meeting, October 2008

"Recognition and Interpretation of Child Abuse Injuries," Annual Meeting, Virginia Association of Orthopaedic Technologists, McLean, VA, March 31, 2007

"Pitfalls in the Practice of Forensic Pathology," Forensic Grand Rounds, Commonwealth of Massachusetts Office of the Chief Medical Examiner and Boston University School of Medicine, November 1, 2006

"The Role of the Forensic Pathologist in Homicide Defense," Seminar, Office of the Georgia Capital Defender, July 6, 2006

"Be Careful What You Wish For…" presented at the National Association of Medical Examiners Annual Meeting, October 2005

"Sudden Natural Deaths," presented at the Armed Forces Institute of Pathology Basic Forensic Pathology Course, December 2, 1999

"Subtle Child Abuse Fatalities" presented at the National Association of Medical Examiners Interim Meeting, February 1997

Teaching and lecturing for various audiences, including: physicians, graduate medical trainees and medical students, nurses and physician assistants, law enforcement, prosecutors and defense attorneys, and interdisciplinary government panels, 1986 - Present. Topics include:
- pediatric forensic pathology (child abuse and neglect, sudden infant death syndrome)
- death investigation and certification
- deaths in custody
- sudden natural deaths
- mistakes in homicide investigations
- courtroom testimony and procedures

## **Publications**

Dror I, Melinek J, Arden JL, et al., Cognitive Bias in Forensic Pathology, Journal of Forensic Sciences. https://doi.org/10.1111/1556-4029.14697, 2021

Arden JL. Letter from the Guest Editor. Academic Forensic Pathology 6(1):x-xi, March 2016

Shuangshoti S, Hjardemaal GM, Ahmad Y, Arden JL and Herman MM. Concurrence of multiple sclerosis and glioblastoma multiforme. Clin. Neuropath. 22:304-8, 2003.

Borio L, Frank D, Mani V, Chiriboga C, Pollanen M, Ripple M, Ali S, DiAngelo C, Lee J, Arden J, Titus J, Fowler D, O'Toole T, Masur H, Bartlett J, Inglesby T. Death due to bioterrorism-related inhalational anthrax: report of 2 patients. JAMA. 2001 Nov 28; 286(20):2554-9.

Flomenbaum MA, Arden JL. Final Considerations: Interacting with the Medical Examiner, Chapter 24 in *Emergency Diagnostic Testing, 2nd Ed,* Flomenbaum NE, Goldfrank L and Jacobson S, eds. Mosby-Yearbook, Philadelphia, PA 1995

Fried KS, Arden JL, Gouge TH, Balthazar EJ. Multifocal granular cell tumors of the gastrointestinal tract. Am J Gastroenterology 79(10):751-755, 1984

Smialek JE, Arden JL, Monforte JR. Changes observed in blood carbon monoxide levels due to decomposition. Abstract #c10, presented at National Association of Medical Examiners meeting, Miami, FL, 1981

Han SS, Holmstedt J, Geha-Mitzel M, Pirbazari M, Arden JL. *Biology of Aging.* Published by Program in Biology of Aging, University of Michigan Institute of Gerontology, Ann Arbor, MI, 1979

Arden Forensics, PC
1390 Chain Bridge Road #105
McLean, VA 22101

333 Las Olas Way #CU1
Ft. Lauderdale, FL 33301

703.749.0227 Office
703.563.6059 Fax
jlardenmd@ardenforensics.com
www.ardenforensics.com

**Jonathan L. Arden, MD**
President

# 2021 FEE SCHEDULE

**Consultations**      **$550.00/Hour**
- Review of documents, photographs or other materials
- Examinations of slides, radiographs or tissue
- Writing reports, correspondence and emails
- Meetings, conferences and telephone contacts
- Literature and medical research
- Preparation for trial or deposition testimony

**Local or Video Depositions and Meetings**      **$550.00/Hour**
- Depositions (within Washington, DC/Northern Virginia/Baltimore metropolitan area – travel time billed at local travel rate)
- Local meetings (within Washington, DC/Northern Virginia/Baltimore metropolitan area and up to 250 miles - travel time billed at local travel rate)

**Local Travel**      **$275.00/Hour + Mileage**
- Washington, DC/Northern Virginia/Baltimore metropolitan area, and up to 250 miles
- Mileage billed at IRS 2021 standard rate of 56 cents/mile

**Out-of-Town Meetings (see notes below)**      **$4,500.00/Day + Expenses**
- Greater than 250 miles from Washington, DC/Northern Virginia/Baltimore area

**Out-of-Town Depositions (see notes below)**      **$5,500.00/Day + Expenses**
- In-person depositions greater than 250 miles from Washington, DC/Northern Virginia/Baltimore area
- Travel time included
- Depositions requiring an overnight stay will be charged an additional $550.00

**In-Person Trials  (see notes below)**      **$5,500.00/Day + Expenses**
- Trial Testimony
- Trial appearances requiring an overnight stay for travel or meetings will be charged an additional $550.00
- Non-testimonial trial days (observation, meetings) charged at Out-of-Town Meetings rate of $4,500.00/Day plus expenses

**Video Trials (Flat Fee)**      **$3,500.00**

**NOTES**
- This is Arden Forensics' standard fee schedule; individual contract terms may vary.
- A $1,000.00 non-refundable retainer is required to initiate consultation.
- Minimum billing increment is 0.25 hours.
- Expenses are billed in addition to consultation fees.
- Fees and expenses may be billed monthly for ongoing matters.
- Payment is due 30 days from Invoice Date.  Late payments are subject to interest charges.
- Any expenses incurred in anticipation of a cancelled trial appearance will be charged.  Cancellation of court appearances within one (1) calendar week of confirmed schedule date will be charged a cancellation fee of $1,500.00.

| DATE | CASE NAME AND CAPTION | CASE TYPE | | APPEARANCE | | | RETAINED BY | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Criminal | Civil | Trial | Hearing | Deposition | Plaintiff | Defense | Prosecution |
| 1/18/2017 | FL v. Adam M. Frasch (Circuit Court of the Second Judicial Circuit in and for Leon County, FL, Case No. 14CF06426) | X | | | | X | | X | |
| 1/20/2017 | IL v. Eric S. Hoff (Circuit Court of the 17th Judicial Circuit, County of Winnebago, Case No. 10 CF 951) | X | | X | | | | X | |
| 1/26/2017 | FL v. Adam M. Frasch (Circuit Court of the Second Judicial Circuit in and for Leon County, FL, Case No. 14CF06426) | X | | X | | | | X | |
| 2/2/2017 | Zanders, et al. (Estate of Larry E. Coates, Jr.) v. Full Citizenship of Maryland, Inc., (Circuit Court, Prince George's Co., MD, No. CAL 15-31575) | | X | | | X | X | | |
| 2/6/2017 | State of Maryland v. Gail Pinder Dobson (Circuit Court for Kent County, MD, Criminal No.: 14-K-15-008782) | X | | X | | | | X | |
| 2/27/2017 | Tolley v NC Department of Health and Human Services (North Carolina Industrial Commission, I.C. File Nos. TA-25496, TA-25497) | | X | | | X | | X | |
| 3/13/2017 | United States v. Alfonso Rodriguez, Jr., (US District Court for the District of North Dakota, Northeastern Division, File No. 2:04-cr-55) | X | | | | X | | X | |
| 3/16/2017 | Commonwealth of Massachusetts v. Raymond Collazo (Superior Court Department, Springfield Division, Indictment No. 13 0164) | X | | X | | | | X | |
| 3/24/2017 | People of the Virgin Islands v. Enrique Saldana (Superior Court of the Virgin Islands, Division of St. Thomas and St. John, Case No. 09-CR-32-03) | X | | X | | | | | X |
| 4/13/2017 | Estate of Mitchell Brad Martinez v. Deryl Loar in official capacity as Sheriff of Indian River County, FL and Christopher Sharkey, in official capacity as a deputy of the Indian River County Sheriff's Office (US District Court, Southern District of Florida, Ft. Pierce Division, Case No. 216-cv-14422-DMM) | | X | | | X | | X | |
| 4/27/2017 | State of Vermont v. Brian E. Butler (Superior Court, Windsor Unit, Criminal Division, Docket No: 1-1-15WrCr) | X | | | | X | | X | |
| 6/2/2017 | Camden J. Grau (a minor), et al., v. American Family Mutual Insurance Co., and Tiffany K. Lorenz (Waukesha Co., Wisconsin Circuit Court, No. 16-CV-283) | | X | | | X | | X | |
| 6/15/2017 | State of VT v. Frank Fellows (VT Superior Court, Essex County Criminal Division, Case No. 54-4-09 Excr) | X | | X | | | | X | |
| 6/20/2017 | United States v. Alfonso Rodriguez, Jr., (US District Court for the District of North Dakota, Northeastern Division, File No. 2:04-cr-55) | X | | | X | | | X | |
| 7/11/2017 | State of WV v. Tremaine L. Jackson (Circuit Court, County of Kinawha, WV, Case No. 16-F-154) | X | | X | | | | | X |
| 7/13/2017 | State of Maine v. Robert M. Craig (Aroostook Co., Docket No. CR-16-40479) | X | | X | | | | X | |
| 8/4/2017 | Colorado v. Matthew Burry (County Court, Adams County, No.15CR2009) | X | | X | | | | X | |
| 8/7/2017 | In the Former Marriage of David Alan Ward and Brooke Nicole Ward (Circuit Court of the Sixth Judicial Circuit, in and for Pasco County, FL, Case No. 2010-DR-5017-ES) | | X | | | | | X | |
| 8/30/2017 | State of New Hampshire v. Eric Langlais (Strafford Superior Court, Case No. 219-2016-CR-00161) | X | | X | | | | X | |
| 9/7/2017 | Estate of Helen Doris Cubbage v. Robert C. Kime, III, MD, et al (Circuit Court for Rockingham County, VA, Civil Division, Case No. CL15-421) | | X | | | X | X | | |
| 9/18/2017 | Dale Rohrer, et al, v. Aryeh L. Herrera, MD, et al (Circuit Court for Washington County, MD, Case No.: 21-D-16-57869) | | X | | | X | X | | |



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **JONATHAN L. ARDEN, MD** **TESTIMONY LOG** | | | | | | | |
| **DATE** | **CASE NAME AND CAPTION** | **CASE TYPE** | | **APPEARANCE** | | **RETAINED BY** | |
| | | **Criminal** | **Civil** | **Trial** | **Hearing** | **Deposition** | **Plaintiff** | **Defense** | **Prosecution** |

| DATE | CASE NAME AND CAPTION | Criminal | Civil | Trial | Hearing | Deposition | Plaintiff | Defense | Prosecution |
|---|---|---|---|---|---|---|---|---|---|
| 9/19/2017 | PA v Chase Argot (Luzerne County Court of Common Pleas, No. 3092-2016) | X | | X | | | | X | |
| 9/28/2017 | VA v Kempton Bonds (Fairfax County Circuit Court) | X | | X | | | | X | |
| 10/10/2017 | Ringle v American Family Mutual Insurance Co, Tonsor, et al (Circuit Court of Washington County, WI, Case No. 15 CV 0666, Case Code 30105) | | X | | | X | | X | |
| 10/11/2017 | Martin L. Boyer, Sr., et al., v. Hankook Tire Co., Ltd., et al. (Superior Court, Iredell Co., NC, No. 14CVS01873) | | X | | | X | | X | |
| 11/3/2017 | Baltimore Police Department v. Caesar Goodson (Disciplinary Board of the Baltimore Police Department, Maryland, Case No. IA#2015-0239) | | X | | X | | | X | |
| 11/9/2017 | DE v James Hammond (Kent Co. Superior Court, No. 1403007996) | X | | X | | | | X | |
| 12/27/2017 | Estate of Jordan Baker v. Juventino Castro, The City of Houston, and RPI Management Company, LLC (US District Court, Southern District of Texas, Houston Division, No. 4:15-cv-003495 | | X | | | X | X | | |
| 1/10/2018 | US v James M. Guerra (Superior Court of the District of Columbia, Criminal Division, Criminal Action No. 2008 CF1 23172) | X | | X | | | | X | |
| 1/12/2018 | Estate of Christina Panzo-Bowers v. Mary Ann McLaurin MD, et al (Circuit Court for Prince William County, VA, Case No. CL16-8331) | | X | | | X | X | | |
| 1/22/2018 | Estate of Yusif Barrie v. Jeffrey A. Gall MD, et al (Circuit Court for Prince George's County, MD, CAL 17-02226) | | X | | | X | X | | |
| 1/26/2018 | Christian Peterson, et al., v. Heartland Express, Inc. of Iowa, et al. (US District Court, District of Maryland, No. 1:16-cv-03213 JFM) | | X | | | X | X | | |
| 2/1/2018 | GA v. Rodney Allen Hamilton (Superior Court, Gwinnett Co., No. 15-B-2680-7) | X | | X | | | | X | |
| 2/27/2018 | MD v Michael John Morris (Circuit Court for Calvert County, MD, Case No. C-04-Dr-17-148) | X | | X | | | | X | |
| 2/28/2018 | MD v Beatrice Manning (Circuit Court for Prince George's County, MD, Case No. CT 160617 X) | X | | X | | | | X | |
| 3/1/2018 | IN v Thomas Smith (Lake County, IN, Superior Court, Cause No. 45G03-1411-MR-9) | X | | X | | | | X | |
| 3/6/2018 | Rohrer, et al. v. Herrera (Circuit Court for Washington County, MD, Case No. 21-C-16-57869) | | X | | X | | | X | |
| 3/16/2018 | Maryland v. Megan Virginia Shaffer (Circuit Court for Garrett County, Case Nol 11K17005383) | X | | X | | | | X | |
| 3/21/2018 | WV v. Jeffrey Sampson (Circuit Court, Wood Co., No. 17-F-129) | X | | X | | | | | X |
| 3/26/2018 | NY v. Yoselyn Ortega (New York County, Supreme Court, Part 32, No. 05112/2012) | X | | X | | | | X | |
| 3/28/2018 | Estate of Michael Patrick McLoughlin v. Len Salas and Max E. Salas (Superior Court of the District of Columbia, Civil Division, Case No. 2015 CA 008054 B) | | X | X | | | X | | |
| 4/4/2018 | Lawrence Rice v. Eric Sellers, Warden (Butts Co., GA, Superior Court No. 2014-HC-10; Habeas Corpus) | | X | | | X | X | | |
| 4/10/2018 | NJ v Michael Cifelli (Middlesex County, Case # 17-000629) | | X | | X | | | X | |
| 4/12/2018 | Trainer, Brian (Government of the District of Columbia, Metropolitan Police Department, Internal Affairs Bureau, IAB Case No. S-F-16-051) | | X | X | | | | X | |
| 4/23/2018 | Livingston Estate v. Nicholas Kehagias, et al (US District Court for the Eastern District of North Carolina, No. 5:16-cv-00906-BO) | | X | | | X | X | | |
| 5/25/2018 | NY v. Danny Munoz (Kings County Supreme Court No. 6985/2016) | X | | X | | | | X | |



| | JONATHAN L. ARDEN, MD | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | TESTIMONY LOG | | | | | | | | |
| DATE | CASE NAME AND CAPTION | CASE TYPE | | APPEARANCE | | | RETAINED BY | | |
| | | Criminal | Civil | Trial | Hearing | Deposition | Plaintiff | Defense | Prosecution |
| 6/4/2018 | GA v. Tracen Franklin (Douglas County Superior Court, No. 10-CR-1244) | X | | | X | | | X | |
| 6/11/2018 | Estate of James Anderson, Jr., et al. v. Corizon Health, et al. (US District Court, Southern District of Florida, No. 2:17 cv-14369-RLR) | | X | | | X | | X | |
| 6/18/2018 | Charlene Johnson and Charlotte Snow, on behalf of Thelma Willis (deceased) v. Rapides Regional Medical Center, et al. (9th Judicial District Court, Parish of Rapides, LA, No. 242-519 DIV. "E") | | X | | | X | X | | |
| 6/28/2018 | Estate of Macario Vasquez, et al. v. BLC-Springs of East Meas, LLC, et al. (Superior Court, Maricopa Co., AZ, No. CV2016-003368) | | X | | | X | | X | |
| 7/13/2018 | Estate of Robert Murray, Sr., v. SSC Silver Stream Operating Company LLC, et al. (US District Court, Eastern District NC, No. 7:17-CV-26) | | X | | | X | X | X | |
| 7/25/2018 | al. (US District Court, District of Columbia, No. 1:16cv01394) | | X | X | | | | X | |
| 8/7/2018 | Jessica Vivier (Estate of Jeanette Veronica Vivier) v. Aleah Zimpfer Bartolomei, PA, et al. (City of Norfolk, VA Circuit Court, No. CL17-10532) | | X | | | X | X | | |
| 8/14/2018 | VA v. Allen Robertson (Fairfax Co. Circuit Court) | X | | X | | | | X | |
| 10/2/2018 | Estate of Matthew Lee Wilson v. Baryalay Ameree, MD, et al. (Circuit Court, Prince William Co., VA, No. CL 15-3841) | | X | X | | | | X | |
| 10/4/2018 | PA v. Tristan O'Brien (Montgomery Co. Court of Common Pleas, No. CP-46-CR-8657-2016) | X | | X | | | | X | |
| 10/9/2018 | MD v. Kevin Battipaglia (Baltimore City Circuit Court, Case No. 118074002) | X | | X | | | | X | |
| 10/22/2018 | Lawrence Rice v. Eric Sellers, Warden (Butts Co., GA, Superior Court No. 2014-HC-10; Habeas Corpus) | | X | | X | | X | | |
| 10/26/2018 | Shonna Moore, et al., v. Robert Stanger, et al. (Circuit Court, Wicomico Co., MD, No. C-22-CV-17-000504) | | X | | | X | | X | |
| 11/14/2018 | Kimberly J. Zion v. County of Orange, Michael Higgins, et al (US District Court, Central District of California, Case No.: 8:14-cv-01134-JVS-JDE) | | X | | | X | | X | |
| 11/27/2018 | Commonwealth v. Darius Terrell Payne (Circuit Court for the City of Lynchburg, VA, Case No.:CR17000520-00-01) | X | | X | | | | X | |
| 11/28/2018 | USA v Heindenstrom (US District Court, District of Maine, Case No.: 2:16-cr-00156-NT) | X | | | X | | | X | |
| 12/12/2018 | Angel Ellen Tyler, Administratrix of the Estate of Breanna Kristen Bumgarner v. Ford Motor Company, et al (Circuit Court of Kanawha County, WV, Civil Action No.: 18-C-182) | | X | | | X | | | |
| 1/8/2019 | Jose Farias (Estate of Lionel Farias) v. the City of East Providence, RI, et al (Rhode Island Superior Court, C.A. No. PC-2010-0432) | | X | | | X | X | | |
| 1/11/2019 | Kimberly J. Zion v. County of Orange, Michael Higgins, et al (US District Court, Central District of California, Case No.: 8:14-cv-01134-JVS-JDE) | | X | X | | | | X | |
| 2/14/2019 | Jose L. Ortiz v. City of Worcester, Michael V. O'Brien, Gary J. Gemme, Stephen Roche, Michael A. Tarckini, Matthew Early and Steven Bonczek (US District Court-Massachusetts C.A. No. 15-CV-40037-TSH) | | X | X | | | | X | |
| 2/25/2019 | Michael Koleini v. Chukweumeka Onyewu, MD (Superior Court for the District of Columbia, Case No. 2018 CA 002695M) | | X | | | X | X | | |



| DATE | CASE NAME AND CAPTION | CASE TYPE | | APPEARANCE | | | RETAINED BY | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Criminal | Civil | Trial | Hearing | Deposition | Plaintiff | Defense | Prosecution |
| 3/12/2019 | Karin Mistrik (Estate of Dominic Dillet) v Neeraj Chopra, MD, et al (Circuit Court for Montgomery County, MD, Case No.: 449521-V) | | X | | | X | X | | |
| 3/19/2019 | Debra Jones (Estate of Todd R. Murray) et al., v. United States (US Court of Federal Claims, No. 1:13-cv-00227-MBH) | | X | | | X | X | | |
| 3/28/2019 | USA v John G. Simer (US District Court, Northern District of Ohio, Eastern Division, No. 4:17CR351) | X | | X | | | | X | |
| 4/1/2019 | GA v Dora Jane Treadaway (Superior Court of Chattoga County, GA at Summerville, Criminial Action No. 10-CR-18381) | X | | | X | | | X | |
| 4/9/2019 | VT v Randal Gebo (Superior Court, Washington Unit, Criminial Division, Docket No. 849-8-17 Wncr) | X | | | | X | | X | |
| 4/10/2019 | RI v Katherine Bunnell (Supreme Court, RI, No. 2010-388-C.A) | X | | | X | | | X | |
| 4/12/2019 | Deborah Suarez, as Personal Representative of the Estate of Ana L. Perez v. Oconee Medical Center, et al., (Court of Common Pleas, County of Oconee, SC, Case No. 2015-CP-37-904) | | X | | | X | X | | |
| 4/24/2019 | FL v. Donald Hartung (Circuit Court, Escambia Co., No. 2015 CF 4806A) | X | | | | X | | X | |
| 6/5/2019 | OH v Frank Lazzerini (Stark Co. Court of Common Pleas, No. 2018 CR 0282) | X | | X | | | | X | |
| 6/11/2019 | Tammie Frost et al., v. Islamic Republic of Iran, et al. (US District Court for the District of Columbia, Case No. 1:17cv603) | | X | X | | | X | | |
| 6/20/2019 | DE v Ralph Swan (Superior Court for the State of Delaware, ID no. 0002004767A) | X | | | X | | | X | |
| 7/9/2019 | Sardis v Overhead Door Corporation (US District Court for the Eastern District of Virginia, Richmond Division, Case No. 3:17-cv-818-JAG) | | X | X | | | X | | |
| 7/23/2019 | Hardin v. Carillon Assisted Living of Shelby, LLC, et al. (General Court of Justice, Superior Court Division, State of NC, County of Cleveland, Case No.: 18-CVS-1168) | | X | | | X | X | | |
| 8/23/2019 | Estate of Jessie L. Mills v. Knox County (US District Court, Eastern District of KY, Southern Division at London, Case No.: 6:17-CV-00184-REW) | | X | | | X | X | | |
| 9/4/2019 | Praveen Tyagi v. Kenneth Scott Hickey, MD, and James River Emergency Group, LLC (Circuit Court for the City of Richmond, VA, Case No.: CL18-3419) | | X | | | X | X | | |
| 9/5/2019 | State of GA v. Billy Charles Lewallen (Superior Court of Banks County, Case No.: 15-CR-396) | X | | | X | | | X | |
| 9/20/2019 | VT v Gregory Coffey (VT Superior Court, Windsor Unit, No. 678-6-17-Wrcr) | X | | | | X | | X | |
| 10/2/2019 | USA v. James Embre (Superior Court, District of Columbia, No. 2018-CF1-5989) | X | | X | | | | X | |
| 10/14/2019 | S. Courtney, et al., v. Daimler Trucks North America, LLC (Superior Court, County of Los Angeles, CA, No. BC615223) | | X | | | X | | X | |
| 10/15/2019 | Praveen Tyagi v. Kenneth Scott Hickey, MD and James River Emergency Group, LLC (Circuit Court for the City of Richmond, VA, No. CL18-3419-5) | | X | | | X | X | | |
| 10/24/2019 | C. Pandolfo, Administrator of Estate of Helen Doris Cubbage v. RC Kime, III, MD, et al. (Circuit Court, Rockinham Co., VA, No. CL15-421) | | X | | | X | | X | |
| 11/6/2019 | Courtney v. Daimler Trucks North America LLC (Superior Court of the State of California, County of Los Angeles, Case No. BC615223) | | X | X | | | | X | |
| 11/7/2019 | MD v Francis Audisio (Baltimore County Circuit Court, No. K-18-3916) | X | | X | | | | X | |



| | JONATHAN L. ARDEN, MD | | | | | | | |
| | TESTIMONY LOG | | | | | | | |
| DATE | CASE NAME AND CAPTION | CASE TYPE | | APPEARANCE | | | RETAINED BY | |
| | | Criminal | Civil | Trial | Hearing | Deposition | Plaintiff | Defense | Prosecution |
|---|---|---|---|---|---|---|---|---|---|
| 11/18/2019 | ME v. Noah Gaston (Docket No. CR-16-488) | X | | X | | | | X | |
| 11/22/2019 | David Edenfield v. Eric Sellers, Warden (Butts Co., GA, Superior Court Case No. 2014-HC-15) | | X | | X | | X | | |
| 11/25/2019 | VA v. Payne City of Lynchburg Circuit Court, No. CR17000520-00-01) | X | | X | | | | X | |
| 12/3/2019 | USA v. Cynthia Clemons, et al. (US District Court, Eastern District of TN at Knoxville, No. 3:15-CR-27) | X | | X | | | | X | |
| 12/6/2019 | Estate of George Tyler v. County of Granville, et al. (Granville Co, NC, Superior Court, No. 18 CVS 767) | | X | | | X | X | | |
| 12/12/2019 | ME v. Mark Cardilli, Jr. (Docket No. CR-19-1823) | X | | X | | | | X | |
| 12/30/2019 | Valdez v Lovelace (County of San Miguel, NM, Fourth Judicial District, Case No. D-412-CV-2017-00376) | | X | | | X | X | | |
| 1/16/2020 | Vicknair v. Plaisance and St. Tammany Parish Hospital (22nd Judicial District Court for the Parish of St. Tammany, Louisiana, Number 2017-15337) | | X | | | X | X | | |
| 1/17/2020 | Young v. Oak Health Care Invstors of North Carolina, Inc. (General Court of Justice, Superior Court Division, Wake County, NC, No. 18 CVS 13169) | | X | | | X | X | | |
| 1/20/2020 | McNeilly v. Southern Health Partners, et al., (General Court of Justice, Superior Court Divisoin, County of Cleveland, NC, File No. 18-CVS-2120) | | X | | | X | X | | |
| 1/21/2020 | April Damiani and Estate of Jose Damiani, Jr., v. Michael Allen, et al. (US District Court, Southern District of Indiana, No. 4:16-cv-53) | | X | X | | | | X | |
| 1/28/2020 | FL v. Donald Wayne Hartung (Escambia Co. No. 1715CF004806A) | X | | X | | | | X | |
| 2/10/2020 | Ray Charles, Jr., et al. v. State of Maryland Department of Human Resources (Circuit Court, Baltimore City, No. 24-C-18-006780) | | X | | | X | X | | |
| 2/11/2020 | Estate of Bruce Brian Kingston v. Sherif S. Tawfik, MD, et al. (Circuit Court, Fairfax Co., No. 2018-15124) | | X | | | X | X | | |
| 3/2/2020 | WI v. Kayle Fleischauer (St. Croix Co. Circuit Court, No. 2018CF000255) | X | | X | | | | X | |
| 3/16/2020 | MN v. Chaz Elijah Moore (Olmstead Co. District Court, No. 55-CR-17-6403) | X | | X | | | | X | |
| 5/20/2020 | Leng v City of Issaquah (US District Court for the Western District of Washington at Seattle, No. 2:19-CV-00490-TSZ) | | X | | | X | X | | |
| 6/15/2020 | AZ v Bryan Miller (Maricopa County, AZ Superior Court, No. CR2015-102066-001DT) | X | | | X | | | X | |
| 6/17/2020 | Moody v. Williams (Circuit Court of Chesterfield County, VA, Case No.: CL19-2500) | | X | | | X | | X | |
| 6/29/2020 | PA v Virginia Hayden (Court of Common Pleas of York County, Pennsylvania Criminal Division, No. CP-67-CR-0004878-20190 | | x | | x | | | x | |
| 7/7/2020 | Estate of Dean Lopata, et al., v. Brightview Senior Living - Severna Park (Binding Arbitration, State of MD) | | X | | | X | X | | |
| 7/31/2020 | In Re: Albert Emmanuel Christian, Albert and Sheila Christian, Petitioners (District of Bell County, TX, 146th Judicial Circuit, Cause No. 311, 392 B) | | X | | X | | | X | |
| 8/4/2020 | FL v. Ronald C. Caruso (Circuit Court, Seventh Judicial Circuit, in and for St. Johns County, FL, Case No.: CF1900169) | X | | | | X | | X | |



| | | CASE TYPE | | APPEARANCE | | | RETAINED BY | | |
|---|---|---|---|---|---|---|---|---|---|

**JONATHAN L. ARDEN, MD**
**TESTIMONY LOG**

| DATE | CASE NAME AND CAPTION | Criminal | Civil | Trial | Hearing | Deposition | Plaintiff | Defense | Prosecution |
|---|---|---|---|---|---|---|---|---|---|
| 8/13/2020 | Estate of Yeardly R. Love v. George W. Huguely, V (Circuit Court, City of Charlottesville, VA, No. CL-2018-648) | | X | | | X | | X | |
| 8/18/2020 | WV v. Darrell Wesley Hazelwood (Circuit Court of Mercer County, WV) | X | | X | | | | | X |
| 10/21/2020 | PA v. Jerry Reeves(Court of Common Pleas, Dauphin Co., No. CP-22-CR-3869-2009) | X | | X | | | | X | |
| 11/10/2020 | Konstandina Pexos, Administrator of the Estate of George Lolos v. Wessell's Nursing Home of Matthews, Inc. (Mecklenburg County, NC, General Court of Justice, Superior Court Division, 19-CVS-23204) | | X | | | X | X | | |
| 11/12/2020 | Batey, et all., v. Washington Hospital Center Corp (Superior Court for the District of Columbia, Civil Division, Case No.: 2019 CA 006716 M) | | X | | | X | X | | |
| 1/7/2021 | Estate of Adelyn Gauthier v. IHC Health Services, Inc., et al. (Third Judicial District Court, Salt Lake Co., UT, No. 180905554) | | X | | | X | X | | |
| 1/21/2021 | US v. SOC Tony Dedolph (USN Court Martial) | X | | X | | | | X | |
| 1/26/2021 | Vicknair v. Plaisance and St. Tammany Parish Hospital (22nd Judicial District Court for the Parish of St. Tammany, Louisiana, Number 2017-15337) | | X | | | X | X | | |
| 3/16/2021 | Starling v Ohio Department of Disabilities (No. 2019-00747JD) | | X | X | | | X | | |
| 4/2/2021 | VA v. Demetrius Roots, Jr. (Chesterfield Co. Circuit Court, No. CR20F01587) | X | | X | | | | X | |
| 4/15/2021 | Debra Kirkland (Estate of Betty Steward) v. Durham Ridge Assisted Living LLC, et al.(Superior Court, Durham Co., NC, No. 20 CVS 1742) | | X | | | X | X | | |
| 4/19/2021 | Eureda Johnson (Estate of Eva Washington) v. Durham Ridge Assisted Living LLC, et al. (Superior Court, Durham Co., NC, No. 20 CVS 2815) | | X | | | X | X | | |
| 5/13/2021 | Tyrone Hood v. City of Chicago, et al (United States District Court for the Northern District of Illinois, Civil Action No. 16 CV 1970) | | X | | | X | X | | |
| 5/25/2021 | Sperling v. Clark Rifles (Superior Court of the State of Washington in and for the County of Clark, No. 16-2-02431-2) | | X | | | X | X | | |
| 6/2/2021 | MD v Steven Nathaniel David (Circuit Court of Maryland for Anne Arundel County, Case No: C-02-CR-19-002418) | X | | X | | | | X | |
| 6/9/2021 | Anthony Nicholas Marks v. State of Maryland, et al. (Circuit Court for Montgomery County, MD, Civil No. 481685-V) | | X | | | X | X | | |
| 6/16/2021 | MD v Andrew Michael Jones (Circuit Court for Harford County, Case No. C-12-CR-19-000598) | X | | | | | | X | |
| 6/17/2021 | FL v Charles Williams Deas, III (Circuit Court for the Fourth Judicial Circuit, in and for Duval County, FL, S.A. Case No. 18CF056955AD, Clerk No: 162018CF010254A) | X | | | | X | | X | |
| 6/25/2021 | FL v Justin Allen Ruggiero (Circuit Court of the Eighteenth Judicial Circuit, in and for Seminold County, FL, Case No: 592017CF001905AXXXXX) | X | | | X | | | X | |
| 6/29/2021 | Altman v. Sentara Healthcare (Circuit Court for the City of Virginia Beach, VA, At Las No: CL19-1808) | | X | | | X | X | | |



| DATE | CASE NAME AND CAPTION | CASE TYPE | | APPEARANCE | | | RETAINED BY | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Criminal | Civil | Trial | Hearing | Deposition | Plaintiff | Defense | Prosecution |
| 7/9/2021 | AZ v. Jeffrey Martinson (Maricopa Co. Superior Court, No. CR 2004-124662-001-SE) | X | | | X | | | X | |
| 7/13/2021 | ME v. Gage Dalphonse (Androscoggin Superior Court, No. ANDCD-CR-19-2321) | X | | | X | | | X | |
| 7/28/2021 | CO v. Brandi LeClaire (Jefferson Co.District Court, No. 2019 CR 4676) | X | | X | | | | X | |
| 8/31/2021 | Estate of Rose Crnjak v. Lake Hospital System, et al (Court of Common Pleas, Cuyahoga County, OH, Case No. CV 20 932285) | | X | | | X | X | | |
| 9/21/2021 | NJ v. Tiray Summers (Union Co. Superior Court, No. 18-11-00691) | X | | X | | | | X | |
| 11/3/2021 | Moussavi, et al v. Community Support Services, Inc (Circuit Court for Montgomery County, MD, Case No. 453754-V) | | X | | | X | X | | |
| 11/18/2021 | Kevin Quintanilla (Estate of William Antonio Quintanilla) v. Atlantic Waste Disposal, Inc., et al. (Circuit Court, Henrico Co., VA, No. CL19003058-00) | | X | | | X | | X | |
| 11/19/2021 | Shelby Wilson (Estate of Mark Wilson), et al., v. Dunstan Trucking, LLC, and Todd William Dunstan (District Court, Jefferson Co., KS, No. 2020-CV-000008) | | X | | | X | X | | |

Exhibit C

In the matter re:

**Mary Towanda Webster-Reed**
**V.**
**Scott Anthony Collins**
**Case No: 7:20-cv-248-FL**
**United States District Court**
**Eastern District of North Carolina**
**Southern Division**

---

**Report**

**of**

**CHARLES W. DRAGO**
**DRAGO PROFESSIONAL CONSULTANTS, LLC**

---

December 17, 2021

# Table of Contents

**Introduction**............................................................................................................**3**

**Qualifications**..........................................................................................................**3**

**Opinions**.................................................................................................................**4**

**Materials considered in forming opinions**...........................................................**17**

**Past Expert Witness Testimony**.........................................................................**18**

**Publications**..........................................................................................................**26**

**Compensation**.......................................................................................................**26**

Appendix 1 – Curriculum Vitae of Charles W. Drago

Mr. Bradley Bannon
Patterson Harkavy LLP
100 Europa Dr., Suite 420
Chapel Hill, North Carolina 27517

Mr. Paul E. Smith
Patterson Harkavy LLP
100 Europa Dr., Suite 420
Chapel Hill, North Carolina 27517

Dear Mr. Bannon and Mr. Smith,

I have been retained as a consultant and expert in the matter known to me as Mary Towanda Webster-Reed v. Scott Anthony Collins. I was asked to review documents relevant to this matter and render expert opinions about the police actions of the defendant involved in this matter.

After evaluation of all the case materials listed below, I employed comparative methodology in determining my opinions and in evaluating the officer's actions. This method of comparing the actions of the officers with accepted practice and training in the law enforcement profession is a common and consistently applied method when evaluating a law enforcement officer's actions.

These accepted practices and training in law enforcement are national practices and/or standards. The practices and standards incorporate nationally developed policies, federal case law, and the practices set forth by national police force organizations in literature, trainings, and conferences that are conducted on a national level. These standards often provide the basis for state and local policies. For example, the materials provided in this case indicate that the North Carolina State Highway Patrol developed at least some of its policy directives from standards promulgated by the Commission on Accreditation for Law Enforcement Agencies (CALEA).

I formed a number of opinions to a reasonable degree of professional certainty, as to the use of force and other police procedures used by North Carolina State Highway Patrol Trooper Scott Anthony Collins in this matter, and whether or not certain actions of Trooper Collins were consistent with accepted national police practices and standards, as well as relevant Directives of the North Carolina State Highway Patrol.

My opinions are based not only on the facts I reviewed this case, but my experience and training concerning proper policies and police practices in use of force, arrests techniques, traffic stops, officer involved shootings and police training. I have studied the reports and other material provided to me regarding this case. Please be advised that if there are any additional depositions, policies, or other materials produced in this case, a supplemental report may be necessary; thus, I reserve the right to supplement my opinions and/or this report.

**<u>Qualifications</u>**

I am a 30-year career law enforcement officer who advanced through the ranks of the police department with an exemplary record.  Recognized for integrity and leadership, I was appointed as assistant police chief, police chief as well as deputy chief of staff and senior law enforcement advisor to the Governor of Florida.

As a senior leader of major law enforcement agencies and a member of the department's review boards; I have investigated hundreds of police misconduct allegations in all areas including use of force/Taser/pepper spray, deadly force, k-9, and police pursuits. I have broad-based experience in high liability areas including the management and development of policies and procedures in those areas.

During my career, I have attained a significant amount of experience in police officer involved shootings as a police officer in the field as well as a line supervisor and homicide detective supervisor who investigated police officer involved shootings. As a police executive, I have also developed use of force policies and evaluated trends and individualized cases. In addition, I served as a union representative on many officer involved shootings. I received training in criminal investigations, homicide investigations, police officer bill of rights and internal police investigations.

In addition, I have consulted on numerous officer involved shooting cases and provided guidance on police tactics, procedures and methods of investigation before, during and after officer involved shootings and in custody deaths. As a consultant, I have been called upon to provide direction as to the effects on an officer after he has been involved in a shooting. My opinions have been sought by the media, government and law firms in high profile officer involved shootings all over the country, including in North Carolina.

As an experienced frontline law enforcement officer who was directly or indirectly involved in thousands of arrests, my experience includes service in various capacities with direct hands-on involvement and/or supervision in areas such as patrol, street narcotics, SWAT, k-9, street crimes, traffic stops, criminal investigations, training and homicide. I have advanced through the ranks and served as a police officer, field training officer, detective, sergeant, detective sergeant, captain, major, assistant chief and police chief. My career includes significant experience with the investigation of police officer use of force, as an officer, immediate supervisor and senior administrator.

My education includes an Associate's Degree in Criminal Justice, a Bachelor's Degree in Criminal Justice, and graduation from the Southern Police Institute Command Officer's School at The University of Louisville. In addition, I have had numerous hours of training in the use of force, Tasers, arrests, firearms, supervision, patrol procedures, criminal investigations and the management of those.

As a certified police instructor, I trained thousands of police officers in the use of force, criminal investigations, search warrant procedures, narcotics investigations, and substance abuse and patrol procedures.

**Opinion A: Based on the totality of the circumstances shown in the materials available to me, Trooper Scott Collins failed to follow generally accepted police practices and training, as well as North Carolina State Highway Patrol policies and training, during the attempted traffic stop of Brandon Lovell Webster.**

1. **IACP National Consensus Policy on The Use of Force 2017:** *De-escalation: Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary. De-escalation may include the use of such techniques as command presence, advisements, warnings, verbal persuasion, and tactical repositioning.*

2. **IACP National Consensus Policy on The Use of Force 2017:** *(IV) (B): De-escalation 1. An officer shall use de-*

*escalation techniques and other alternatives to higher levels of force consistent with his or her training whenever possible and appropriate before resorting to force and to reduce the need for force.*

3. **NCSHP Defensive Tactics Training 2018:** (I) (C) Reasons: *It is imperative that officers use effective communications skills to deescalate situations and be able to transition from levels of force on the continuum in order to resolve issues, subdue, control behavior that may arise from combative subjects. Training is critical to afford an officer the ability to enhance his communication abilities when dealing with the irate suspect to possibly de-escalate a situation in order to minimize use of force. (Webster 311)*

4. **NCSHP Directive B.01 Use of Force 2019 III**: *"Where lethal force is not authorized, a member should assess the situation in order to determine which less than lethal technique or weapon will be best to de-escalate the incident to bring it under control in a safe manner."*

5. **NCSHP Officer Safety and Vehicle Stops Training 2018**: *"Survival Key #3 – Increasing Distance Decreases Danger. … Approach – There are two (2) basic approaches to the violator vehicle, driver side and passenger side. If possible, regardless of approach do not stand in between the two (2) vehicles. … Do not expose yourself beyond the 'B' pillar as this will place the driver at a disadvantage by having to turn around to converse with you. The 'B' pillar can also afford you some protection if an assault is imminent. At night, always keep your flashlight beam aimed at the driver side outside view mirror." (Webster 330-331)*

6. **NCSHP Directive B.01 Use of Force 2019 VI**: *"No member shall intentionally position him/herself into the path of a vehicle that is attempting to flee. Whenever possible, the affected members shall make a reasonable effort to get out of harm's way if a vehicle is moving toward him/her."*

7. **NCSHP Officer Safety and Vehicle Stops Training 2018**: "*Motorist refuse to obey commands – Remember, **time** is on the side of the officer. The officer should not be concerned with how long it takes to complete the task. If it becomes necessary for the officer to back the patrol vehicle up to avoid injury, do so without hesitation. **Never** attempt to remove motorist from vehicle alone. **Always** have at least two (2) officers on the scene." (Webster 337)*

8. **NCSHP Officer Safety and Vehicle Stops Training 2018**: *"Motorist flees – If a motorist exits the suspect vehicle and runs. Do not chase the motorist. You should never leave your position of cover until all occupants of the vehicle have been secured and vehicle cleared. **Do not fire shots at the motorist without justification in accordance with G.S. 15A-401 (Arrest by Law Enforcement Officers) and Tennessee v Garner**. Radio in a description of the fleeing motorist and the direction of his/her travel."*

9. **Street Survival II p.94: High Risk Vehicle Contact**: *"It is important to note, you do not want to approach the suspect vehicle on foot where there is a known danger. Control the adrenaline rush that drives too many officers to feel they need to rush in toward the suspects. If they don't flee, give them a chance to comply and take that compliance a far as it will go toward a successful and safe arrest."*

10. **NCSHP Officer Safety and Vehicle Stops Training 2018**: *In any high-risk vehicle stop, NCSHP officers should call in the stop, including the location, vehicle description, reason for stop, and number of occupants. Webster 333. The officer who initiates the stop, called the "command officer," should "take a crouched position in the open door on the driver's side of the patrol vehicle to protect the officer." Webster 334. Officers should approach the vehicle from behind. (Webster 329-332)*

11. **National Consensus on Use of Force-Discussion Paper:** *(III) (B) "Another de-escalation technique is tactical repositioning. In many cases, officers can move to another location that lessens the level of danger. An example is an incident involving an individual with a knife. By increasing the distance from the individual, officers greatly reduce the risk to their safety and can explore additional options before resorting to a use of force, notwithstanding the need to control the threat to others."*

12. **NCSHP Directive B.02 Extraordinary Patrol Vehicle Operations V**: *"A member and his supervisor shall constantly evaluate his/her decision to continue a chase. In weighing the decision to continue a chase, they shall consider the likely harm from not apprehending the suspect as soon as possible. Additionally, they should consider the following:* • *The danger to the public created by the fleeing suspect's driving, including indications the suspect may be impaired, or an apparent willingness on the part of the suspect to inflict serious injury on others, or reckless and threatening driving by a suspect….* • *Whether the crime the suspect is believed to have committed is dangerous to persons or property, is a felony or serious misdemeanor, or involves conduct that threatens persons or property"* and *"•* *Whether the suspect can be apprehended at a later time with little risk or danger to the public."*

13. This incident involves the officer involved shooting of Brandon Webster by Trooper Scott Collins. While it is critical to review the actual moments when the shooting occurred, it is also critical to look "upstream" and see where the officer missed opportunities to de-escalate the situation and where the officer took action which exacerbated situation. The review of the material in this matter indicates that Trooper Collins violated NCSHP polices and training, as well as nationally accepted police practices and policies, throughout the period of time leading up to the shooting of Mr. Webster.

14. Police policies and training across the country, as well as in the North Carolina State Highway Patrol (NCSHP), require law enforcement officers to take appropriate steps to de-escalate a situation before they use force.

15. NCSHP policies and training require troopers to make serious attempts to de-escalate a situation before they use force. The purpose of de-escalation is to stabilize a situation so that more time, options, and resources are available for incident resolution. Law enforcement personnel are trained to slow down when approaching potentially dangerous situations to allow the police officers time to consider options, call for back up, take a position of cover, gather more information, create a plan and/or protect innocent people in the area. A failure to take the time bring a situation to a safe conclusion is referred to as "Time compression".

16. "Time Compression": This is where an officer becomes so emotionally involved by a person he/she perceives as resistant that the officer overreacts and rushes into a situation when he/she didn't have to. Typical symptoms would be moving too close to the subject, aggressive behavior, shouting/screaming confusing commands, putting himself/herself in a dangerous position in front of a moving vehicle, and/or engaging an agitated person who doesn't present an immediate threat.

17. On 1/1/2019, Trooper Collins stated he observed a pickup truck make a left turn onto NC130 off of SR 1132. According to Collins, the pickup truck was "fish tailing" while making the turn. Collins followed the truck and saw the truck pull into the parking lot of the Civietown Mini Mart.

18. Collins threatened to shoot Mr. Webster from the beginning of the traffic stop when he first pulled in behind the truck. The trooper had no reason to point his firearm at Webster when he stopped Webster for a minor traffic infraction. Collins immediately exacerbated the situation upon arrival without any legitimate police purpose. Collins continued those threats throughout the traffic stop and eventually carried out that threat and did shoot Mr. Webster.

19. Collins followed the truck into the parking lot with his emergency lights activated and stopped behind Webster's truck. The truck began to back up and Collins stated he started backing up to reposition his vehicle when the truck attempted to pull around the front of his police car. Collins then positioned his car to prevent the truck from going around his police car. Collins further stated that the truck backed up and Collins got out of his vehicle and unholstered his firearm. Collins explained that he drew his firearm because of the "driver's erratic behavior". Collins also stated he began to give loud verbal commands for the driver to "stop the truck and show me his hands". (Collins NCSHP IA Statement)

20. According to Trooper Collins, he observed the truck stop but was unable to see Webster's hands and began to move around the rear of his police vehicle and approached the pickup truck. (Collins NCSHP IA Statement).

21. The incident was partially captured to various degrees in two different videos, Paul Jones cell phone camera and a surveillance system at the Mini Mart. The Mini Mart video shows Webster drive into the Mini Mart parking lot where he pulled into a parking spot while Collins drove into the parking lot behind Webster and stopped at an angle near the back of the truck. The truck then backed up out of the parking space and Collins repositioned his police vehicle to block Webster from driving forward. Webster then moved the truck forward and backward again while Collins opened his driver's side door, drew his firearm and pointed it in the direction of the pickup truck. Collins then moved from a cover position behind his driver's side door and moved around the rear of his vehicle and stood in front of the pickup truck with his firearm aimed at the truck. (Mini Mart Video 3:18-3:31)

22. Trooper Collins continued to move towards the front of the truck with his firearm pointed at the truck. The truck's passenger door then opened and Collins continued to move closer to the front of the pickup truck. Collins said in his NCSHP IA Statement that he knew there was a passenger in the vehicle with her hands up in surrender. Collins eventually moved very close to the truck and appeared to be standing at the left front fender of the driver's side of the truck. (Mini Mart Video 3:35- 3:44).

23. At 3:45 of the Mini Mart Video, Collins moved closer to the driver's door and the truck moved forward. Trooper Collins then backed up and stood at the driver's side front fender. Collins stated in his NCSHP IA Statement "*The driver accelerated the vehicle towards me as an aggressive threat not to approach him. At that time, I was in fear of being run over and killed. I began to walk backwards in an attempt to put distance between me and his vehicle and look for cover.*" According to the Mini Mart video, Collins then again began to move towards the driver's door again when the truck moved forward and passed Trooper Collins who is standing off to the left of the pickup truck. (3:45- 4:44)

24. Collins said he believed that Webster was threatening him and warning him *"not to approach him".* In fact, Collins stated he *"was in fear of being run over and killed at that time".* Nevertheless, Collins didn't move to cover or protection, he continued to stand in the path of the truck and move closer towards the truck. If

Collins believed that Webster was threatening to injure him with the truck, the proper procedure would be for Collins to move away from the truck and seek cover and protection. Accepted police practices and NCSHP policies require an officer to move away from the path of a moving vehicle. Collins had room to move back to his police car or towards the fence line off the left side of the truck and take cover.

25. Trooper Collins had cover when he first got out of his vehicle when he stood behind his driver's side door. However, he moved from the cover of his vehicle to an exposed position in front of Webster's truck. In doing so, Collins exposed himself to danger from Webster and the moving truck if Webster tried to flee or wanted to use deadly force against Collins with a weapon or with the motor vehicle. In fact, by positioning himself in front of a moving vehicle, Collins not only placed himself in danger but also placed the occupants of the vehicle in danger and any innocent bystanders in the area. Collins created a situation more likely to result in an officer involved shooting and thereby risked striking innocent bystanders and innocent occupants of the pickup truck with stray bullets. Collins acknowledged that he knew there was a passenger in the front seat of the truck, later identified as Whitney McKeithan, and that he did not perceive her to be a threat.

26. Police officers are trained in a concept known as the "Reactionary Gap". Reactionary Gap is defined as "the minimum amount of space needed to ensure that you can properly react to whatever threat may be presented by a suspect being questioned or detained." Police officers are taught that a safe distance will vary depending on the circumstances. The officers learn that they should mitigate the danger through distance and cover.

27. Trooper Collins acknowledged that police training dictates that police officers should maintain that "Reactionary Gap": *"I'm keeping plenty of distance at the same time. I'm remembering, you know, in training, distance is your friend. I'm not going to rush into it."* In spite of his training, Trooper Collins did in fact rush in and close that gap without any urgent need to do so. In fact, Collins did so while he claimed that he was concerned that the driver might possess a firearm. *"There's a reason he's trying to run. I don't know if he's got a gun. In my mind, I don't know if he's got a gun or what he's going to do, so keeping him covered."* (NCSHP IA Statement)

28. When the situation involves a moving vehicle and the officer is concerned that the occupants might have a gun, the officer should move away from that vehicle, seek cover and create that "Reactionary Gap" that will provide the officer with protection and the ability to defend him/herself if necessary. Collins did the exact opposite; he moved away from cover and closed that reactionary gap, deliberately placing himself in a more dangerous position.

29. Trooper Collins's actions were consistent with an officer who was overcome with emotion during this event: Trooper Collins stepped away from a position of cover at his vehicle and moved to a dangerous position in front of a moving motor vehicle in contravention of police training. Trooper Collins saw that the pickup truck being driven by Webster had moved to a position where he may be able to escape so Collins placed himself in front of the pickup truck and used his body and the threat of shooting Webster to effect the traffic stop. Collins continued this aggressive and improper traffic stop even after, according to his statements, he believed Webster would run him over if he got in front of the truck.

30. When Trooper Collins made the decision to force a confrontation with Webster, there was no immediate risk or urgent need to stop Webster. Collins was making a traffic stop because he believed that Webster had committed what was, at most, a very minor traffic offense. Collins had no reason to believe that Webster was armed or any threat to the general public if Webster did not remain at the scene of the traffic stop. Collins caused a more dangerous situation for the driver, the innocent occupant of the truck and the innocent bystanders in the area by forcing a confrontation with Webster. It was reasonable to believe and foreseeable that Webster would likely flee and drive recklessly if Collins attempted to apprehend him. Collins expressed that concern in his NCSHP IA Statement. *"And I felt threatened. I was like, you know -- at that point, I was* like, *hey, you need to back away. You need to put some distance between you and him and find -- this ain't going to work. This man's letting you know I'm going to kill you if I have to. You're not getting me out of this truck. And that's in my mind, you know."* Hence, any attempt to apprehend Webster without a proper plan and appropriate back up units would endanger innocent bystanders, the police and the suspect. Trooper Collins continued to push this encounter through the use of improper police practices. Trooper Collins' actions significantly increased the potential for any danger to the public.

31. Trooper Collins likely had time to wait for a backup, gather more information, create a plan, formulate de-escalation techniques and arrange for the safety of the innocent bystanders before forcing contact with Webster. Trooper Collins didn't know where his back up units were and therefore didn't know how long it would take to get a backup. Nevertheless, he didn't attempt to reach out for back up before he began his rush to move in on the pickup truck. (NCSHP IA Statement)

32. The actions of Trooper Collins served to exacerbate the situation and create an environment more likely to end in deadly force.

- Collins contacted Webster without taking time to create a plan, wait for back up, take cover
- Collins drew his gun early in the encounter
- Collins threatened to fire his weapon
- Collins moved into the path of a moving vehicle
- Collins believed that Webster was warning Collins to stay back
- Collins continued to move towards Webster without any plan or cover after Collins believed Webster threatened him with the truck

33. The truck stopped several times and created an opportunity for Collins to slow things down, create distance, observe, call for back up, take cover or create a plan. The initial phases of de-escalation create time and distance, and were overlooked by Collins. The questions stressed in police training include "was immediate action necessary?" The answer here is "no."

34. The proper procedure would have been to call in the stop, wait, keep a position of safety behind cover, keep the vehicle under surveillance and let the marked back up units arrive and assist with a safe way to handle the situation. If Collins believed that Webster was threatening him then Collins should have waited for back up and conducted a felony stop.

35. A "Felony Stop" refers to a high-risk traffic stop where the police officers believe the occupants of the vehicle are felons who are armed and/or dangerous. There are strict protocols to be followed when conducting such a high-risk traffic stop. Perhaps the most critical is that a police officer will not walk up to a vehicle in which he believes the occupants are armed and/or dangerous. The proper approach is to stay at the police vehicle while the officer orders the occupants out of the car in a safe manner. No minimally trained police officer following generally accepted police practices would have walked up to the vehicle where he/she believed the occupants were dangerous felons. That behavior is inconsistent with the way police officers are trained. Reasonably trained police officers know that they will be placing themselves in a dangerous situation if the occupants are armed or if the driver of the vehicle drives towards them while they are exposed on foot.

36. Trooper Collins continued to approach Webster in a reckless manner without considering established police practices and training. The trooper disregarded the tenets of police training for de-escalation, approaching a moving vehicle, the need for a safe reactionary gap and the requirement for taking proper cover when engaging a potentially dangerous suspect.

37. Cover will stop or deflect bullets. Usually cover incorporates concealment but its salient feature is it capacity for protecting an officer from hostile fire. Concealment refers to when an officer is not seen by a suspect. Concealment may be provided by natural or manmade objects such as bushes, trees, darkness, motor vehicles or anything that will hide the police officer's presence. Concealment will not stop bullets.

38. Trooper Collins had taken a position of cover behind his driver's door when he first stopped behind the truck driven by Webster. Collins left a position of cover and placed himself in the path of a moving vehicle which he believed was refusing to stop and attempting to flee; *"I'm coming around back of my car and walking up. I'm keeping plenty of distance at the same time. I'm remembering, you know, in training, distance is your friend. I'm not going to rush into it. There's a reason he's trying to run."* (NCSHP IA Statement). Collins acknowledged that he should maintain a safe distance from the moving vehicle but closes the distance and intentionally places himself in the path of the moving vehicle anyway.

39. Police officers are trained to approach a stopped vehicle from the rear so as not to expose the officer to an assault from the vehicle. Police officers should not approach a moving vehicle at all but especially not from the front. Trooper Collins ignored that training principle and walked straight at the front of the truck. Collins approached the front of the pick p truck with his firearm pointed at the truck. Collins took this approach because he feared that the truck would flee and he wanted to prevent a pursuit. (NCSHP IA Statement) *"So I make the decision to come from behind my car and approach his vehicle. I did not want to get back in my car and reposition my car and that's because I've got to lose contact with him. He can't see me no more. You know, maybe he thinks -- I don't want this to lead to a car chase on the highway and somebody get hurt."*

40. Considering NCSHP's criteria for engaging in a chase, if Collins believed that Webster was about to flee the scene, then the proper police procedure would have been for him to maintain a safe position behind cover and call in a description of the vehicle and its direction of travel, rather than placing himself or any bystander at the Minimart in danger by leaving cover and escalating the encounter. At that time, Collins had no reason to believe that Webster was a danger or threat to the public, who was willing to inflict serious injury on others. Collins had no reason to believe that Webster had committed any felony or serious misdemeanor

that involved violence or threats to persons or property. Webster was also identified within minutes of the encounter, as evidenced by 911 calls and Brunswick County Sheriff's Office radio traffic.

41. Trooper Collins deliberately placed himself in front of a moving vehicle which he believed might try to flee. His response to that was to continue to stand in front of the truck with his firearm pointed at the truck. In doing so, Collins violated accepted police practices and training by leaving cover, moving out of foot in front of a moving vehicle and threatening to shoot the driver as a way to stop a fleeing vehicle.

42. Trooper Collins was not only risking his own life by walking out in front of the moving vehicle but was threatening to use lethal force by shooting into the truck and risking the lives of the driver, Ms. McKeithen and innocent bystanders in the area. It should also be noted that at the time Trooper Collins was threatening to shoot into the truck, as far as he knew, Webster had only committed a traffic violation. Trooper Collins did not have any information that Webster was a danger to the public or possessed any deadly weapons.

43. As Trooper Collins continued to move towards the truck, he saw the passenger try to get out of the truck and he *"knew that there's something fixing to—this is bad."* (NCSHP IA Statement). Collins also acknowledged in his statement that there were innocent bystanders nearby. In fact, close enough so he could ask them to call 911.

44. In spite of the fact that he knew the situation was turning dangerous and there was an innocent passenger in the vehicle and innocent bystanders nearby, Collins decided he was going to move even closer to the truck and escalate the situation even further *"I'm going to stay as close as I can to that front fender on that truck and I'm going to slide down the side of it with my back and I'm going to pop his glass with my flashlight and I'm going to step back and, you know, that way I can see has he got a gun, has he got – what's he doing; you know, what's fixing to happen."* (NCSHP IA Statement)

45. Collins's lack of real planning resulted in him improperly approaching a moving vehicle from the front with the intent to walk up to the side of the vehicle which he believes may be trying to flee and smash out the window to see if he has a gun. That is contrary to accepted police practices, and no minimally competent police officer would attempt such an action. Police officers are trained to approach a stopped car from the rear unless it is a felony stop and then the officers would not approach the vehicle at all until the occupants had exited the vehicle. In addition, police officers are not trained to smash out the windows of a vehicle during a traffic stop for minor traffic violations, even if the subject of the stop attempts to flee.

46. Trooper Collins stated that he was going to back away after he smashed the window out of the truck and order the driver out of the truck. Collins referred to this as a *"Felony Stop Approach."* And stated his reason for that was "*because I had told him so many times to show me his hands. He would not comply to that."* (NCSHP IA Statement).

47. Collins's description of his plan to remove the driver from the truck was not consistent with generally accepted training for police officers conducting felony stops, and it was a violation of North Carolina State Highway Patrol "Officer Safety and Vehicle Stops" training that Collins received in 2018: "***Never*** *attempt to remove [a] motorist from vehicle alone.* ***Always*** *have at least two (2) officers on the scene.*"

48. Trooper Collins had many failures in the time leading up to the fatal shooting of Mr. Webster. Not only did he fail to de-escalate the situation, but he took many actions that exacerbated the situation. When police officers fail to take cover, they reduce their opportunities for de-escalation. The officers are more vulnerable and left with fewer options if the suspect becomes threatening. In this incident, the trooper would have been able to avoid the use of non-deadly and deadly force if he had stayed in a position of cover. The actions taken by the trooper made it more likely that this incident would end with deadly force.

49. It is my opinion that Trooper Collins failed to follow department policy and accepted police practices prior to use of the deadly force against Webster. In policing, there are protocols, procedures and training established that, if followed by the police, will lessen the danger involved in a given situation. However, police officers must follow those protocols. When they don't, it increases the chance of a shooting situation like this. Trooper Collins' failure to follow accepted police practices for de-escalation fostered an environment conducive to the use of deadly force by the trooper, and reflected a disregard for the safety of Webster, the passenger in Webster's car, and innocent bystanders.

50. Trooper Collins repeatedly violated department policies and nationally accepted police practices which created a situation more likely than not to lead to a police officer involved shooting.

**Opinion B: Based on the totality of the circumstances as shown in the materials available to me, Trooper Scott Collins failed to follow clearly established police training and accepted police practices when he used deadly force against Brandon Lovell Webster**

51. **IACP National Consensus on Use of Force-Discussion Paper p14**: *"Shots Discharged at Moving Vehicles. The use of firearms under such conditions often presents an unacceptable risk to innocent bystanders. Even if successfully disabled, the vehicle might continue under its own power or momentum for some distance thus creating another hazard. Moreover, should the driver be wounded or killed by shots fired, the vehicle might proceed out of control and could become a serious threat to officers and others in the area."*

52. **IACP National Consensus Policy on Use of Force (II) Policy**: *"It is the policy of this law enforcement agency to value and preserve human life. Officers shall use only the force that is objectively reasonable to effectively bring an incident under control, while protecting the safety of the officer and others. Officers shall use force only when no reasonably effective alternative appears to exist and shall use only the level of force which a reasonably prudent officer would use under the same or similar circumstances."*

53. **IACP National Consensus Policy on Use of Force (IV) D**: *"Use of Deadly Force 1. An officer is authorized to use deadly force when it is objectively reasonable under the totality of the circumstances. Use of deadly force is justified when one or both of the following apply a. to protect the officer or others from what is reasonably believed to be an immediate threat of deah or serious bodily injury b. to prevent the escape of a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit a felony involving serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to the officer or another if the subject is not immediately apprehended."*

54. **IACP National Consensus Policy on Use of Force III**: *"Objectively Reasonable: The determination that the necessity for using force and the level of force used is based upon the officer's evaluation of the situation in*

*light of the totality of the circumstances known to the officer at the time the force is used and upon what a reasonably prudent officer would use under the same or similar situations."*

55. **NCSHP Directive B.01 I**: *"Members shall use only that force which is reasonably necessary to effectively bring an incident under control while protecting the lives of the officer or another. Members shall use physical force in arrest and custody situations only in strict conformance with the United States Constitution, the Constitution and law of North Carolina, and this policy."*

56. **NCSHP Directive B.01 II**: *"Members shall use lethal force only in conformance with the Constitution and laws of North Carolina. **Imminent** shall be synonymous with the term immediate. General Statute § 15A-401(d) (2) states, in pertinent part: A law-enforcement officer is justified in using deadly physical force upon another person only when it is or appears to be reasonably necessary thereby: 1) To defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force. 2) To effect an arrest or to prevent the escape from custody of a person who he reasonably believes is attempting to escape by means of a deadly weapon, or who by his conduct or any other means indicates that he presents an imminent threat of death or serious physical injury to others unless apprehended without delay."*

57. **NCSHP Directive B.01 VI:** *"Members shall not fire at unarmed violators in a moving vehicle unless the member reasonably believes that the oncoming vehicle presents an imminent threat of death or serious physical harm to the member or third person, and no other means are available at that time to avoid or eliminate the danger. No member shall intentionally position him/herself into the path of a vehicle that is attempting to flee. Whenever possible, the affected members shall make a reasonable effort to get out of harm's way if a vehicle is moving toward him/her."*

58. **Police Executive Research Forum: 30 Guiding Principles on Use of Force:** Officers attempting to approach, pursue or stop a motor vehicle "*shall not unreasonably place themselves in a position where the threat of imminent danger of death or serious physical injury is created."*

59. Police officers are trained that not only might they receive civil and criminal penalties for using unreasonable force, but they could also receive departmental discipline. Therefore, the objectively reasonable standard has become the accepted police practice when a police department is evaluating an officer's use of force administratively as well as criminally. Since the policy requires that an officer meets that standard then any unreasonable use of force would be determined to be a violation of the department policy.

60. The reasonableness standard is an accepted police practice and recognized as such by most police organizations in the United States including the North Carolina State Highway Patrol. (NCSHP Directive B.01 I)

61. The International Association of Chiefs of Police (IACP) brings police chiefs together from all over the country to create Model Policies to guide local police agencies in police best practices. While police agencies are not obligated to follow these model policies, they do serve as generally accepted police practices. IACP formulated model policies on the use of force, referenced at the beginning of this section, which clearly delineate Objective Reasonableness as the standard for police use of force.

62. The officer's reasons for using force must be consistent with constitutional and statutory law, as well as agency policy and training guidelines.

63. Therefore, police officers are trained to understand the level of force that would be appropriate in response to a certain level of resistance.  This is often described as a response to resistance.

64. Police policies and training enforce the reasonableness standard and officers are expected to understand and follow the standard when considering the use of force. The question the officer asks himself should be do I need to use force?  And when using force, what amount of force is reasonably necessary under these circumstances?  Police officers are only supposed to use force when it is reasonable to do so under the circumstances facing them.

65. Police officers are only supposed to use the amount of force necessary to control a situation or to protect themselves or others from imminent harm. An officer's use of force must be proportional to the amount of resistance offered by the suspect.

66. The use of force must be proportional to the amount of resistance offered by the suspect.  To be proportional, the level of force applied must reflect the totality of circumstances surrounding the situation at hand, including the nature and immediacy of any threats posed to officers and others. Officers must rely on training, experience, and assessment of the situation to decide an appropriate level of force to be applied. Reasonable and sound judgment will dictate the force option to be employed. Proportional force does not require officers to use the same type or amount of force as the subject. The more immediate the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be proportional, objectively reasonable, and necessary to counter it.

67. Police officers are taught throughout the United States, including the State of North Carolina, that they may use deadly force to defend themselves against what they reasonably believe to be an immediate threat of death or serious bodily injury.

68. In his NCSHP IA Statement, Collins stated that *"when I got a few steps back, he nailed that truck." "And I shot. And I remember I shot twice and after that second shot, I'm standing there and I'm -- I'm moving at the same time trying to get away from this guy. The truck's next to me. I can see it right now. I can see it -- I remember a hole in the glass like that."*

69. Jones phone Video*: Collins is seen standing in front of the truck and moves closer to the truck as he says, "cut the car off". Webster is sitting in the truck and the truck is not moving. Collins then moved alongside the truck and closer to the driver's side door. That is when Webster's truck moved forward and stopped.

70. Jones Cell Phone Video 00:22: The video shows Collins standing and moving towards the front of Webster's truck with his firearm pointed at the truck. The truck moves forward slowly and Collins backs up but remains in front of the truck and yells "*stop, I'll shoot you god damn it, stop."* And the truck stops.

71. At 3:45 of the Mini Mart Video, Collins moved closer to the driver's door and the truck moved forward. Trooper Collins then backed up and stood at the driver's side front fender. Collins stated in his NCSHP IA Statement *"The driver accelerated the vehicle towards me as an aggressive threat not to approach him. At

*that time, I was in fear of being run over and killed. I began to walk backwards in an attempt to put distance between me and his vehicle and look for cover."* According to the Mini Mart video, Collins then again began to move towards the driver's door again when the truck moved forward and passed Trooper Collins who is standing off to the left of the pickup truck as Webster fled the parking lot. (3:45- 4:44)

72. At 4:23 of the Mini Mart Video*:* The truck moves forward and Trooper Collins appears to be to the left front fender of the truck as the truck passed him. According to Trooper Collins and all other evidence, this is when Trooper Collins fired his weapon twice striking the driver's side window striking Mr. Webster. Collins is several feet away from the left side of the truck when the truck clears Collins' position*.*

73. Police officers are trained and cautioned against shooting into moving vehicles. Police officers are expected to get out of the way of the vehicle if possible. It is well recognized that the fleeing vehicle is generally just trying to escape and not intentionally trying to hit any police officers. Here, Trooper Collins had previously positioned himself in front of the pickup truck. The truck stopped, avoiding hitting Collins. Collins had therefore had it confirmed that the truck was trying to flee, not cause him physical harm. At the time Trooper Collins fired his weapon, it should have been apparent that Webster did not pose an imminent threat of serious physical harm. Trooper Collins decision to fire into the truck was contrary to generally recognized police practices and SHP policies. Officers cannot kill a suspect just because the suspect is trying to evade a police stop.

74. It is also well known among the police community that shooting into moving vehicles presents a great deal of danger to anyone in the area for the reasons noted above*.*

75. Any minimally trained police officer should understand that they cannot kill a car and cannot stop a moving vehicle by shooting at the vehicle or the driver. If an officer shoots a driver, it is more likely that the driver will lose control of the car. In addition, there is as much chance that the driver will push down on the accelerator as let off the accelerator thereby causing more danger to the officers. Drivers will often attempt to elude the police officer who is firing a gun at him and cause his driving to become more dangerous and erratic.

76. It is also extremely dangerous to fire a bullet into the windshield of a moving vehicle. The curvature of the windshield can redirect the course of a bullet causing it to strike somewhere other than the intended target. In addition, the windshield can cause the bullet to splinter sending pieces of the bullet in all directions. As a result shooting into the windshield of a moving vehicle creates great danger not only for the driver but for everyone in the car. This is especially concerning when Trooper Collins said he knew there was an innocent occupant in the front passenger seat who was trying to surrender. (The passenger hadn't committed any crime or even any traffic offense). Firing into the car placed any innocent people in the vehicle in danger.

77. Trooper Collins's decision to fire his gun into the moving pickup truck was contrary to accepted police practices as well as NCSHP policies. NCSHP policies and nationally accepted police practices required Trooper Collins to stay out of the path of the moving vehicle and prohibited him from firing into a moving vehicle.

78. If Collins believed he was in danger, there were many alternatives that would have been far safer than firing into the moving truck, and that would have better protected his safety, Mr. Webster's safety, and

bystanders' safety. Collins could have walked off to the side, gotten behind the low fence to the left of the truck or taken cover behind his police car. The most appropriate action would have been to follow high risk traffic stop protocols once he saw the vehicle was likely to flee. These protocols would include Trooper Collins calling for a backup and staying in a cover position at his vehicle and ordering the occupants of the truck out of the vehicle. This would allow the trooper to stay at a safe position and out of harm's way if the truck tried to flee. Police officers are trained to understand that there is a great deal of dangers in trying to affect a traffic stop of a vehicle when the officer is on foot.

79. According to Trooper Collins and the physical evidence in this case, Trooper Collins fired his weapon into the driver's side window as the truck passed Collins. Collins NCSHP IA Statement *"I'm moving at the same time trying to get away from this guy. The truck's next to me. I can see it right now. I can see it -- I remember a hole in the glass like that."*

80. SBI Investigative Report: Crime Scene Search, Webster 00105: A hole was present on the exterior of the driver's side door near the driver's side mirror. Embedded within the driver's side door handle casing was an object consistent with a projectile, which was collected as Item #19. The driver's window was shattered.

81. Photo MMR 0289: Photo of pick-up truck's driver's side door with a defect in the door and shattered glass that is consistent with the crime scene narrative above.

82. It is almost never appropriate for a law enforcement officer to fire a gun into the side of a moving car. The testimony from Trooper Collins and the physical evidence indicates that the defect in the driver's side door was caused by Trooper Collins when he fired his weapon into the side of the moving truck. The Mini Mart Video would also seem to confirm that Collins was standing to the side of the truck when he fired his gun. Therefore, the use of deadly force by Trooper Collins would have been inconsistent with NCSHP policies and accepted police practices and training. Trooper Collins would not have been in danger from the truck once it started to pass by him and there would be no basis to believe that Webster was threatening to use deadly physical force against Collins. There is also no reason for Collins to believe that Webster would be an imminent threat of death or serious physical injury to others unless apprehended without delay. Trooper Collins believed that Webster committed a minor traffic infraction. He had no reason to believe that Webster committed a serious crime or was armed with a deadly weapon.

83. I have reviewed the collision reconstruction report prepared by the State Highway Patrol. If this reconstruction is accurate, it was inconsistent with accepted police practices and SHP policies for Collins to shoot Mr. Webster. I have reviewed portions of Bill Williams' reconstruction report showing Collins and Webster's relative positions at five different moments in time, identified as M1, M2, M3, M4, and M5. If this reconstruction is accurate, it was inconsistent with accepted police practices and SHP policies for Collins to shoot Mr. Webster.

84. Trooper Collins violated numerous NCSHP policies as well as nationally accepted police practices throughout this incident. The trooper never attempted to de-escalate the situation and in fact followed a course of action which aggravated the situation by standing in front of the truck with his gun drawn and threatening to shoot Mr. Webster. Collins knowingly placed himself in positions of potential danger and then used that as an excuse for employing deadly force. The trooper had the time and the ability to use

tactical disengagement as a force alternative and a way to protect everyone, Collins, Webster, McKeithen and innocent bystanders.

**Materials Considered:**

Scott Collins SBI Interview: Video (MVI_0001.MP4)

Scott Collins SBI Interview: Summary (SBI-SUBP. - 000265-268)

Scott Collins SHP IA Interview: Transcript (SHP Disc. - 000202-243)

Scott Collins SHP IA Interview: Audio (Trooper Scott A. Collins Interview.MP3)

SBI Interview: Lisa Evans: Video/Summary (SBI-SUBP. - 000293-294, Attachment #1148-16, MVI_0001.MP4)

Paul Jones SBI Interview video/Summary (SBI-SUBP. - 000159-162, Attachment #1187-5, 2019-00004 Jones, P (Wit).MP4)

Paul Jones SHP IA Interview Transcript/audio (SHP Disc. - 000244-261, Mr. Paul Richard Jones Jr. INTERVIEW.MP3

Lauren Williams SBI Interview video/summary (SBI-SUBP. - 000269-271, Attachment #1148-15, MVI_0001.MP4)

Whitney McKeithen SBI Interview video/Summary (SBI-SUBP. - 000155-157, Attachment #1148-03, RonaldHockett_201901020116_SOIntervie_82909621.mp4)

IACP National Consensus on Use of Force

Photographs of Mini Mart Parking Lot, patrol car and pickup truck (MMR_0005-19, 31-32, 35-40, 43-49, 51-64, 81-82, 89-90, 96, 98-100, 205-208, 264, 272, 276-285, 287, 290-296, 487-488, 567-579.JPG

In Service Training File (WEBSTER 000309-427)

Captain Moore Memo (SHP Disc. - 000643)

Captain Morton Memo (SHP Disc. - 000642)

Counseling Slip (SHP Disc. - 000644-645)

Brunswick County Sheriff's Office Reports (WEBSTER 000440-459)

Amended Complaint (Document 36 Filed 09/23/21)

NCSBI Investigative Report (WEBSTER 000001-262)

NCSHP Directive B.01 Use of Force (WEBSTER 000826-843)

NCSHP Directive B.02 Extraordinary patrol vehicle Operations (WEBSTER 000844-857)

NCSHP Directive B.03 Forced Vehicle Stops (WEBSTER 000858-865)

NCSHP Directive B.04 Treatment of Persons In and Out of Custody (WEBSTER 000866-878)

NCSHP Directive I.01 Citation and Arrest Enforcement Regulations (WEBSTER 001127-1136)

NCSHP Directive J.05 Use of Patrol Video Recording Devices and Still Photography Cameras (WEBSTER 001225-1237)

NCSHP Directive K.01 Selective Traffic Enforcement (WEBSTER 001264-1265)

NCSHP Directive K.02 Patrol Methodology and Traffic Supervision (WEBSTER 001266-1270)

Training Documents (SHP Disc. - 000548-639, WEBSTER 000268-271)

Mini Mart Security Video (20450500.avi)

Jones Cell Phone Video (2019-00004 Jones, P Phone Video.mp4)

Collins Written Statement Report (SHP-SUBP. - 000362)

NCSHP Supervisor Notification and Report of Investigation (SHP-SUBP. - 000199-218)

Expert Report of Bill Williams, not including appendices
IACP National Consensus Policy On The Use Of Force 2017
IACP National Consensus on Use of Force-Discussion Paper p14
Street Survival II by Charles Remsberg


**Expert Witness Testimony for the Past Four Years:**

Perez v. Collier County (plaintiff)
United States District Court
Middle District of Florida
Case No.: 2:15-cv-238-FTM-CM
Use of force/Taser/Flashlight
Testified in deposition

Doel Santiago v. City of New Haven (plaintiff)
Superior Court at New Haven, Ct.
Case No.: NNH-CV-13-6037147-S
Use of Force
Testified in deposition

Parnoff v. Aquarion Company et Al. (plaintiff)
Superior Court, Bridgeport, Ct.
Case No.: CV14-6045191-S
Criminal Investigations/Arrest Procedures
Testified in deposition

Secic v. City of St. Louis (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit (St. Louis City)
Case No: 1522-cc-00228
Vehicular Pursuit
Testified in Trial

Lowrie v. General Motors et al. (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit, St. Louis, Mo.
Case No: 1422-CC08909
Traffic management/control

Michael Ray West v. Bartow County, Georgia et al. (plaintiff)
United States District Court

Northern District of Georgia
Case No: 15-CV-00168
Use of Force (Taser)
Testified in deposition

Ray v. Markley, Cain & Washington City (Plaintiff)
United States District Court
Western District of Pennsylvania
Pittsburgh, Pa.
Case No.: CV-13-1483-DSC
Use of Force /handcuffing
Testified in trial

Myers v. City of Haleyville et al (plaintiff)
Circuit Court of Marion County, Alabama
Case No.: 49-CV-2015-9000152
Emergency vehicle operation
Testified in deposition
James v City of Chicago (plaintiff)
United States District Court
Northern District of Illinois
Eastern Division
Case No.:14 CV 7955
Use of Force
Testified in deposition

Capasso, et al. v. City of Westlake, Ohio et Al. (plaintiff)
United States District Court
Northern District of Ohio, Eastern Division
Case No.: 1:16-cv-01753
Vehicular Pursuit/Stop Sticks
Testified in deposition

Janice Wilson v. City of New Haven et Al. (plaintiff)
Judicial District of New Haven
New Haven Connecticut
Case No: CV10-6010876-S
Narcotics Investigation/Fail to provide medical aid
Testified in deposition

Otha Johnson v Daytona Beach (defense)

United States District Court
Middle District of Florida, Orlando Division
Case no.: 6:16-cv-9410Orl-40-TBS
Use of force /Temporary Detentions//Arrest
Testified in deposition

BethAnne Thomas v. City of Blue Island et Al. (plaintiff)
United States District Court
Northern District of Illinois
Case No.: 14-cv-11183
Criminal investigation/internal affairs
Testified in deposition

David Shearon v. Womack et Al. (defense)
United States District Court, Middle District of Tennessee
Nashville Division
Case No.: 3:15-cv-01061
Internal affairs/Supervision
Testified in deposition

James v City of Chicago (plaintiff)
United States District Court
Northern District of Illinois
Eastern Division
Case No.:14 CV 7955
Use of Force
Testified in trial

David Potter v. City of Dothan (plaintiff)
United States District Court
Northern District of Alabama, Southern Division
Case No.: CV-1:16CV-749-CSC
Use of Force
Testified in deposition

Andrew Aragon v. City of Espanola et Al. (plaintiff)
First Judicial District, Rio Arriba, New Mexico
Case No.: D-117-CV-2016-00147
Use of Force (Taser)
Testified in deposition

Myers v. City of Haleyville et al (plaintiff)
Circuit Court of Marion County, Alabama
Case No.: 49-CV-2015-9000152
Emergency vehicle operation
Testified in trial


Julian Ray Betton v. Bill Knowles et al (plaintiff)
Case No.: 4:15-cv-04638-RBH-KDW
United States District Court
District of South Carolina
Florence Division
Officer Involved Shooting/Search Warrant Execution
Testified in deposition


McGowan v. County of Kern (plaintiff)
Case No.: 1:15-CV-01365-DAD-SKO
United States District Court
Eastern District of California
Emergency driving
Testified in deposition


Nelson v. Brevard County Sheriff's Office (plaintiff)
Case No: 05-2013-CA-038400
Eighteenth Judicial Circuit, Brevard County
Narcotics investigation/Search Warrants
Testified in deposition


Chelsey Marie Browder V. Greenville County Sheriff's Office, et al.  (defense)
Case No: 6:16-cv-02493-HMH-JDA
United States District Court
District of South Carolina
Officer Involved Shooting/Failure to supervise/train
Testified in deposition


Byron Jordan v. Iverson Mall (plaintiff)
Case No.: 8:14-cv-00037-RWT
United States District Court
District of Maryland
Use of force/Taser
Testified in trial

Childress v. North Charleston Police Department (plaintiff)
Case No.: 2017-CP10-1119
State of South Carolina
County of Charleston
Temporary detention/use of force
Testified in deposition


LeGrier v Chicago (plaintiff)
Case No.: 15-L 12964
Circuit Court of Cook County
Cook County, Illinois
Testified in deposition
OIS/Use of Force


Estate of Fritz Severe v. City of Miami (plaintiff)
Case No.: 17-cv-22153-DPG
United States District Court
Southern District of Florida
OIS/Use of Force
Testified in deposition


Ortega v. Pierce County (plaintiff)
Case N.: 17-2-11836-8
Superior Court of the State of Washington
Pierce County, Washington
Domestic Violence/Criminal Investigation
Testified in deposition


Joseph v. Bartlett, et al. (plaintiff)
Case No.: 17-cv-5051
United States District Court
Eastern District of Louisiana
Use of Force/Taser/Medical Care
Testified in deposition


Lweh Htoo (plaintiff)
Case No.: HHD-CV17-6079945-S
Superior Court, Hartford, Ct.
Vehicle Pursuit
Testified in deposition

Annas v. Pierce County (plaintiff)
Case No.: 18-2-07321-4
Superior Court of the State of Washington
County of Pierce
Domestic Violence/Criminal Investigation
Testified in deposition
Prosper v. Martin (plaintiff)
Case No.: 17-20323-CIV-Altonaga/Sullivan
United States District Court
Southern District of Florida
Officer Involved Shooting
Testified in deposition

Moreno v. Meriden Police Department (plaintiff)
Case No.:27943.001
Holding Cell Procedures
Holding Cell Procedures
Testified in deposition

Amanda Hoskins v. Knox County et al. (plaintiff)
Case No.: 17-cv-84
United States District Court
District of East Kentucky
Criminal Investigation
Testified in deposition

Evans v. Melara (plaintiff)
Case No.: 439733V
Circuit Court for Montgomery County, Maryland
Emergency Driving Operation
Testified in trial

Pendry, Adm. of the Estate of Anthony Hufford v. City of Troy P.D et al. (Plaintiff)
Case No.: 2018-cv-01676
Common Pleas Court
Montgomery County, Ohio
Vehicular Pursuit
Testified in deposition

Howard v. City of Durham (Plaintiff)
Case No.: 1:17-cv-477

United States District Court
Middle District of North Carolina
Criminal Investigation
Testified in deposition

Holmes v Hernandez et al (Plaintiff)
Case No.: 14CV8536
United States District Court
Northern District of Illinois
Eastern Division
Officer Involved Shooting
Testified in deposition

Ann Tracy DeLeo v Ryan Houk et al. (Plaintiff)
Case No.: 5:19CV00027-RH-MJF
United States District Court
Northern District of Florida
Use of Force
Testified in deposition

James B. Griffin as Personal representative of James Olvey, Deceased v.
Donald Hornsby Wright II et al. (Plaintiff)
Case No.: CV-2018-903480
Circuit Court of Jefferson County, Alabama
Birmingham Division
Vehicular Pursuit
Testified in deposition

Peralta v. State of Arizona (Plaintiff)
Case No.: CV-17-01868-PHX-DJH (BSB)
United States District Court
District of Arizona
Holding cell/police procedures
Testified in Trial

Beltran v. City of Tacoma (Plaintiff)
Case No.:15-2-11618-1
Superior Court of the State of Washington
County of Pierce
Officer Involved Shooting
Testified in deposition

DeGraw v. Pinellas County Sheriff's Office (Plaintiff)
Case No.: 8:18-cv-02116-WFJ-SPF
United States District Court
Middle District of Florida
Use of Force, Taser
Testified in deposition

William Anderson v. Knox County et Al. (Plaintiff)
Case No.: 17-cv-133
United States District Court
Eastern District of Kentucky
Criminal Investigation
Testified in deposition

Johnnie Williams v. Strickland (Plaintiff)
Case No.: 9:15-cv-01118-DCN
United States District Court
District of South Carolina
Officer Involved Shooting
Testified in deposition

Miller v Montgomery County (Plaintiff)
Case No.: 18-CV-619
United States District Court
Eastern District of Kentucky
Criminal Investigation
Testified in deposition

Hall v. City of Atlanta (defense)
Case No.: 1:18-cv-04710-ELR
United States District Court
Northern District of Georgia
Atlanta Division
Admin/IA investigation
Testified in deposition

Howard v. City of Durham (Plaintiff)
Case No.: 1:17-cv-477
United States District Court
Middle District of North Carolina

Criminal Investigation

Testified in trial

**Publications:**

Dig Deeper to Address Officer Involved Shootings: Orlando Sentinel, 5/26/13

Police Leaders Must Walk the Walk, Pursuit Driving: Orlando Sentinel, 2/19/12

Save Community Policing: Orlando Sentinel, 5/25/11

State Cracks Down on Unlicensed Activity, Orlando Sentinel, 3/18/09

The Threat Abatement Group, Police and Security News, 11/95

**Compensation:**

My fees for this case are $225.00 per hour to review and analyze relevant material and $325.00 per hour to testify in depositions or trial in the State of Florida and $2,500.00 per day plus expenses to testify in deposition or trial out of the State of Florida.

Submitted by:

**Charles W. Drago**

**Charles (Chuck) Drago**
**Police Practices Consulting & Litigation Support**

*Drago Professional Consultants LLC*
*P.O. Box 623511*
*Oviedo, Florida 32762-3511 407-473-8033*
*www.dragoconsultants.com*

Chuck Drago is a highly decorated, career law enforcement officer who advanced through the ranks of the police department with an exemplary record. Recognized for integrity and leadership, he was appointed as assistant police chief, police chief, Deputy Chief of Staff and senior law enforcement advisor to the Governor of Florida.

As a senior leader of major law enforcement agencies and a member of the department's review boards; he has investigated hundreds of police misconduct allegations in all areas including officer involved shootings, use of force/Taser/pepper spray/firearms, k-9, police pursuits, and traffic stops. He has broad-based experience in high liability areas including the management and development of polices and procedures in those areas. He developed a county-wide policy for the use of Tasers as well as a management accountability system for Taser Use.

He has developed a wide range of experience in police vehicular pursuits and emergency vehicle operation as a police officer, supervisor and senior manager. As such, he has developed police pursuit policies and management pursuit review procedures. As a member of a county wide policy committee, he co-authored a pursuit model policy for the entire county. He has firsthand experience with police pursuits and emergency vehicle operation as a police officer, a supervisor managing police pursuits and as an administrator responsible for evaluating police pursuits. In addition, he has received extensive training in vehicular pursuits, stop sticks and emergency driving.

As a police supervisor, he managed canine police units which involved every type of dog utilized by local police agencies including apprehension, tracking, bomb and narcotics. In doing so, he was responsible for ensuring that the canine officers followed department policies and procedures for the training and use of the trained canines. In addition, as Assistant Chief and as Chief of Police, he reviewed all canine bites for the police department to ensure that they complied with the law as well as department use of force policies. He participated in canine trainings and participated in and approved of the selection and purchasing of canines for the police department.

During his career, he has attained a significant amount of experience in police officer involved shootings as a police officer in the field as well as a line supervisor and detective supervisor who investigated police officer involved shootings. As a police executive, he has also developed use of force policies and evaluated trends and individual cases.

In addition, he has consulted on numerous officer involved shooting cases and provided guidance on police tactics, procedures and methods of investigation before, during and after officer involved shootings and in custody deaths. As a consultant, he has been called upon to provide direction as to the effects on an officer after he has been involved in a shooting. His opinions have been sought by the media, government and law firms in high profile officer involved shootings all over the country. Government agencies have utilized his expertise in matters such as police policies; use of force, biased based policing, employee misconduct, vehicular pursuits and training.

His experience as a criminal investigator included service in the Organized Crime Division, Vice, Narcotics, Fraud, Domestic Violence, and Homicide. He was involved in these criminal investigations at various levels to include detective, homicide detective sergeant, forensics unit supervisor, and Commander of the Criminal Investigations Division. He conducted long term, complex organized crime investigations which in some cases involved the highest levels of organized crime syndicates. In addition, he was responsible for overseeing hundreds of death investigations including homicide, aggravated battery, sexual assault, officer involved shootings, suicide, and accidental deaths. As an experienced criminal investigator, he engaged in numerous interviews/interrogations as a part of criminal investigations.

As an investigator, he served many years in drug and vice units and personally handled numerous confidential informants. In addition, he served as the supervisor of a drug unit and supervised detectives in their use of countless informants. In both of these functions, he vetted informants, signed up informants, managed informants, terminated informants, and investigated numerous criminal cases with the assistance of informants

An experienced frontline law enforcement officer who was directly or indirectly involved in thousands of arrests, his experience includes service in various capacities with direct hands on involvement and /or supervision in areas such as patrol, narcotics, vice, SWAT, k-9, street crimes, criminal investigations, training and homicide.

As a Florida Certified Police Instructor, he has trained thousands of police officers from all over the country in use of force, tactics and force techniques in undercover operations, search warrant techniques, stalking, narcotics investigation, patrol procedures, workplace violence, community policing and criminal investigation. In his role as a senior manager, he was directly responsible for the practices and procedures relating to the use of holding cell facilities. In addition, the City of Ft. Lauderdale was the only city in the State of Florida with a fully residential corrections facility.

As the sole narcotics instructor for the Broward County Police Academy, he taught narcotics investigations and managing confidential informants to recruits as well as to seasoned police officers.

He has been a guest lecturer at colleges and universities on strategies for reducing officer involved shootings, biased based policing, the role of a police chief, community policing, use of force, ethics and current trends in policing.

Over 35 years experience of frontline law enforcement has provided expertise in the following:

Police Practices and Training              Police Organization and Management
Use of Force                                          Taser/Less Lethal Weapons
Vehicle Pursuits                                     Officer Involved Shootings
Narcotics Investigations                          Criminal Investigations

## PROFESSIONAL EXPERIENCE

**Drago Professional Consultants, LLC: 2011-Present**
Following a successful career as law enforcement professional, now a police practices consultant for attorneys, government agencies and the media. He provides police practices consulting and expert witness testimony for both plaintiff and defense attorneys. He has served as an expert witness in State and Federal Courts in matters involving use of force, k-9, use of Taser, vehicular pursuit, domestic violence, officer involved shootings, criminal investigations, homicide investigations, narcotics investigations, racially biased policing, confidential informants, investigative detentions, training, supervision, internal affairs, security, police hiring procedures and police policies.

**Certified Reserve Deputy Sheriff with Broward County Sheriff's Office: October 2013-October 2015**

**Certified Reserve Police Officer with Florida Department of Law Enforcement, Capitol Police: January 2011-October 2012**

**State of Florida: January 2007 - January 2011**
Deputy Chief of Staff to Governor Charlie Crist: November 2009 - January 2011
Member of Governor Crist's senior executive management team with responsibility for over 100,000 employees and a $70 billion budget. Senior advisor to the Governor on law enforcement and business regulation with direct oversight responsibilities for all of the primary statewide law enforcement agencies.

**Florida Department of Business and Professional Regulation: Jan 2007 - Nov 2009**
Secretary/CEO: February 2008 - November 2009
Deputy Secretary: January 2007 - February 2008
The Secretary is a constitutional officer appointed by the Governor and confirmed by the Florida Senate. This statewide agency is the primary business regulatory agency charged with licensing and regulating approximately one million Floridians. The agency consists of 2000 employees including 200 law enforcement agents and a budget of 150 million dollars.

**Oviedo Police Department: March 2004 - January 2007**
*Chief of Police*

Oviedo is a fast-growing mid-size city located within the Orlando Metropolitan Area. During this period, crime was reduced to its lowest levels in at least 10 years in spite of a rise in crime in the metro area. Changes were initiated in polices and procedures that resulted in dramatic reductions in vehicle pursuits and taser deployments. As the Chief of Police, he held sole responsibility for the review/investigation of all use of force, police pursuits and other allegations of misconduct. Chuck was a founding member of a county wide policy committee which developed model policies for taser procedures and police pursuits. Chuck's familiarity with policies and procedures helped guide the agency through the rigorous reaccreditation process with the Commission on Law Enforcement Accreditation.

**Fort Lauderdale Police Department: 1975-2004**
Resort city of nearly 200,000 full time residents which is located in the Miami-Ft. Lauderdale Metropolitan area which has a population of nearly 6 million. Chuck advanced through the ranks and served as a police officer, field training officer, detective, sergeant, detective sergeant, captain, major, and assistant chief with 18 of those years as a commanding officer. His career includes significant experience in crime prevention and security analysis for government and businesses as well as the investigation of police officer involved shootings. Chief Drago also participated in, planned and/or supervised dozens of SWAT situations and over 900 search warrant executions.

*Assistant Chief of Police: 2001-2004*
Oversight for the efficient delivery of primary police services throughout the City on 24-hour, 7-day basis. Directly assisted and relieved the Chief of Police in planning, directing, and coordinating the administration, operation and service functions of the department. Responsible for findings and final recommendations of discipline on all allegations of misconduct. Security responsibilities for major events in the city including spring break, air and sea show, Superbowl activities and others. Instituted the COMP Stat process and instituted hundreds of crime prevention techniques. Developed an original proactive program for reducing citizen complaints, created new pepper spray policy and new review process for k-9 apprehensions. In addition, he served on the hiring committee and participated in the hiring of all Ft. Lauderdale police officers.

*Police Major: 1998-2001*
Oversight for the 24-hour/7-day week delivery of police services in a Patrol District comprising approximately 70,000 residents. Also served as the Commander of the department's Community Support Division, which coordinated all community policing activity. Command responsibility for patrol, k-9, crime prevention, community policing, traffic, mounted, school resource officers and marine patrol. Personally directed the oversight team for the Florida Attorney General's Convenience Store Security Act.

*Police Captain: 1993-1998*
1995-1998: Commander of a Patrol Shift and the Field Training Officers Program.
1993-1995: Direct oversight and responsibility for the Criminal Investigations Division, which contained 10 investigative units.

***Police Sergeant: 1987-1993***
Supervised a patrol shift, countywide drug enforcement unit, the homicide unit, technical Investigations and street narcotics unit.

**Detective/undercover: Vice/Metropolitan Organized Crime Unit: 1982-1987**.
Member of Local, State and Federal Task Force. Lead Detective in Organized Crime investigation of large Philadelphia Crime family resulting in conviction of the head of the family.

***Police Officer: 1975-1987***
Served the City of Fort Lauderdale as a certified Police Officer and tactical/SWAT officer. Member of highly trained street crimes felony unit.

Field Training Officer: Selected and trained to train new police officers after completion of basic academy.


**SELECT ACCOMPLISHMENTS**
1989: Co-founder and supervisor of the countywide Operation CRADLE Anti-Drug Street Crime Program
1990: Developed and managed two successful crime reduction studies
1995: Created the Threat Abatement Group (Stalking Prevention and Investigation)
1996: Developed the FLPD Field Training Officers Program
1997: Co-authored the City of Fort Lauderdale Workplace Violence Policy
2001: Co-authored new pepper spray policy
2005: Co-founded Countywide Model Policy Taser Task Force
2006: Co-founded Countywide Model Policy Police Pursuit Task Force
2008: Appointed to Florida Legislative Narcotics Paraphernalia Statewide Task Force
Managed three re-accreditation of three law enforcement agencies

**MAJOR AWARDS**
Fort Lauderdale Police Department Officer of the Year: 1989
State of Florida Fraternal Order of Police Officer of the Year Nominee: 1989
40 Departmental and Public Commendations

**EDUCATION**
**Bachelor of Arts Degree, Administration of Justice: 1979**
St. Thomas University, Miami, Florida
**Associates Degree, Criminal Justice: 1975**
State University of New York, Farmingdale, New York
**Command Officers Development Course (400 hours) Graduated 1995**
Southern Police Institute, University of Louisville, Kentucky
**Florida Police Officer Certification: Graduated 1975**
***Broward County Institute of Criminal Justice***

**FORMER CERTIFIED POLICE INSTRUCTOR/TRAINER– FDLE/Florida Commission on Standards and Training**
**Trained thousands of Police Officers and civilians in the following areas:**
Keynote Speaker; Human Security Conference (Officer Involved Shootings) presented by: California University of Pennsylvania and NAACP.
Speaker/Panelist; Dr. King Forum; Police Shootings/Orlando, Florida
Recurring Guest Instructor for Criminal Justice Degree Program in Police Practices and Procedures at Valencia College on Managing Use of Force, Police Discretion, Ethics, hiring police officers and The Role of a Police Chief
Guest Instructor at Seminole State College for State and Local Government
Sole Narcotics Instructor for Broward County Police Academy and Corrections Academy
Stalking Investigations
Domestic Violence
Workplace Violence
Narcotic Investigations and Drug Identification
Search Warrants
High Risk Entries
Patrol Response to Street Narcotics
Use of Force
Street Narcotics Enforcement Instructor for the Key West Police Department
Field Training Officer
Commander of the Field Training Officer Program
Avoiding Police Vehicular Pursuits

**PROFESSIONAL AFFILIATIONS**
International Association of Chiefs of Police, Member
National Alliance on Mental Illness (NAMI)
National Tactical Officers Association
Florida Police Chiefs Association (Past Member)
Fraternal Order of Police, Member, Past Board Member
Ft. Lauderdale Retirees Association
Broward County Police Chiefs Association (Past Member)
Seminole County Police Chiefs Association (Past Member)
Women in Distress (Past Board Member)

**INTERNATIONALLY RECOGNIZED POLICE PRACTICES EXPERT/RECENT MEDIA INTERVIEWS**
11/25/20: WKMG TV Interview regarding Officer Involved Shooting in Brevard County
07/03/20: WFTV TV Interview regarding police reforms
06/23/20: WFTV Interview regarding hiring police officers with history of misconduct
06/17/20: Live WIOD Radio interview regarding Police Department reforms
06/29/20: CBC Interview regarding proper procedures for civil disturbance in Minn.
02/29/20: WFTV TV Interview regarding George Floyd case in Minneapolis
02/10/20: WFTV TV interview regarding police misconduct

06/10/19: WFTV TV interview on the proper procedures for Homicide Investigation
05/08/19: Sun Sentinel interview regarding use of force video in Broward County, Fl.
05/07/19: WFTV TV Interview regarding proper procedures for vehicular pursuits
11/15/18: WFTV Live TV interview regarding training for shooting through a windshield
08/10/18: WWL, New Orleans live radio interview regarding lethal force procedures
08/05/18: Washington Post interview regarding officer involved shootings
05/17/18: WFTV TV interview to explain process after officer involved shootings
09/28/16: WFTV interview re: training needed to reduce officer involved shootings
08/17/16: Sun Sentinel interview regarding police procedures for vehicular pursuits
08/11/16: Business Insider interview requesting opinions on DOJ report on Baltimore
08/10/16: AP interview regarding officer involved shooting in Los Angeles
07/21/16: AP interview regarding officer involved shooting in North Miami
07/07/16: Business Insider interview regarding Minnesota officer involved shooting
06/15/16: WFTV interview regarding investigative practices in Orlando mass shooting
10/21/15: Yahoo News interview pertaining to a shooting by a plainclothes officer
08/21/15: Associated Press interview regarding suspects shot in the back
04/08/15: Washington Post interview regarding use of deadly force in South Carolina
12/04/14: Guest on MSNBC Ed Show regarding N.Y. Police Officer /choke hold

**PROFESSIONAL COURSES/SEMINARS ATTENDED**
The Science of Violence: Considerations in Use of Force Investigations IACP 10/22/20
Police Response to the Armed and Suicidal, IACP Conference 10/22/20
Critical Mind Set & Coordinated Response Training, IACP Conference 10/22/20
Increase Your Response Options to Suicide Subjects, IACP Conference 10/21/20
OD Homicide Investigation and Prosecuting Drug Overdoses, IACP Conference 10/21/20
When is Objectively Reasonable, Unreasonable, IACP Conference 10/21/20
Public Communication for Large Events, IACP Conference 10/21/20
Duty to Intercede Training: Conceptual, Cultural, and Legal Aspects, Lexipol 7/7/20
Firearms State Police Qualification; Oviedo Police Department 2/20
Arrest-Related Deaths: Managing Your Medical Examiner, Lexipol 6/20/19
Police Liability: Recent Developments under Section 1983, Justice Clearinghouse 2/7/19
Firearms State Police Qualification; Oviedo Police Department 4/19
Introduction to the Inductive Interview System, Justice Clearinghouse 2/5/19
Domestic Violence, Florida Department of Law Enforcement: 7/18/18
Police Use of Force in Today's World, Miami-Dade Police Department: 6/25-6/26/2017:
First Amendment Rights vs. Officer Safety; Science Behind Positional Asphyxia Death;
Excited Delirium and Arrest Related Death; Prone Positional Deaths, Designer Drugs,
Policies and Procedures; Wheelchair Users; Basics of CEWs and Investigating Arrest
Related Deaths; Safer Restraint Considerations of Agitated Subjects; CEWs and Cardiac
Arrest; Body Worn Camera Issues, Following TASER Science, Medical Examiner
Significant Errors.
One Breath: The Importance of Recognizing Agonal & Other Breathing Problems IPICD
12/28/16
Constitutional Considerations, FDLE 7/10/16
Firearms Training/qualification, Oviedo Fl. Police Department 5/4/16
Legal and Practical Issues of Handling Informants 9/8/15

National Alliance on Mental Illness (NAMI) Mental Illness Training 3/15-5/15
FDLE Physiological Response Dynamics Training: 2/24/15
Use and Control of Informants, FDLE: 02/06/15
Project Safe Neighborhoods Characteristics of Armed Persons, IACP/DOJ: 10/25/14
Use of Force/Less Lethal Weapons/Taser, Broward County Sheriff's Office: 11/5/13
Firearms training/qualification, Broward County Sheriff's Office: 11/5/13
Domestic Violence, Florida Department of Law Enforcement: 8/14/13
Juvenile Sexual Offenders, FDLE: 8/14/13
Discriminatory Profiling and Professional Traffic Stops, FDLE: 8/14/13
Police Liability/Use of Force, Lorman Education Services: 7/17/13
Firearms Qualification, Oviedo Police Department: 6/13
Management, Oversight, and Monitoring Use of Force (AELE): 4/2 & 4/4/13
Electronic Control Weapons Tactics and Training (AELE): 4/3/13
Post-Incident Electronic Control Weapon Forensic Analysis
Office of Attorney General/Florida Crime Prevention Training Institute: Crime
Prevention Commercial Applications: 12/12/11-12/16/11
SEAK National Expert Witness Conference: 4/15, 16/11
FDLE Elder Abuse: 1/29/11
FDLE Ethics Training: 6/2/09
FDLE Ethics Training Module 2, 3, 4: 6/3/09
FDLE Domestic Violence: 5/20/09
FDLE Juvenile Sexual Offenders: 5/26/09
FDLE Discriminatory Profiling and Professional Traffic Stops: 5/26/09
Scenario Based Use of Force: 6/10/09
Firearms Qualification: 6/10/09
FPCA Law Enforcement Bill of Rights: 1/8/06
Public Safety Technology: 1/8/06
Legislative Process: 1/8/06
Change Management: 3/8/06
Oviedo Disaster Preparedness: 7/06
Oviedo Use of Force: 7/06
FPCA Understanding Islamist Militant Terrorism: 6/29/06
FSA In-Custody Sudden Death: 6/1/06
Oviedo Executive Training: 2005
Oviedo Firearms Training and Qualifications: 8/05
Oviedo Use of Force/Taser Training: 8/05
Executive Look at Coaching and Managing Discipline and Discharge: 9/14/05
Oviedo Executive Training, Policies, Taser, Police Pursuits: 2005
Oviedo EOC Training: 6/05
FPCA Preparing for Media Relations, Public Safety Technology: 2/9/05
Executive summary of "The 7 Habits for Highly Effective Law Enforcement": 3/16/05
Search Warrant Legal Updates: 4/04
ICMA Scenario Planning: 3/23/04
Oviedo Use of Force/policy/Taser Training: 3/04
Oviedo Blood borne Pathogens: 5/04
Oviedo Diversity Training: 6/04

Oviedo Firearms Training and Qualifications: 3/04
Oviedo Firearms Training and Qualifications: 11/04
FPCA Risk Management Leadership, Fatal Police Shootings, In Harm's Way: 6/26/05
Assistant Emergency Management Director Training: 6/10/05
Oviedo Supervisor Diversity Training: 6/04
FPCA "What Do They Say When They See You Coming": 6/27/04
SCC Personal Protection Equipment Fit Training: 10/20/04
Professional traffic stops, domestic violence, juvenile sex offenses: 12/03
FDLE FCIC Certification: 4/29/02
DOJ WMD Incident Management/Unified Command: 12/02
FDLE Incident Command Center: 11/01
FLPD Professional Traffic Stops: 10/01
National Emergency Response and Rescue Training Domestic Preparedness Program: 12/14/01
Florida Regional Community Policing Institute, Introduction to Community Policing: 8/2000
FLPD Human Diversity: 11/99
St. Petersburg College, The Managerial Buy-In: Strategic Analysis of Police Strategies: 3/99
FLPD Domestic Violence: 7/98
FLPD Juvenile Sexual Offender Investigations: 7/98
FLPD Emergency Vehicle Operations: 4/98
Mental Health Association Domestic Violence: 10/97
FLPD Gender Bias in the Workplace: 9/97
Mental Health Assoc. of Broward, Domestic Violence, Breaking the Cycle: 10/96
IPTM Administration and Management of the Field Training Officer Program: 3/96
University Of Louisville, Southern Police Institute: 1995
Governor Chiles' Task force on Domestic Violence, "The Epidemic of a Crime, Acting to End Domestic Violence": 10/95
Women in Distress, Domestic Violence and Substance Abuse Training: 9/95
Association of Threat Management Professionals, Threat Management Conference: 8/95
Broward Community College, Human Diversity Concepts: 2/95
Miami-Dade Community College, Investigating Unusual Deaths: 12/94
State Attorney, 17th circuit, Domestic Violence
Women in Distress, Enforcement of Injunctions and Stalking Investigations: 6/94
Specialized Training Services, The Psychopathic Personality: 2/94
Specialized Training Services, Assessment of Violence Potential: 2/94
BSO, The Law and Electronic Surveillance: 2/93
Broward Community College, Developing and Maintaining a Sound Organization: 12/93
Women in Distress, The National Domestic Violence Awareness Workshop: 10/93
National Intelligence Academy, Advanced Surveillance Operations: 3/93
M3 Media, Technology for the 90s: 3/93
SAGE Less than Lethal Training: 1993
Train the Trainer Program: 3/92
FDLE Professional Law Enforcement Trainer's Course: 6/92
The Rights of Police Officers: 11/92

ATF Undercover Investigative Techniques: 2/91
National Emergency Response & Rescue Training Center, Domestic Preparedness: 12/91
F.B.I. Hostage Rescue Team: Hostage and Entry Team training: 1991
FLPD Skills Refresher: 11/91
The Metropolitan Police Institute, Spontaneous Knife Defense: 11/91
DEA Cannabis Detection and Eradication: 4/91
FDLE Cannabis Indoor Grow Investigations: 4/91
Broward Community College "Chasing the Dragon": 4/91
Career Track "Leadership of Attila the Hun": 11/90
Broward Community College, Effective Presentation for Instructors: 8/90
Keyes' Supervising under Pressure: 8/90
FLPD Room Entry Techniques/Noise /flash diversionary device: 5/90
Broward Community College Instructor Techniques: 1/90
FLPD Handgun Retention: 12/89
Broward Community College Designer Drugs: 1/89
Broward Sheriff's Office Vice Narcotics Intelligence Commander: 10/89
FDLE, Vice, Intelligence, Narcotics Commander: 10/89
FDLE Auto Pistol: 10/89
BSO, Crack Enforcement Training: 9/89
GML Seminars Auto Pistol 2: 8/89
Broward Community College, Assessment Center Training: 6/89
Broward Community College, Auto Pistol: 4/89
Broward Community College Computer Applications in Criminal Justice: 11/88
Broward Community College Crack Cocaine: 10/88
FLPD Tough Communications for Tough Situations: 11/88
Broward Community College Models for Management: 5/88
FLPD Control and Constraint: 2/88
Broward Child Abuse Committee Multidisciplinary Training Program: 11/87
The Police Supervisory Seminar: 8/87
FLPD Interpersonal Communications I: 7/87
International Conference on Canadian Racketeering: 08/85
FBI Gambling Technology: 3/84
IRS Financial Investigative Techniques 9/83
Broward Community College Organized Crime for Law Enforcement Officers: 6/83
Broward Community College Officer Stress Awareness: 11/81
FLPD SWAT Training: 1981
Homicide Investigation: 9/81
National Intelligence Academy Technical Surveillance I: 10/79
Police Driving Seminar: 05/79
DEA Narcotics and Dangerous Drugs Law Enforcement: 01/79
FLPD Automatic Tactical Rifle Training: 1979
Broward County Police Academy, Police Officer Certification: 1975

**PUBLISHED AUTHOR**
Dig Deeper To Address Officer Involved Shootings: Orlando Sentinel, 5/26/13
Police Leaders Must Walk The Walk, Pursuit Driving: Orlando Sentinel, 2/19/12

Save Community Policing: Orlando Sentinel, 5/25/11
State cracks down on unlicensed activity, Orlando Sentinel, 3/18/09
The Threat Abatement Group, Police and Security News, 11/95


**SUBJECT OF ARTICLES AND BOOKS**
The Minneapolis Police Department: Blue Code Of Silence by Mike Padden
Crime Beat by Michael Connelly, Nick Scarfo Case
Chief Communicator, Community Policing, Seminole Chronicle, 4/04
Cops Where You Shop, Community Policing, Seminole Chronicle, 2005
New Oviedo Police Chief, Orlando Sentinel, 3/14/04
Little Nicky's Big Gamble, Sun Sentinel Sunshine Magazine, 8/19/90
Arrest of Nick Scarfo, Philadelphia mob boss
New Police Unit to stop domestic violence early, Sun Sentinel, "Tag Team" for stalking
Lauderdale cops to follow stalkers in effort to block domestic violence, Miami Herald,
7/15/95, Tag Team for stalking
DBPR is cutting its own red tape, Tallahassee Democrat, 12/22/08, "Accelerate Florida"
COPS Center opens in Oviedo Marketplace, Oviedo Voice
The Mind of a Stalker, Miami Herald, 7/4/93
Police aim to cut drug sales near schools, Sun Sentinel, Project CRADLE
Stalking, Terrorism Comes Home, Boca Raton Magazine, 3/9/94

# Exhibit D

# Forensic Training & Consulting, LLC

350 An County Road 3582                              Office: 903.723.3612
Palestine, TX 75803-1745                          E-mail: edhueske@gmail.com

**12/17/2021**

**Re   Webster-Reed et al. v. Collins et al. (FTC Case #21-6134) – Report of Findings**

**Introduction**

This is the report of findings regarding a review of documentation received in reference
to a shooting incident that took place on January 1, 2019 at approximately 8:50 p.m. in a
parking lot at 1133 Holden Beach Road in Shalotte, North Carolina in which North
Carolina State Highway Patrol (NCSHP) Trooper Scott Collins initiated a stop on a 1996
Chevrolet pickup driven by Brandon Lovell Webster along with passenger Whitney
McKeithan.

Trooper Collins exited his patrol vehicle and proceeded to order Webster to exit the
pickup, ultimately drawing his service weapon and taking a position on the driver's side
of the pickup. When Webster attempted to accelerate and drive between Trooper Collins'
vehicle and Trooper Collins, Collins fired twice into the driver's side of the pickup
striking Webster with the second shot.

Webster was able to flee the scene and was later transported by family members to a local
hospital where he died of his bullet wound. A surveillance video of the incident was
recorded by a camera mounted on a nearby convenience store. Although quite grainy, the
position of Trooper Collins on the driver's side of the pickup is discernable in the video.
The emergency lights on the roof of Trooper Collins' patrol unit were clearly on and
visible.

A video was also taken by witness Paul Richard Jones, Jr. using a cell phone. No date or
time stamps were reportedly found on the video. Two apparent gunshots can be heard on
the video. The video was taken from the passenger's side of the Chevrolet pickup.

**Request and Methodology**

It was requested that this writer determine the trajectory of the two bullets fired into Mr.
Webster's truck, evaluate the validity and use of the trajectory paths generated by
Plaintiffs' scene reconstruction expert Bill Williams, and evaluate the scene
reconstruction generated by the North Carolina State Highway Patrol.

I have worked with Mr. Williams in another case, and am therefore familiar with his
work.  Shortly after being contacted by counsel, I spoke with Mr. Williams regarding the
vehicle and evidence on scene regarding the bullet trajectories.   I then requested and
reviewed numerous documents, identified below, regarding the shooting, including
documents showing Mr. Williams' placement of trajectory rods and some of his

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*
*Distinguished Member – Association of Firearm and Tool Mark Examiners*

preliminary work regarding his scene reconstruction. After reviewing these files, I then discussed the matter again with Mr. Williams and requested and reviewed additional documents.

My methodology in this case is that explained in my book, "Practical Analysis and Reconstruction of Shooting Incidents" , CRC Press, 2nd Ed., 2015.

My qualifications and credentials, along with additional information required by Fed. R. Civ. P. 26(a)(2)(B), are attached to this report.

**Documentation reviewed**

The following documentation was received and reviewed by the writer concerning this incident.
1. State Bureau of Investigations Report (WEBSTER 000001-000262)
2. 36-page NCSHP Reconstruction Report
3. Surveillance Video
4. Bystander Video
5. Canon Shot 1 and 2 photographs (IMG_7391-IMG_7584)
6. Olympus Shot 1 and 2 photographs (PB130464-PB160030)
7. Additional Photos (DCS_0872, 0874, 0875, 0877, 0880)
8. Project Working Draft 11-16-2021 (Bill Williams)
9. NCDPS Record Check (SHP Disc. – 000331)
10. Opinion of Bill Williams
11. Appendix C to Opinion of Bill Williams
12. Appendix D to Opinion of Bill Williams

**Observations and Opinions**

The Chevrolet pickup driven by the decedent had evidence consistent with 2 shots to the drivers' door, one a perforating shot and the other a penetrating shot. The 2 shots were fired in rapid progression according to the audio received. The most forward of the 2 shots was probably the first shot and the shot more to the rear was probably second since the pickup was moving forward when shot and the trooper does not appear to have been moving when he fired.

The apparent first shot ricocheted off the curved bottom of the driver's side sideview mirror before perforating the outer surface of the driver's door and lodging in the door against the door handle mechanism. The apparent second shot grazed the driver's side rubber window molding prior to likely striking and entering the torso of Mr. Webster. Trooper Collins is reportedly 5 ft. 10 inches tall and was holding a flashlight with his left hand and his service Sig Sauer pistol with his right.

The apparent second shot was traveling approximately 48 inches above the ground. The paths of both shots are similar in spite of the fact that the apparent first shot involved a ricochet and a deflection.

Case 7:20-cv-00248-FL Document 80-13 Filed 09/23/22 Page 71 of 124

The first bullet grazed the underside of the side mirror before hitting the door. The bullet's intermediary impact with the mirror destabilized the bullet, making it more difficult to accurately calculate an angle of entry solely with trajectory rods. The defect in the door is irregular, which is consistent with a destabilized bullet.

The defects caused by the second bullet are significantly more reliable for determining bullet path. The angle of impact for this bullet can be determined by placing a trajectory rod through the two defects, to a margin of error of +/- five degrees. I have reviewed the trajectory rods placed by Bill Williams for the second bullet. This accurately portrays the path of the second bullet. The horizontal impact angle of the second bullet is approximately 61.5 degrees.

I would expect the angle of impact to be similar between the two bullets due to the rapid fire involved. One way to approximate the path of the first bullet is to use trajectory rods that connect the location of the graze mark on the mirror and the entry defect in the door. I have reviewed the trajectory rods placed by Bill Williams for the first bullet, showing the angle of entry to be 57.2 degrees. This is quite similar to the angle of impact measured for the second bullet, indicating that the intermediary impact from the mirror may have had a limited effect on the bullet's path into the door. This makes sense given the short distance between the side mirror and the door. This trajectory rod appropriately portrays the path of the first bullet, with a margin of error of +/- five degrees.

The trajectories and angles of impact determined by scene reconstruction expert Bill Williams, as described above, accurately reflect the paths for the two shots to the driver's side mirror/door of the 1996 Chevrolet pickup driven by Mr. Brandon Webster to a reasonable degree of scientific certainty. Mr. Webster's use of those trajectories in his reconstruction is consistent with accepted scene recreation practices.

Of particular note are the magnetic holders devised by Mr. Williams to hold trajectory rods in place during his evaluation of the incident. This is a technique this writer will certainly try in the future when appropriate.

Based on the evidence I have reviewed, it is impossible to determine the distance Mr. Collins stood from the 1996 Chevrolet pickup truck based solely on an analysis of the bullet entry points. If Trooper Collins had held his firearm within 3 feet or less of the vehicle at the time it fired, gunpowder residue likely would have been present at the points of impact. However, testing for gunpowder residue would need to have been conducted shortly after the shooting, before the vehicle was exposed to the elements. I have not seen any indication that any law enforcement agency conducted this testing. At this point, it would be impossible to test for gunpowder residue given the amount of time that has passed, and the fact that the vehicle has been stored outside.

I have reviewed the incident reconstruction performed by the State Highway Patrol's Collision Reconstruction Unit. The trajectory determined by the Highway Patrol for the second bullet is generally consistent with my own determination. Their reconstruction is

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*
*Distinguished Member – Association of Firearm and Toolmark Examiners*

3

Case 7:20-cv-00248-FL Document 80-13 Filed 03/23/23 Page 72 of 124

otherwise inconsistent with accepted practices regarding shooting reconstructions. For example, there was no indication of a substantive review of the 2 videos, and no swabs collected from the driver's side mirror or door. Additionally, it does not appear that Mr. Webster's outer clothing was ever examined microscopically or tested chemically for the presence of gunpowder residue, lead  or copper.

The two videos of the shooting, from different perspectives, should be considered extremely important pieces of evidence when reconstructing the shooting.  They make it possible to determine the relative locations of the vehicle and the shooter to a high degree of certainty, as done by Bill Williams.  The State Highway Patrol's scene reconstruction report's sole reference to the videos of the shooting is to state:

> Trooper Collins was positioned in front of the 1996 Chevrolet pick-up truck on the driver's side at approximately the driver's side headlight. This was determined by video footage obtained from the Civietown Mini-Mart that depicts the driver's side headlight illuminating Trooper Collins left leg area.

The State Highway Patrol's placement of Mr. Collins "in front of the 1996 Chevrolet" based solely on light shining on his leg is inconsistent with accepted practices regarding shooting reconstruction, especially given that there were multiple sources of light in the parking lot, and given that there were far more reliable methods for determining Mr. Collins' relative position using the two videos of the encounter.


_Edward E. Hueske_
Edward E. Hueske
Consulting Forensic Scientist


*Note:  The opinions expressed herein are based upon the discovery that had been provided at the time of this writing. Should new or different discovery be forthcoming, the right to modify these findings accordingly is hereby reserved.*

**Attachments**

Attachment 1: Shots 1 & 2 – overhead view
Attachment 2: Shots 1 & 2 – diver's side view

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*
*Distinguished Member – Association of Firearm and Toolmark Examiners*

4

Case 7:20-cv-00248-FL Document 80-10 Filed 09/23/22 Page 73 of 124



**TIME 00:00:01:18**

① RICOCHET OFF BASE OF SIDE VIEW MIRROR
② SHOT PASSES THRU RUBBER MOLDING ON TOP OF WINDOW IN DRIVER'S DOOR

Tuesday, November 23, 2021 3:08:29 PM - Reconstruction Report.pdf - Personal - Microsoft Edge



① FRT. CLEARANCE -20" ( 6" LIFT KIT)

② HT. ABOVE GROUND OF 2nd SHOT -49.2"

20" ①

② 49.2"

WB-141.5"

# CURRICULUM VITAE

**Phone:** (903) 723-3612        **Edward E. Hueske**        **Cell:** 972-898-7497
**E-mail:** edhueske@gmail.com

Present Position:

- Director, Forensic Training & Consulting, LLC since 1997

Former Positions:

- Instructor of Chemistry, Blinn College, Brenham, Texas 1971-1974
- Assistant Laboratory Director, Fort Worth Police Department, 1974-1983
- Adjunct Instructor of Chemistry, Weatherford College, Weatherford, Texas 1976-1980
- Adjunct Instructor of Criminal Justice, University of Texas at Arlington, 1980-1983
- Supervising Criminalist, Arizona Department of Public Safety, 1983-1996 (ret.)
- Adjunct Instructor of Police Science, Northern Arizona University, 1984-1994
- Firearms Examiner, Tulsa Police Department, Tulsa, Oklahoma 1996-1997
- Adjunct Instructor of Police Science, Tulsa Community College, 1997
- Laboratory Manager, Weckerling Scientific Laboratories, Carrollton, Texas 1997-1998
- Criminalist, Forensic Consultant Services, Fort Worth, Texas, 1998-1999
- Principal Lecturer/Criminalistics Coordinator, University of North Texas, 1999-2012 (ret.)

Formal Education:

- B.S., Chemistry, Sam Houston State University, 1968
- M.A., Chemistry, Sam Houston State University, 1971

Special Courses Attended:

- *DEA Forensic Chemist Seminar,* McLean, Virginia, 1975 (40 hrs)
- *FBI Glass Analysis Course,* Quantico, Virginia, 1976 (40 hrs)
- *Applied Molecular Spectroscopy,* Arizona State University, Tempe, Arizona, 1977 (40 hrs)
- *ATF Arson Residue Analysis Course,* Rockville, Maryland, 1980 (40 hrs)
- *FBI Gunshot Residue Analysis Course,* Quantico, Virginia, 1981 (40 hrs)
- *Ballistics and Handloading Course,* Trinidad State College, Trinidad, Colorado, 1982 (40 hrs)
- *Polarized Light Microscopy,* McCrone Institute, Austin, Texas, 1982 (40 hrs)
- *FBI Instrumental Analysis of Paints and Polymers Course,* Quantico, Virginia, 1983 (40 hrs)
- *FBI Symposium on Footwear and Tire Tread Examination,* Quantico, Virginia, 1984 (40 hrs)
- *X-Ray Fluorescence Class,* Tracor Corporation, Flagstaff, Arizona, 1985 (8 hrs)
- *FBI Specialized Techniques in Firearms Identification Course,* Quantico, Virginia, 1987 (40 hrs)
- *Ruger Police Armorer's Course,* Phoenix Police Academy, Phoenix, Arizona, 1987 (40 hrs)
- *Crime Scene Reconstruction Class,* Dr. Henry Lee, Scottsdale, Arizona, 1988 (8 hrs)
- *AFTE Glock Armorer's Class,* Virginia Beach, Virginia, 1989 (8 hrs)
- *AFTE Remington 1100 Service Class,* Houston, Texas, 1991 (8 hrs)
- *Photomicrography Class,* Leitz Corporation, Phoenix, Arizona, 1991 (8 hrs)
- *Crime Scene Photography,* Flagstaff, Arizona 1992 (8 hrs)
- *Wound Ballistics Class,* Dr. Martin Fackler, Glendale, Arizona, 1992 (8 hrs)
- *Blood Spatter Interpretation and Crime Scene Reconstruction,* Scottsdale, Arizona, 1993 (16 hrs)
- *FBI Footwear and Tire Tread Examination Seminar* (presenter), Quantico, Virginia, 1994 (40 hrs)
- *SWAFS Shooting Reconstruction Class,* Colorado Springs, Colorado, 1995 (8 hrs)
- *SWAFS Lamp Bulb Examination Class,* Colorado Springs, Colorado, 1995 (8 hrs)

1

- *Accident Reconstruction and Low-Speed Crash Evaluation,* Texas A&M University, 1996 (16 hrs)
- *Bloodstain Pattern Analysis in Violent Crimes,* University of North Texas, 2000 (40 hrs)
- *Recovery of Buried Remains,* University of North Texas, 2001 (16 hrs)
- *Bloodstain Pattern Analysis in Crimes of Violence – Pt. II,* University of North Texas, 2002 (40 hrs)
- *Blood Wipes, Swipes & Other Patterns,* IAI Training Seminar, Boston, MA, 2006 (2 hrs)
- *Preparation of Demonstrative Exhibits for Bloodstain Pattern Analysis,* IAI Training Seminar, Boston, MA, 2006 (10 hrs)
- *Microscopical Approach to Trace Evidence in Shootings,* AAFS, Denver, CO, 2009 (8 hrs)
- *Ron Fellows Performance Driving School,* Spring Mountain, NV, 2019 (16 hrs)

Professional Affiliations:

- Retired Fellow of the American Academy of Forensic Sciences
- Emeritus Member of the Association of Firearm and Tool Mark Examiners
- Emeritus Member of the Southwestern Association of Forensic Scientists
- Emeritus Member of the American Society of Crime Laboratory Directors
- Member of the International Association of Bloodstain Pattern Analysts

Papers Presented/Speaking Engagements:

- "Developing Regional Lab-User Agency Communication," Southern and Southwestern Assns. of Forensic Scientists, Baton Rouge , Louisiana, 1986
- "Mikrosil Casting in Firearms Examinations," Assn. of Firearm and Tool Mark Examiners, Houston, Texas, 1991
- "The Jennifer Wilson Homicide: A Study in Trace Evidence," SW Assn. of Forensic Scientists, Tucson, Arizona, 1991
- "The Use of Videomicroscopy in Footwear Comparisons," Southern and Southwestern Assns. of Forensic Scientists, Shreveport, Louisiana, 1992
- "The Reconstruction of a Double Homicide near Ashfork, Arizona," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "Gunshot Residue Testing of Blood Stained Garments," SW Assn. of Forensic Scientists, South Padre Island, Texas, 1993
- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," Southern and Southwestern Assns. of Forensic Scientists, Little Rock, Arkansas, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Symposium on Footwear/Tire Tread Identification, FBI Academy, Quantico, Virginia, 1994
- "Footwear/Tire Tread Identification-The Northern Arizona Perspective," International Association for Identification, Phoenix, Arizona, 1994
- "The Application of Videomicroscopy to Footwear Identification," International Association for Identification, Phoenix, Arizona, 1994
- "A Bizarre Homicide," SW Assn. of Forensic Scientists, Houston, Texas, 1995
- "The Portable Scopeman-A Powerful New Crime Scene Tool," SW Assn. of Forensic Scientists, Fort Worth, Texas, 1996
- "Defense Experts- The Good, The Bad, and The Ugly," Texas Criminal Defense Lawyers Assn., El Paso, Texas, 1998
- "Forensic Science for the Prosecution and the Defense," University of Texas Law School, 2000
- "The Defense of Shawn Berry," Louisiana Criminal Defense Lawyers Association, Lafayette, Louisiana, 2000
- "The Defense of Shawn Berry," University of Texas Law School, 2000
- "Private Forensic Labs – The Good, The Bad and The Ugly," International Conference of the American Society for Industrial Security, 2001
- "Bloodstain Pattern Interpretation," Oklahoma City University Law School, 2002

- "Crime Scene Deconstruction-Reconstruction," Oklahoma City University Law School, 2002
- "Re-Examination of Physical Evidence – A Defense Perspective," American Academy of Forensic Science Annual Conference, Dallas, Texas, 2004
- "Shooting Incident Reconstruction," 8th Annual Public Defender Retreat, Las Vegas, NV, 2008
- *"Pseudo-High Velocity Impact Blood Spatter",* American Chemical Society Regional Meeting (Forensic Section), El Paso, TX, 2009
- *"The Jennifer Wilson Case",* Major Case Investigators of North Texas, Ft. Worth, Texas, 2013
- *"The Jennifer Wilson Case",* Student/Faculty Symposium, Blinn College, Brenham, Texas, 2013
- *"Forensic Myth Busters",* Midwestern Assn. of Forensic Sci., Branson, Missouri, 2016
- *"42 Years of Murder & Mayhem",* Forensic Science Students, Coppell High School, Coppell, TX, 2017

Specialized Forensic Classes Taught:

(List of classes taught from 1984-1998 is available upon request)

- *Shooting Reconstruction,* El Paso Police Department, 1999 (40 hrs)
- *Shooting Reconstruction,* Prince William County Police Training Center, Nokesville, Va.,1999 (40 hrs)
- *Shooting Reconstruction,* Florida Dept. of Law Enforcement, Pensacola, Fla., 1999 (24 hrs)
- *Shooting Reconstruction,* Salt Lake Co. Sheriff's Training Center, Salt Lake City, Ut., 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-County Police Training Center, Fergus Falls, Minn., 1999 (24 hrs)
- *Clandestine Drug Lab Investigation,* Tarrant Co. (TX) Drug Task Force, Cleburne, Tx., 1999 (24 hrs)
- *Blood Spatter Interpretation,* Arlington Police Training Center, Arlington, Texas, 1999 (24 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Ankara, Turkey, 1999 (40 hrs)
- *Advanced Homicide Investigation,* Turkish National Police, Istanbul, Turkey, 1999 (40 hrs)
- *Shooting Reconstruction,* Gastonia Police Training Center, Gastonia, N.C., 1999 (24 hrs)
- *Shooting Reconstruction,* Tallahassee Police Department, Tallahassee, Florida, 1999 (24 hrs)
- *Shooting Reconstruction,* Tri-Cities Police Academy, Richardson, Texas, 1999 (24 hrs)
- *Shooting Reconstruction,* West Palm Beach Co. Sheriff, West Palm Beach, FL, 2000 (24 hrs)
- *Crime Scene Investigation*, Office of the Attorney General , Guatemala City, Guatemala, 2000 (40 hrs)
- *Officer –Involved Shooting Incidents,* University of North Texas, Denton, Texas, 2000 (16 hrs)
- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2000 (24 hrs)
- *Shooting Reconstruction,* Las Vegas Metro Police Department, Las Vegas, Nevada, 2000 (24 hrs)
- *Advanced Shooting Reconstruction,* West Palm Beach Police Department, Florida, 2000 (24 hrs)
- *Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas 2000 (24 hrs)
- *Shooting Reconstruction/Adv. Shooting Reconstruction,* NYPD, New York City, New York, 2000 (48 hrs)
- *Shooting Reconstruction,* Grossmont College, San Diego, California, 2000 (24 hrs)
- *Advanced Crime Scene Investigation/Reconstruction,* University of North Texas, Denton, Texas, 2000 (40hrs)
- *Shooting Reconstruction,* Suffolk County Crime Lab, Hauppauge, New York, 2000 (40 hrs)
- *Shooting Reconstruction,* Missouri State Police Academy, Columbia, Missouri, 2001 (24 hrs)
- *Shooting Reconstruction,* Bannock County Sheriff's Office, Pocatello, Idaho, 2001 (40 hrs)
- *Shooting Reconstruction,* Syracuse Police Department, Syracuse, New York, 2001 (40 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2001 (40 hrs)
- *Shooting Reconstruction,* Washington Metropolitan Police, Washington, D.C., 2001 (24 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2001 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2001 (40 hrs)
- *Footwear/Tire Tread Evidence,* Metropolitan Police Department, Washington, D.C., 2001 (24 hrs)
- *Officer-Involved Shootings,* Baton Rouge Police Department, Baton Rouge, Louisiana, 2001 (16 hrs)
- *Officer-Involved Shootings,* East Texas Police Academy, Kilgore, Texas, 2001 (16 hrs)
- *Bio-Terrorism,* Kimberly-Clark Corporation, Dallas, Texas, 2001 (4 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2001 (24 hrs)
- *Shooting Reconstruction,* Santa Barbara County Sheriff's Office, Santa Barbara, California, 2002 (24 hrs)
- *Bio-Terrorism,* Solutions 2000, Austin, Texas, 2002 (8 hrs)
- *Gunpowder and Primer Residues,* University of North Texas, Denton, Texas, 2002 (40 hrs)

3

- *Advanced Shooting Reconstruction,* University of North Texas, Denton, Texas, 2002 (24 hrs)
- *Shooting Reconstruction,* Metropolitan Police Department, Washington, D.C., 2002 (total of 72 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Northwestern University, Chicago, 2002 (40 hrs)
- *Shooting Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2002 (24 hrs)
- *Shooting Reconstruction,* Federal Bureau of Investigation, Dallas, Texas 2002 (40 hrs)
- *Shooting Reconstruction,* El Paso Police Department, El Paso, Texas 2002 (40 hrs)
- *Tool Mark Comparison,* Centre of Forensic Science, Toronto, Ontario, Canada, 2002 (40 hrs)
- *Shooting Reconstruction,* Sioux Falls Police Department, Sioux Falls, South Dakota, 2002 (40 hrs)
- *Footwear/Tire Tread Evidence,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Crime Scene Analysis/Reconstruction,* East Texas Police Academy, Kilgore, Texas, 2002 (24 hours)
- *Shooting Incident Analysis/Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2003 (48 hours)
- *Shooting Incident Reconstruction,* St. Louis County Police Academy, St. Louis, MO, 2003 (24 hours)
- *Crime Scene Analysis/Reconstruction,* NYPD, New York, New York, 2003 (24 hours)
- *Bloodstain Pattern Analysis in Crimes of Violence,* NYPD, New York, New York, 2003 (24 Hours)
- *Advanced Trajectory Analysis,* Special Investigations Unit, Mississauga, Ontario, Canada, 2003 (24 hours)
- *The Abuse and Sexual Assault of Children,* East Texas Police Academy, Kilgore Texas, 2003 (16 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* Denton County Sheriff's Training Center, Denton, Texas, 2003 (40 hours)
- *The Analysis/Reconstruction of Crimes of Violence,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Advanced Trajectory Analysis,* UNT Police Academy, Denton, Texas, 2003 (24 hours)
- *Shooting Incident Reconstruction,* Charlotte-Mecklenburg Regional Police Training Center, Charlotte, NC, 2003, (40 hours)
- *Shooting Incident Reconstruction,* Nashville Metro Police Academy, Nashville, Tennessee, 2003 (40 hours)
- *The Investigation of Officer-Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2003 (40 hours)
- *Gunpowder & Primer Residues in Distance Determination,* San Diego Police Department, San Diego, CA, 2003 (40 hours)
- *Crime Scene Analysis/Reconstruction,* Florida Public Defenders Association, Ft. Lauderdale, FL, 2003 (16 hours)
- *Shooting Reconstruction/Officer-Involved Shootings,* St. Louis Cty. P.A., St. Louis, MO, 2004 (40 hrs)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Gunpowder & Primer Residues in Distance Determination,* NYPD New York, New York, 2004 (40 hours)
- *Crime Scene Photography,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Advanced Trajectory Analysis,* St. Louis County Police Academy, St. Louis, MO, 2004 (24 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2004 (40 hours)
- *Shooting Reconstruction Techniques,* Texas Rangers Annual Conference, Cypress, Texas, 2004 (4 hours)
- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2004 (40 hours)
- *Forensic Photography,* East Texas Police Academy, Kilgore, Texas, 2004 (24 hours)
- *Crime Scene Analysis/Reconstruction,* Special Investigations Unit, Mississauga, Ontario, Canada, 2004 (24 hours)
- *The Investigation of Officer Involved Shootings,* Drug Enforcement Administration Academy, Quantico, Virginia, 2004 (24 hours)
- *Shooting Reconstruction/Officer-Involved Shootings,* Sioux Falls Police Dept. , Sioux Falls, SD, 2004 (40 hours)
- *Shooting Reconstruction/Officer-Involved Shootings,* Lewis & Clark Co. S.O., Helena, MT, 2004 (40 hours)
- *Analysis/Reconstruction of Violent Crimes,* St. Louis Co. Reg. Police Academy, St. Louis, MO, 2005 (40 hours)
- *Investigating Officer-Involved Shootings,* Natick Police Department, Natick, MA, 2005 (16 hours)
- *Advanced Shooting Incident Reconstruction,* Suffolk Co. Crime Lab, Hauppague, NY, 2005 (24 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2005 (40 hours)
- *Sexually-Related Violent Crime,* Texas Rangers Annual Conference, Spring, Texas, 2005 (4 hrs)
- *Introduction to Shooting Reconstruction,* Texas DPS Training Academy, Austin, Texas, 2005 (24 hours)

4

- *Advanced Trajectory Analysis,* Federal Bureau of Investigation, Dallas, Texas, 2005 (40 hours)
- *Introduction to Shooting Reconstruction,* Minneapolis Police Dept., Minneapolis, WI, 2005 (40 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Mississippi State Crime Lab, Jackson, MS 2005 (40 hrs)
- *Processing Violent Crime Scenes,* Federal Bureau of Investigation, Dallas, Texas, 2005 (8 hours)
- *Shooting Incident/Officer-Inv. Shooting Reconstruction,* Texas DPS Academy, Austin, TX, *2005 (40 hrs)*
- *Introduction to Shooting Reconstruction,* Charlottesville PD, Charlottesville, Virginia, 2005 (24 hrs)
- *Homicide Investigation,* Texas DPS Training Academy, Austin, Texas, 2005 (8 hours)
- *Introduction to Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* Las Vegas Metro Police, Las Vegas, NV, 2006 (24 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings ,*St. Louis Co. Police Academy, St. Louis, MO, 2006 (40 hrs)
- *Shooting Reconstruction/Officer-Involved Shootings,* Austin Police Academy, Austin, TX, 2006 (40 hrs)
- *Footwear/Tire Tread Evidence,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *The Analysis & Reconstruction of Violent Crimes,* Austin Police Academy, Austin, TX, 2006 (24 hrs)
- *Introduction to Bloodstain Pattern Analysis,* Dallas Police Academy, Dallas, TX, 2006 (24 hrs)
- *Advanced Shooting Reconstruction,* East Texas Police Academy, Kilgore, TX, 2006 (24 hrs)
- *Special Topics in Shooting Reconstruction,* Texas Rangers In-Service Training Conference, Austin, TX, 2006 (4 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2006 (40 hours)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Garland PD, Garland, TX, 2007 (40 hrs)
- *Special Topics in Shooting Reconstruction,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *The Analysis & Reconstruction of Violent Crimes,* NYPD, Jamaica, Queens, NY, 2007 (24 hours)
- *Shooting Incident Reconstruction,* Madison PD, Madison, WI, 2007 (24 hrs)
- *Shooting Incident Reconstruction,* Chatauqua County Sheriff's Office, Mayville, NY, 2007 (40 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2007 (40 hours)
- *Shooting Reconstruction/Officer-Involved Shootings ,*St. Louis Co. Police Academy, St. Louis, MO, 2007 (40 hrs)
- *Advanced Shooting Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2007 (16 hrs)
- *Advanced Shooting Incident Reconstruction,* Vancouver P.D., Vancouver, WA, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction,* Texas Tech Univ. Inst. of Forensic Sci., 2008 (24 hrs)
- *Crime Scene Analysis & Reconstruction,* East Texas Police Academy, Kilgore, TX, 2008 (24 hrs)
- *Shooting Incident/Officer-Involved Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2008 (40 hours)
- *Introduction to Crime Scene photography, ,* East Texas Police Academy, Kilgore TX, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* New Hampshire State Police, Concord, NH, 2008 (40 hrs)
- *Advanced Shooting Incident Reconstruction, ,* New Hampshire State Police, Concord, NH, 2008 (24 hrs)
- *Shooting Incident Reconstruction,* Clackamus Co. Sheriff's Office, Oregon City OR, 2008 (40 hrs)
- *Crime Scene Analysis & Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (24 hrs)
- *Fracture Match Identification,* St. Louis Co. Police Academy, St. Louis, MO, 2008 (16 hrs)
- *Shooting Incident Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Advanced Shooting Reconstruction,* Texas DPS Training Academy, Austin, TX, 2008 (24 hrs)
- *Officer-Involved Shooting Investigation,* Minneapolis Police Dept., Minneapolis, MN, 2008 (24 hrs)
- *Advanced Shooting Reconstruction,* Georgia Bureau of Investigation., Forsyth, GA, 2009 (24 hrs)
- *Advanced Shooting Reconstruction,* Ohio Bureau of Investigation., Columbus, OH, 2009 (24 hrs)
- *Shooting Incident Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2009 (24 hrs)
- *Intro. to Crime Scene/Accident Photography, ,* St. Louis Co. Police Acad., St. Louis, MO, 2009 (16 hrs)
- *Shooting Incident Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2006 (32 hours)
- *Shooting Incident Reconstruction,* Bureau of Indian Affairs, Albuquerque, NM, 2009 (24 hrs)

5

- *Shooting Incident reconstruction,* El Paso Police Academy, El Paso, TX, 2010 (32 hrs)
- *Shooting Incident Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2010 (24 hrs)
- *Inv. Officer-Involved Shootings,* St. Louis Co. Police Academy, St. Louis, MO, 2010 (24 hrs)
- *Shooting Incident Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2010 (32 hours)
- *Specialized Topics in Shooting Reconstruction,* New Jersey State Police Academy, 2010 (4 hrs)
- *Specialized Topics in Shooting Reconstruction,* SWAFS Conference, Grapevine, TX, 2010 (4 hrs)
- *Shooting Incident Reconstruction,* East Texas Police Academy, Kilgore, TX, 2011 (24 hrs)
- *Bloodstain Pattern Analysis,* East Texas Police Academy, Kilgore, TX, 2011 (24 hrs)
- *Crime Scene Reconstruction,* NYPD, Jamaica, Queens, NY, 2011 (16 hrs)
- *Shooting Incident Reconstruction,* TX DPS Academy, Austin, TX, 2011 (24 hrs)
- *Shooting Incident Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2011 (24 hrs)
- *Inv. Officer-Involved Shootings,* St. Louis Co. Police Academy, St. Louis, MO, 2011 (24 hrs)
- *Shooting Incident Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2011 (24 hours)
- *Advanced Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2011 (24 hours)
- *Shooting Incident Reconstruction,* NYPD, Jamaica, Queens, NY, 2011 (24 hrs) – Group I
- *Shooting Incident Reconstruction,* Chicago Independent Police Review Authority, Evanston, Illinois 2011 (24 hrs)
- *Shooting Incident Reconstruction,* NYPD, Jamaica, Queens, NY, 2011 (24 hrs) – Group II
- *Advanced Shooting Reconstruction,* NYPD, Jamaica, Queens, NY, 2012 (24 hours) – Group I
- *Shooting Incident Reconstruction,* NYPD, Jamaica, Queens, NY, 2012 (24 hrs) – Group III
- *Advanced Shooting Reconstruction,* NYPD, Jamaica, Queens, NY, 2012 (24 hours) – Group II
- *Special Topics in Crime Scene Investigation,* El Paso Police Dept., 2012 (16 hours)
- *Shooting Incident Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2012 (24 hours)
- *Advanced Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2012 (24 hours)
- *Shooting Incident Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2012 (24 hrs)
- *Inv. Officer-Involved Shootings,* St. Louis Co. Police Academy, St. Louis, MO, 2012 (24 hrs)
- *Shooting Incident Reconstruction,* Missoula Police Department, Missoula, MT, 2012 (24 hours)
- *Shooting Incident Reconstruction,* Bannock Co. S.O., Pocatello, ID, 2012 (24 hours)
- *Shooting Incident Reconstruction,* NYPD, Jamaica, Queens, NY, 2013 (24 hrs) – Group IV
- *Fracture Match Identification,* Nebraska State Crime Lab, Omaha, NE, 2013 (24 hrs)
- *Advanced Shooting Reconstruction,* NYPD, Jamaica, Queens, NY, 2013 (24 hrs)
- *Shooting Incident Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2013 (24 hours)
- *Advanced Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2013 (24 hours)
- *Shooting Incident Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2013 (24 hrs)
- *Inv. Officer-Involved Shootings,* St. Louis Co. Police Academy, St. Louis, MO, 2013 (24 hrs)
- *Fracture Match Identification,* Nebraska State Police, Omaha, NE, 2013 (24 hrs)
- *Shooting Incident Reconstruction,* East Texas Police Academy, Kilgore, TX, 2014 (24 hrs)
- *Shooting Incident Reconstruction,* St. Louis Co. Police Academy, St. Louis, MO, 2014 (24 hrs)
- *Inv. Officer-Involved Shootings,* St. Louis Co. Police Academy, St. Louis, MO, 2014 (24 hrs)
- *Shooting Incident Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2014 (24 hours)
- *Shooting Incident Reconstruction,* New York State Police, Albany, NY, 2014 (40 hrs)
- *Advanced Shooting Reconstruction,* New York State Police, Albany, NY, 2014 (24 hrs)
- *Advanced Shooting Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois 2014 (24 hours)
- *Shooting Incident Reconstruction,* Montana Div. of Crim. Inv., Billings, MT, 2014 (40 hrs)

6

- *Shooting Incident Reconstruction,* Center for Public Safety, Northwestern University, Evanston, Illinois, 2015 (24hours)
- *Shooting Incident Reconstruction,* Austin Police Department, Austin, TX, 2016 (40 hours)

Academic classes:

I was a full time faculty member (rank of Principle Lecturer) in the department of criminal justice at the University of North Texas and regularly taught the following undergraduate classes and coordinated the criminalistics certificate program at the university that I developed in concert with the chemistry and biology departments:

- CJUS 3330 – Introduction to Criminalistics
- CJUS 4370 – Advanced Criminalistics I
- CJUS 4380 – Advanced Criminalistics II
- CJUS 4390 – Crime Scene Investigation

Additionally, I taught the following graduate classes, on a rotating basis, each year during my 14 years at the university:

- CJUS 5800 – Crime Scene Reconstruction
- CJUS 5800 – Bloodstain Pattern Analysis
- CJUS 5800 – Shooting Incident Reconstruction
- CJUS 5900 – Directed Studies (graduate research projects conducted under my supervision)

Publications:

- "Reaction of Azobenzene with Triphenylphosphine," co-authored with R.E. Humphrey, *Journal of Organic Chemistry,* 1971
- "A Procedure for the Isolation and Identification of LSD in a Single Dosage Unit (The Microdot Tablet)," *Microgram,* 1976
- "A Comparison of Decomposition Products from Selected Burned Materials with Common Arson Accelerants," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences,* 1977
- "An Examination of Selected Automobile Rubber Bumper Guards," co-authored with R.W. Clodfelter, *Journal of Forensic Sciences,* 1977
- "Techniques for Extraction of Spermatozoa from Stained Clothing: A Critical Review," *Journal of Forensic Sciences,* 1977
- "Tannic Acid as a Field Test for Caffeine," *Microgram,* 1982
- "Toy Store Bomb Paraphernalia," *AFTE Journal,* 1984
- "Forensic Aspects of Shotshell Buffers," *AFTE Journal,* 1984
- "Enhancement of Footwear Impressions on Glass," co-authored with R.A. Erfert, *SWAFS Journal,* 1985
- "Stripping of Lead Bullets in a Browning High Power Pistol," *AFTE Journal,* 1988
- "The Browning of Firearms Serial Numbering System," *AFTE Journal,* 1988
- "An Anti-Splashback Lid for Water Traps," *AFTE Journal,* 1988
- "A Preliminary Report on the Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination," *AFTE Journal,* 1990
- "Class Characteristics of Mossberg C-Lect-Choke Barrels with Factory Porting," *AFTE Journal,* 1990
- "Silencers – A Review and a Look at the State of the Art", *AFTE Journal*, 1991
- "Photographing and Casting Footwear/Tire track Impressions in Snow", *J. Forensic Ident.,* 1991
- "A Superior Method for Obtaining Test Prints from Footwear and Tires", *J. Forensic Ident.,* 1991
- "The Examination of Goodyear Neolite Cowboy Walking Boot Heels," *SWAFS Journal,* 1992
- "The Application of Fiber-Optic Videomicroscopy to Firearm and Tool Mark Examination- A Further Look," *AFTE Journal,* 1993
- "Calculation of Trajectory Angles Using an Inexpensive Angle Gauge," *AFTE Journal,* 1993
- "Gunshot Residue Testing of Blood Stained Garments," *AFTE Journal,* 1993
- "Gunshot Residue Testing of Blood Stained Garments," *SWAFS Journal,* 1994

7

- "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with B.M. Courtney, *SWAFS Journal,* 1994
- "The Portable Scopeman- A Powerful New Crime Scene Tool," *SWAFS Journal,* 1996
- "Some Observations on Blood Back-Spatter," *SWAFS Journal,* 1997
- "A New and Economical Forensic Light Source for Crime Scene and Laboratory Use," *SWAFS Journal,* 2003
- "Recognition and Documentation of Bullet Ricochet Characteristics and Predicting Directionalities," *SWAFS Journal,* 2003
- "A Compact Laser Protractor and its Use in Shooting Reconstruction," *SWAFS Journal,* 2004
- "Estimation of Caliber for Distorted Bullets," *SWAFS Journal,* 2004
- "Determination of Lateral Angles for Bullet Holes in Windshields," *SWAFS Journal,* 2005
- "Making Knife Blade Test Impressions," *SWAFS Journal,* 2007
- "A Simplistic Approach to Demonstrative Evidence in Complex Shootings", *SWAFS Journal,* 2008
- "A Comparison of Some Selected 00 Buckshot Pellet Patterns", *AFTE Journal,* 2009
- "Some Thoughts on Accreditation, Certification and Bad Behavior in Crime Labs", *Forensic Evidence, 2010*
- "Winchester Hi-Density Buffer", *AFTE Journal,* 2010
- "The Need for Bullet Deflection Training for Field Investigators", *Forensic Science Policy and Management: An International Journal,* 2010
- "Pseudo-HVIS: An Empirical Study", *SWAFS Journal,* 2010
- "An Unusual Example of Scene Staging", *Evidence Technology Magazine, 2010*
- "A Comparison of Several Substrates Used for Gunpowder Stippling Evaluations", *AFTE Journal,* 2011
- "Civilianization of Crime Scene Units – A Growing Trend", *SWAFS Journal,* 2011
- "Shooting Reconstruction by iPhone", *SWAFS Journal,* 2011
- "State Mandated Accreditation in Texas – A Look Back and a Look to the Future", *Forensic Science Policy and Management: An International Journal,* 2012
- "Terminology in Forensics: Its Use and Abuse", *Evidence Technology Magazine,* July-August 2014
- "Maximizing Crime Lab Results", *Evidence Technology Magazine,* January-February 2015
- "CT Scanning of Firearms – A New Dimension in Forensic Firearm Examinations", *AFTE Journal, 2019*

Books Contributed To/Written:

- Mozyani, A. and Noziglia, C., "The Forensic Laboratory Handbook" (chapter on Firearm/Tool Mark identification), Humana Press: New Jersey, 2005 (revised 2010 – 2nd edition)
- Hueske, E.E., "The Analysis and Reconstruction of Shooting Incidents", CRC Press/Taylor & Francis: Boca Raton, 2006
- Hueske, E.E., "The Analysis and Reconstruction of Shooting Incidents", CRC Press/Taylor & Francis: Boca Raton, 2nd edition, 2016
- Hueske, E.E., "Fingerprints and Firearms", Essentials of Forensic Science Series, Facts on File: New York, 2009
- Taylor, Robert, et al, "Criminal Investigation", McGraw-Hill, 8th edition, 2000

Training Videos Written/Produced (Through the Law Enforcement Training Network of Carrollton, Texas, 2002-03):

- "Bloodstain Pattern Analysis I"
- "Bloodstain Pattern Analysis II"
- "Blood Spatter in Shooting Incidents"
- "Bloodstain Evidence Documentation"
- "The Proper Use of Trajectory Rods"
- "Bullet Ricochet Phenomena I"

8

- "Bullet Ricochet Phenomena II"
- "Finding Invisible Footwear Impressions at Crime Scenes"
- "Photographing & Casting Impression Evidence"
- "Tire Tread Evidence Deductions"
- "Producing Test or Elimination Impressions"
- "The Use of Gunshot Residue in Distance Determinations"
- "Cartridge Case Ejection Pattern Testing"

Media Appearances

- Appeared on national television in pilot program on MSNBC's "Verdict: You Decide" regarding State of Texas vs. Richard Hicks, Fall, 2008
- Appeared on national television in Identification Discovery program "Forensics: You Decide" Regarding State of Oklahoma vs. Gregory Maurek, Fall, 2009

Professional Offices Held:

Association of Firearm and Tool Mark Examiners:

- Reviewer for *AFTE Journal*, 1989-2009

Southwestern Association of Forensic Scientists:

- Program Chairman, 1984
- Member, Board of Directors, 1986-1988
- Chair of Professional Development, 1988-1990
- *SWAFS Journal* Editor, 1988-1992
- President, 1993-1994
- Chairman, Board of Directors, 1994-1995
- Fall Meeting Workshop Chair, 1993

American Society of Crime Lab Directors:

- Member, Board of Directors, 1986-1989
- Chair, Publication Committee, 1986-1987
- Chair, Membership Committee, 1987-1989
- Laboratory Accreditation Inspector, 1987-1995
- Laboratory Accreditation Board Member, 1996
- Forensic Science Operations and Program Committee, 1988-1991
- Member, Management Committee, 1992-1994
- Chair, Crime Scene Investigation Standards Committee, 1996

Advisory Board Membership

- 2004 served as a member of the NYPD Laboratory Accreditation Advisory Board
- 2006-2007 served as a member of the Crime Laboratory Review Board for the Houston P.D.

Awards/Honors:

- "Distinguished Member Award," Association of Firearm and Tool Mark Examiners (AFTE),1988
- "James Zotter Award," SW Assn. of Forensic Scientists, 1991, ("For Outstanding Dedication and Contributions to the SW Association of Forensic Scientists and Forensic Science")
- "Best Technical Paper," Southern and SW Assns. of Forensic Scientists, 1992, "The Use

- of Videomicroscopy in Footwear Comparisons"
- "Best Technical Paper," SW Assn. of Forensic Scientists, 1993, "The Reconstruction of a Double Homicide near Ashfork, Arizona"
- "Best Technical Paper," Southern and SW Associations of Forensic Scientists Joint Conference, 1994, "The Use of Hand-Held Laser Pointers in the Reconstruction of Events at Crime Scenes," co-authored with Max Courtney
- Awarded Emeritus status in the American Society of Crime Laboratory Directors, 1996
- Awarded Emeritus status in the Southwestern Association of Forensic Scientists, 1996
- Co-recipient of the annual MLK Award for Community service in 2007 for work done on the Houston Crime Lab project (Review of Firearms Cases)
- Co-recipient of award for "Top 10 Books for Youth" in 2009 for "Fingerprints & Firearms"
- "Distinguished Faculty Award", University of North Texas, 2012
- Awarded Emeritus status in the Association of Firearm and Tool Mark Examiners, 2021

**High Profile Cases Involved in**

- *State of Texas vs. Pamela Fielder* - 1981
- *State of Arizona vs. Richard Lynn Bible* – 1988
- *State of Arizona vs. Robert Casey* – 1988
- *State of Arizona vs. John Famalaro* – 1994
- *State of Texas vs. Diane Zamora* – 1998
- *State of Texas vs. Shawn Berry* – 1999
- *Article 32 Hearing USMC Sgt. Frank Wuterich* -2007
- *State of Texas vs. Stephen Lance Heard* – 2009
- *State of Montana vs. Markus Kaarma* – 2014
- *State of Oklahoma vs. Joseph Campbell* – 2015
- *State of South Carolina vs. Michael Slager* **–** 2016

**Have been qualified as an expert in shooting incident reconstruction in District, State and Federal Courts in 17 different states:**

Alaska, Arizona, Illinois, Kansas, Louisiana, Missouri, Montana, New York, Nevada, Oklshoma, Pennsylvania, Tennessee, Texas, Utah, Vermont, Wisconsin and WVa

# Court Testimony (last 4 years) – Edward E. Hueske

| | | | |
|---|---|---|---|
| 03/10/2017 | 16-6059 | Criminal District Court Salina, Kansas | State of Kansas vs. Michael Ryan |
| 05/11/2017 | 16-6055 | Criminal District Court Altus, Oklahoma | State of Oklahoma vs. Terry Drury |
| 05/17/2017 | 15-6039 | Tarrant County Criminal District Court | State of Texas vs. Courtney Johnson |
| 09/21/2017 | 17-6073 | Tarrant County Criminal District Court | State of Texas vs. Charles Bell |
| 09/27/2017 | 16-6055 | Criminal District Court Altus, Oklahoma | State of Oklahoma vs. Terry Drury (Re-trial) |
| 10/30/2017 | 17-6074 | Criminal District Court Groesbeck, Texas | State of Texas vs. Jacoby |
| 07/17/2018 | 18-6081 | Criminal District Court Crockett, Texas | State of Texas vs. Intelisano |
| 01/16/2019 | 16-6045 | Federal Court Dallas, Texas | Luster v. City of Dallas |
| 01/23/2019 | 18-6093 | Montgomery County Conroe, Texas | State of Texas vs. Rafael Leos-Trejo |
| 02/07/2019 | 18-6086 | Smith County – Tyler, TX | State of Texas vs. Alan Patterson |
| 03/27/2019 | 18-6096 | St. Albans, VT | State of Vermont vs. Ethan Gratton |
| 07/02/2019 | 19-6100 | Fort Worth, Texas | State of Texas vs. Deontay Hampton |
| 09/28/2020 | 14-6007 | Fort Worth, Texas (Zoom) | Waller v. City of Fort Worth |
| 04/28/2021 | 20-6123 | Houston, Texas (Zoom) | Grand Jury – Off/ Tu Tran |
| 12/03/2021 | 19-6107 | Brownwood, TX | Habeas hearing – Doug Barnum |
| | | | |

# Exhibit E

## Assignment:

I have been retained by Patterson Harkavy LLP on behalf of the Plaintiffs in the case titled Mary Towanda Webster-Reed et al. v. Scott Anthony Collins 7:20-cv-00248-FL (E.D.N.C.) to perform the following:

1. A scene reconstruction to include:
   a. Determine the position of Trooper Collins in reference to the Webster Chevrolet Pickup during the incident that took place on January 1st, 2019. Of specific interest are:
      i. Trooper Collins' position after Mr. Webster initially brought his truck to a complete stop and just prior to Mr. Webster moving the truck forward the first time.
      ii. Trooper Collins' position just prior to the Webster truck movement as he exited from the mini-mart parking lot
      iii. Trooper Collins' position when he fired shot 1
      iv. Trooper Collins' position when he fired shot 2
   b. Determine the speed of the Webster truck if possible
2. Review the reconstruction prepared by the North Carolina State Highway Patrol's Collision Reconstruction Unit.

## Background & Experience:

I have operated the consulting firm Williams Innovative Software and Training (WISAT) since 1996. Before founding WISAT, I served as director of training for a large automotive undercar chain, where my responsibilities included developing training software and instructional scaled mockups, demonstrations, and video productions for training purposes.

At its founding, WISAT provided custom software development, website design, and training video production, along with conducting "hands on" training seminars for automotive technicians. Since 2003, WISAT transitioned to performing forensic examinations of automobile accident vehicles and accident scenes, including the forensic recreation of accident scenes. Over the past decade I have been retained by police officers, victims, and criminal prosecutors to recreate the scenes of numerous officer-involved shootings, including in high profile cases such as the South Carolina shooting of Walter Scott.

In addition to decades of hands-on experience, I stay current on literature regarding scene reconstruction and forensic scene analysis. I have worked alongside numerous expert witnesses in various relevant fields, including experts in bullet trajectory and fire origin analysis, as well as other experts in accident reconstruction. I have been accepted as an expert in areas including scene analysis and recreation, automotive forensic investigations, computer technology, video syncing, and animation, in addition to numerous additional topics related to the automotive industry.

Further information regarding my background and qualifications is attached as Appendix A.

**Material Reviewed:**

See Appendix B.

**Methodology**

See Appendix C.

**Incident Background:**

This incident occurred on the night of January 1, 2019, in the parking lot of the Civietown Mini-Mart in Shallotte, North Carolina. Several descriptions of the incident have been included in the file materials provided. The following description is from Bates series Webster 1-262, at Webster 2:

> "On January 1, 2019, NCSHP Trooper Scott Collins initiated a traffic stop on a white truck driven by Brandon Lovell Webster in a parking lot located at 1133 Holden Beach Road, Shallotte, North Carolina. Webster was accompanied by his girlfriend, Whitney McKeithan, during the incident. During the stop, Webster attempted to flee the scene, trying to maneuver his vehicle around Trooper Collins' vehicle and Trooper Collins, who had exited his vehicle. Trooper Collins drew his service weapon and instructed Webster to stop the vehicle multiple times. Webster drove his truck between Trooper Collins and his vehicle, at which time Trooper Collins discharged his weapon twice, striking Webster as he fled the scene. Webster was transported to a local hospital by family members where he later succumbed to his injuries."

The incident was captured on video by two separate cameras:

> <u>Camera 1</u>: One of the exterior security cameras at the Mini-Mart, mounted on the right side of the building, near the top right corner of the garage door, recorded the entire incident without audio.

> <u>Camera 2</u>: Using his Samsung Galaxy 7 mobile phone, one of the customers present at the Mini-Mart recorded a portion of the incident with audio.

Using the process described in Appendix C, I synced both videos. See Appendix G.

## Opinion 1

Based on my education, training, and experience, using methods regularly relied upon in the field of incident reconstruction, I have developed opinions about the relative positions of Trooper Collins and Mr. Webster's truck at five different moments during the incident:

M1. Approximately seven seconds before Trooper Collins fired the first shot, after Mr. Webster initially brought his truck to a complete stop, and just before Mr. Webster moved the truck forward the first time.
M2. Approximately three seconds before Trooper Collins fired the first shot.
M3. Approximately one second before Mr. Webster began driving out of the parking lot.
M4. When Trooper Collins fired shot 1.
M5. When Trooper Collins fired shot 2.

## Opinion Regarding M1

At M1, Trooper Collins was located approximately 5.0' to the left and 2.25' to the front of the truck, using the dummy's head as the reference point. Figures 57 and 58 accurately portray the positions of Trooper Collins and Mr. Webster's truck in the Mini-Mart parking lot at M1, which is just before Mr. Webster's truck briefly accelerated, approximately seven seconds before Trooper Collins first fired his gun.



*Figure 57*



*Figure 58*

3

## Opinion Regarding M2

At M3, Trooper Collins was located approximately 4.75' to the left and 3.25' to the front of the truck, using the dummy's head as the reference point. Figures 70 and 71 accurately portray the positions of Trooper Collins and Mr. Webster's truck in the Mini-Mart parking lot at M2, which is approximately three seconds before Trooper Collins first fired his gun.



*Figure 70*



*Figure 71*

4

## Opinion Regarding M3

At M3, Trooper Collins was located approximately 5.75' to the left and 2.75' to the front of the truck, using the dummy's head as the reference point. Figures 82 and 83 accurately portray the positions of Trooper Collins and Mr. Webster's truck in the Mini-Mart parking lot at M3, which is just before Mr. Webster began driving out of the parking lot.



Figure 82



Figure 83

**Opinion Regarding M4**

At M4, Trooper Collins is located approximately 5.5' to the left of the truck, and approximately 0.5' to the front of the truck, using the dummy's head as the reference point. Figures 95 and 96 accurately portray the positions of Trooper Collins and Mr. Webster's truck in the Mini-Mart parking lot when Trooper Collins fired Shot 1.



*Figure 95*



*Figure 96*

6

## Opinion Regarding M5

At M5, Trooper Collins was located approximately 5.1' to the left of the truck and approximately 2.75' behind the front of the truck, using the dummy's head as a reference point. Figures 103 and 104 accurately portray the positions of Trooper Collins and Mr. Webster's truck in the Mini-Mart parking lot when Trooper Collins fired Shot 2.



*Figure 101*



*Figure 104*

7

Figure 178 shows Trooper Collins' and the truck's position at M3, M4, and M5:



*Figure 182*

## Opinion 2

In addition to conducting my own scene and incident reconstruction, I reviewed the North Carolina State Highway Patrol's report of its reconstruction, Investigative Report 19-001, by Sgt. A. Barnes (the SHP Report). The SHP Report's description of the incident and analysis of Camera 1's video is on page 15 of the report. Based on the description provided below, the SHP Report is referencing M3, the position of the Webster truck and Trooper Collins just prior to Mr. Webster exiting the parking lot:

> "At this time during the traffic stop Trooper Collins was positioned in front of the 1996 Chevrolet pick-up truck on the driver's side at approximately the driver's side headlight."

The SHP Report's conclusion that Trooper Collins was in front of the Webster truck is based on the following methodology:

> "This was determined by video footage obtained from the Civietown Mini-mart that depicts the driver's side headlight illuminating Trooper Collins left leg area."

The SHP Report provides no other support, analysis, or work to support this position. There is no mention of the Mini-Mart customer's video in the entire report, which means the SHP's reconstruction entirely ignored the second point of view offered by Camera 2. Trooper Collins' position along the line of site of Camera 1 cannot be determined in isolation with accuracy. While it may appear that Trooper Collins is in front of Mr. Webster's truck when viewing Camera 1 alone, this is simply not the case when Camera 2's view is considered with Camera 1's.

The SHP Report further attempts to support its conclusion that Trooper Collins was in front of the Webster truck, and that the truck was coming towards him as Mr. Webster exited the parking lot, with this statement:

> "The 1996 Chevrolet pick-up is a rear wheel drive vehicle and as the vehicle was rapidly accelerating on the gravel parking lot the back of the vehicle was going to the right which was causing the front headlights to turn to the left towards Trooper Collins as if the vehicle was coming towards him. This motion caused the collision between the Chevrolet pick-up and Trooper Collins Dodge Charger by only the back right quarter panel of the Chevrolet pick-up striking the back right quarter panel of the Dodge Charger."

This statement cannot be reconciled with the evidence I have reviewed and analyzed. The moments described above occurred after the front of the truck had already passed Trooper Collins and he had fired both shots. By that time, Trooper Collins was off to the left side of the Webster truck and could not have seen headlights pointed toward him.

Based upon these flawed assumptions, the SHP investigator performed several reconstructions using the Webster truck and a surrogate for Trooper Collins on January 9, 2019. While the report refers to 2 tests the material provided included 7 runs. Screen captures of the start of each of these 7 runs were generated. Based on a review of these, there is a significant shift in the surrogate Trooper's starting position when comparing runs 1 and 2 to runs 3 to 7. Runs 3 to 7 have the surrogate Trooper closer to the front of the truck as can be seen by super-imposing Run 2 with Run 3 as shown in Figure 182 below. There is no explanation of why the position changed or how the change would relate to Trooper Collins' actual position in the Camera 1 video.



The State Highway Patrol's reconstruction places Trooper Collins much closer to the truck than he actually was.  A comparison was made between our position M3 and the SHP Report's start position from their Run 3. Figure 183 below shows the 2 super-imposed on one another. Runs 1 to 7 start frame, Shot 1 frame, and Shot 2 frames can be found in Appendix E.



It is clear that when Camera 2's view is included in the analysis, Trooper Collins cannot be where the SHP Report places him.

The same process was performed on the point where Collins fired Shot 1. Our position M4 and their Run 3 shot 1 position are shown below in Figure 184.



The same process was performed on the point where Collins fired Shot 2. Our position M5 and their Run 5 shot 2 position are shown below in Figure 185.

12



Based upon my review of the SHP Report, they failed to use any accepted methodology to determine Trooper Collins' position at M3, they misinterpreted Camera 2's video when they describe Trooper Collins being able to see the headlights of the Webster truck coming toward him, and they based their reconstruction on these flawed assumptions.

Further information regarding my methodology, including additional related and subsidiary opinions, are reflected in the documents in the attached Appendices C through G.

I have offered the previous opinions based upon the information currently available to this investigator. However, I reserve the right to amend or supplement these opinions as additional information becomes available.

Sincerely,

William A. Williams

WISAT

Exhibit F

DocuSign Envelope ID: 75BA5659-A939-494A-B1F2-0A6C36FB9FB3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
File No. 7:20-CV-248-FL

| | |
|---|---|
| MARY TOWANDA WEBSTER-REED, individually and as a representative of the Estate of Brandon Lovell Webster; ALDRIDGE REED, as representative of the Estate of Brandon Lovell Webster; K.W., a minor, by and through her Guardian Ad Litem, as heir to Brandon Lovell Webster; and B.W. JR., by and through his Guardian Ad Litem, as heir to Brandon Lovell Webster, | **MEDIATED SETTLEMENT AGREEMENT** |
| Plaintiffs, | |
| v. | |
| SCOTT ANTHONY COLLINS, *in his individual capacity,* | |
| Defendant. | |

THIS SETTLEMENT has been entered into between the Plaintiffs Mary Towanda Webster-Reed, individually and as the personal representative of the Estate of Brandon Lovell Webster; Aldridge Reed, as co-representative of the Estate of Brandon Lovell Webster; K.W., a minor, by and through her Guardian Ad Litem, Ryan Smithwick; and B.W. Jr., a minor, by and through his Guardian Ad Litem, Ryan Smithwick ("PLAINTIFFS") and Scott Anthony Collins, in his individual capacity ("DEFENDANT") as a result of a mediated settlement conference completed upon the date subscribed below. PLAINTIFFS and DEFENDANT agree as follows:

1. The parties hereto stipulate that at the Mediated Settlement Conference held on the 31st day of March, 2022, virtually over electronic means, a full and final agreement of all issues was reached. The terms of this agreement are:

2. PLAINTIFFS will receive the total sum of $2,200,000.00 (two million and two hundred thousand dollars and no cents). Plaintiffs shall execute such releases as required by Defendant and/or the North Carolina Department of Public Safety ("NCDPS"), in a form acceptable to Defendant and/or the North Carolina Department of Public Safety. The North Carolina Department of Public Safety agrees to provide a settlement check of $2,200,000 within 45 days of signing the final settlement agreement and release.

3. PLAINTIFFS and DEFENDANT agree that the proceeds of the check will not be disbursed by Plaintiff's attorney until such time as a release and dismissal with prejudice, or consent judgment, have been executed and the dismissal or consent judgment filed with the appropriate court, and the release and filed copies of the dismissal or consent judgment forwarded to Defendant's attorney.

4. Any and all claims which PLAINTIFFS and DEFENDANT may have against one another, described in the above captioned litigation will, after distribution of funds and execution, filing and delivery of the

appropriate release and dismissal with prejudice or consent judgment, be settled and discharged completely. This agreement binds and benefits the parties and their successors.

5. PLAINTIFFS and DEFENDANT agree to execute a formal settlement agreement which includes a declaration the Defendant, the North Carolina Department of Public Safety, and the North Carolina Highway Patrol do not admit to any wrongdoing by entering into this settlement agreement.

6. The Parties agree to split evenly the cost of mediation that occurred on March 31, 2022.

7. Plaintiffs will bear the burden of their own attorney fees and cost.

8. Pursuant to NC Gen Stat. Section 143-300.6(b), Defendant has approved a settlement in excess of the limit provided in NC Gen Stat Section 143-300.6(a).

9. Should Plaintiffs determine that this settlement requires judicial approval, Defendant and Defendant's counsel will cooperate in seeking such approval.

This, the 31st day of March, 2022.

Plaintiff Towanda Webster-Reed, in her individual capacity and as Co-Executor of Estate of Brandon Webster

Attorney for Plaintiff

Plaintiff Aldridge Reed, in his capacity as Co-Executor of the Estate of Brandon Webster

Attorney for Plaintiff

Plaintiffs B.W., Jr. and K.W.

Guardian ad Litem and Attorney for Plaintiffs

Defendant Scott Anthony Collins

Attorney for Defendant

# Exhibit G

| | **Time for Paul Smith** | |
|---|---|---|
| Date | Description | Time |
| 03/09/2021 | 3/9 -- corr w/ team re possible representation, conf and corr w/ Ira Braswell re case, docs to review | 0.90 |
| 03/11/2021 | 3/11 -- figure out plan for review of file | 0.10 |
| 03/19/2021 | 3/19 -- preliminary research, corr w/ NG re same | 0.40 |
| 03/25/2021 | 3/25 -- conf w/ team re case, preliminary research | 0.70 |
| 03/29/2021 | 3/29 -- reviewing SBI file | 2.50 |
| 04/01/2021 | 4/1 -- conf w/ Ira Braswell re: case, corr w/ team | 0.50 |
| 04/01/2021 | 4/1 -- research, corr w/ team re same, group call | 0.60 |
| 04/02/2021 | 4/2 -- review Brad's additional factual evaluation | 0.20 |
| 04/07/2021 | 4/7 -- review fee split proposal, corr & confs w/ NG re same | 0.40 |
| 04/09/2021 | 4/9 -- conf w/ NG and corr w/ Braswell re co-counsel agreement | 0.40 |
| 04/13/2021 | 4/13 -- finalize terms of co-counsel agreement; research wrongful death/survivorship law | 0.50 |
| 05/10/2021 | 5/10 -- conf w/ NG re mediators to propose | 0.20 |
| 05/21/2021 | 5/21 -- travel to Shallotte, confs w/ BB and NG, meet with clients, Ira, Ryan Smithwick, visit scene of the shooting, visit home and see car, debrief, travel | 10.00 |
| 05/24/2021 | 5/24 -- draft and file NOA; drafting discovery requests, supoenas, reviewing file | 2.50 |
| 05/25/2021 | 5/25 -- dafting discovery requests/subpoenas; corr w/ team re discovery, disclosures, next steps | 3.60 |
| 05/28/2021 | 5/28 -- incorporate feedback, finalize and serve discovery requests | 1.40 |
| 06/01/2021 | 6/1 -- draft initial disclosures, corr w/ OC re subpoena service, conf w/ NG re initial disclosures, finalize and serve; corr w/ OC re service of third party subpoenas | 2.30 |
| 06/04/2021 | 6/4 -- review proposed protective order from SBI re subpoena; compiling 3rd party subpoenas | 0.60 |
| 06/07/2021 | 6/7 -- draft protective order, send to NG | 0.70 |
| 06/08/2021 | 6/8 -- finalize proposed protective order | 0.50 |
| 06/09/2021 | 6/9 -- research gunshot trajectory expert witness, conf w/ NG re expert strategy, corr w/ team re same, look into additional experts | 2.20 |
| 06/11/2021 | 6/11 -- corr re third parties re subpoena service/contacts; conf w/ expert Drago re opinions, corr w/ team re Drago opinions and next steps | 1.60 |
| 06/14/2021 | 6/14 -- corr and conf re experts, LM w/ OC re protective order; general update to co-counsel, conf w/ Ira re Collins separation from highway patrol | 0.80 |
| 06/15/2021 | 6/15 -- protective order, follow up w OC | 0.10 |
| 06/16/2021 | 6/16 -- corr w/ team re protective order issues | 0.20 |
| 06/18/2021 | 6/18 -- draft protective order language re custodial law enforcement recordings and circulate internally | 0.40 |

| | | |
|---|---|---|
| 06/21/2021 | 6/21 -- revise protective order, incorporate DOJ changes and flag additional tweaks, send to OC | 0.90 |
| 06/30/2021 | 6/30 -- follow up w/ OC re protective order conf w/ NG re same | 0.10 |
| 07/02/2021 | 7/2 -- corr re protective order; draft joint motion; send to OC; conf w/ Columbus County Sheriff's Office re subpoena service and follow up e-mail | 0.90 |
| 07/06/2021 | 7/6 -- corr w/ OC, conf w/ NG re state of protective order, finalizing subpoenas to SBI and NCSHP, send to OC and serve | 1.20 |
| 07/07/2021 | 7/7 -- file protective order and corr re same | 0.30 |
| 07/08/2021 | 7/8 -- corr w/ Steve Agan re shooting reconstruction expert, review expert report, circulate thoughts to team | 0.30 |
| 07/09/2021 | 7/9 -- finalize subpoenas to Columbus and Brunswick Sheriffs, serve, corr w/ OC re same | 0.70 |
| 07/12/2021 | 7/12 -- corr w/ video expert, corr w/ third party subpoena recipients re subpoena, protective order; review KS's video merging and conf w/ NG re same | 0.90 |
| 07/13/2021 | 7/13 -- corr re: possible video expert, review CV/rates; corr re: possible reconstruction experts; reach out to expert Wright | 1.10 |
| 07/14/2021 | 7/14 -- corr w/ OC re discovery extension, amending scheduling order; conf w/ BC and NG re video experts; conf w/ accident reconstruction expert; draft joint motion to extend; corr w/ NG re same, send to OC | 1.40 |
| 07/15/2021 | 7/15 -- finalize and file motion to extend discovery, corr w/ video expert | 0.30 |
| 07/16/2021 | 7/16 -- research re subpoenaing social media records | 0.60 |
| 07/19/2021 | 7/19 -- think about and corr re: best way to access social media info; conf w/ Josh Wright re shooting reconstruction expert; conf w/ Richard re audio/visual expert; corr re expert reviews | 1.20 |
| 07/21/2021 | 7/21 -- corr re experts; reach out to prof re: possible ties to white supremacist organizations and how to approach those issues | 0.50 |
| 07/22/2021 | 7/22 -- corr w/ ira re: discovery issues, corr w/ experts | 0.30 |
| 07/26/2021 | 7/26 -- conf w/ Ryan Smithwick; review hospital subpoena response; check on oustanding requests w/ KS; corr w/ SBI re protective order; corr re professor/white supremacist ties | 0.40 |
| 07/27/2021 | 7/27 -- corr re outstanding discovery/subpoenas, responses | 0.30 |
| 07/28/2021 | 7/28 -- conf w/ NG re discovery extension request, general plan for discovery; brief review of docs received from highway patrol; corr w/ Bryan nichols re discovery extension request; LM w/ Rick Paxton re possible expert opinion | 0.60 |
| 07/30/2021 | 7/30 -- trying to ID trajectory expert | 0.70 |
| 08/09/2021 | 8/9 -- review and LM w/ Bill Williams re shooting reconstruction expert | 0.10 |
| 08/10/2021 | 8/10 -- conf w/ expert Bill Williams re case, retention; pull examples of Williams' work and review; corr w/ team re same | 1.00 |
| 08/11/2021 | 8/11 -- corr & confs w/ OC re status of discovery responses and delivery option, set up logistics for hand delivery tomorrow; conf w/ KS re pulling files to provide to expert Williams | 0.90 |

| | | |
|---|---|---|
| 08/12/2021 | 8/12 -- corr w/ OC re continued problems getting documents, alternate delivery options; conf w/ KS re uploading documents for expert Williams review | 0.50 |
| 08/13/2021 | 8/13 - conf w/ BC re expert strategy; corr w/ Bill Williams re docs to review | 0.70 |
| 08/14/2021 | 8/14 -- corr w/ Ira re status of discovery | 0.20 |
| 08/16/2021 | 8/16 -- corr w/ OC re oustanding doc productions, sending Beverly; quick review of documents produced electronicaly and corr w/ KS pulling/filing documents, checking for duplicates | 0.60 |
| 08/17/2021 | 8/17 -- conf w/ NG re state of the case/experts/discovery and next steps; corr w/ OC re: missing rog and RPD responses | 0.80 |
| 08/18/2021 | 8/18 -- review discovery, corr w/ expert Williams re additional written reports; corr w/ OC re pending discovery requests/motion to compel; expert release; conf w/ team re status of discovery and next steps | 1.20 |
| 08/20/2021 | 8/20 -- conf w/ Bill Williams, incl prep and debrief; confs w/NG expert Williams, state of discovery; trying to figure out logistics; corr and confs w/ Bryan Nichols re next steps; start drafting motion to compel | 2.20 |
| 08/23/2021 | 8/23 -- conf w/ NG and BB re discovery and next steps, check docs produced over the weeked, corr w/ KS re pulling all the docs from over the weekend and indexing | 1.60 |
| 08/24/2021 | 8/24 -- conf w/ BB re discovery and next steps, conf & corr w/ KS re discovery index and corr w/ BB re same | 1.30 |
| 08/25/2021 | 8/25 -- draft and circulate motion to modify scheduling order; review discovery; conf w/ client re: getting expert Williams access to the truck, corr w/ Williams re schelduling; conf w/ minimart owner re access to parking lot; LM w/ OC re extension | 2.00 |
| 08/26/2021 | 8/26 -- draft and finalize expert confidentiality agreement, send to expert Williams; LM w/ OC re extension | 0.70 |
| 08/27/2021 | 8/27 -- corr w/ expert Williams re scheduling | 0.10 |
| 08/30/2021 | 8/30 -- corr w/ Williams re site visit, additional docs; conf w/ NG | 0.40 |
| 08/31/2021 | 8/31 -- reviewing docs produced in discovery; comparing to videos produced from SBI; identifying deficiencies in production; reviewing videos to send to expert Williams and corr w/ KS re uploading, corr w/ Williams re same | 2.40 |
| 09/01/2021 | 9/1 -- corr re subpoenas, corr re expert site visits; revise subpoenas; conf w/ BB re expert visit and corr re same | 1.20 |
| 09/02/2021 | 9/2 -- revise and circulate DA subpoenas; corr w/ expert | 0.40 |
| 09/07/2021 | 9/7 -- conf w/ BB re review of discovery | 0.50 |
| 09/09/2021 | 9/9 -- corr re getting Ira copies of all discovery so far | 0.20 |
| 09/13/2021 | 9/13 -- corr re getting docs to Ira, corr w/ Ira re state of discovery | 0.30 |
| 09/14/2021 | 9/14 -- start revising complaint; conf w/ NG and BB re status of everything, and follow up with OC re failure to provide insurance policies; conf w/ KS re indexing responses so far and identification of deficiencies; review cases on viability of Wanda's NIED claim and corr w/ NG re same | 3.90 |

| | | |
|---|---|---|
| 09/15/2021 | 9/15 -- revising complaint, reviewing documents, confs re same; ID possible existence of 3D scan of truck and internal corr re same | 4.40 |
| 09/16/2021 | 9/16 -- incorporate edits to complaint; conf w/ NG re general status; corr w/ Ira re amendment; corr w/ team re call with Ira; internal corr re: what to demand in motion to compel and draft corr to OC re deficiencies, finalize and send letter re discovery defficiencies | 4.80 |
| 09/17/2021 | 9/17 -- LM w/ each opposing counsel re: motion to compel; conf w/ Ira and Ryan Smithwick re: amendments; revising amended complaint; related legal research to ensure sufficiency | 5.10 |
| 09/20/2021 | 9/20 -- revise complaint; corr re outstanding discovery/motion to compel; conf w/ Bryan N. re discovery supplementation to address deficiencies; draft additional representation for Aldridge Reed in his capacity as co-administrator of estate and send to client; secure and review video from Wanda from inside the hospital of her being arrested; research viability of substantive due process claim and confs re dropping/keeping | 5.50 |
| 09/21/2021 | 9/21 -- revise complaint; draft e-mail to OC; circulate and e-mail to OC for position; corr w/ OC. | 3.50 |
| 09/22/2021 | 9/22 -- discovery, confs re next steps, corr w/ team re depo dates; experts; subpoenas; reviewing SBI file and circulate earlier protective order; identify necessary initial disclosure supplementations | 2.40 |
| 09/23/2021 | 9/23 -- corr w/ OC re scheduling Collins depo; internal corr re: DA subpoenas, corr w/ SHP re subpoena response | 0.20 |
| 09/28/2021 | 9/28 -- various corr re discovery; conf w/ BB re expert strategy and next steps | 0.70 |
| 09/29/2021 | 9/29 -- BCSO subpoena follow-up letter, corr w/ BB, review docs for Drago | 0.90 |
| 09/30/2021 | 9/30 -- corr w/ OC re depo dats, confs w/ BB re evidence review, depo prep | 0.30 |
| 10/01/2021 | 10/1 -- conf w/ BB and NG re depositions, next steps, in-person v remote; draft notice of deposition | 2.80 |
| 10/04/2021 | 10/4 -- confs w/ BB re doc review/experts; review file; conf re what docs to send to Drago | 0.90 |
| 10/05/2021 | 10/5 -- confs w/ BB and NG re medical files, following up, experts; corr w/ SBI re follow-up; corr w/ client re release; revise inidial disclosures | 2.80 |
| 10/06/2021 | 10/6 -- conf w/ BB re: Drago docs, general next steps; corr w/ SBI re: supplemental production | 1.50 |
| 10/07/2021 | 10/7 -- review SHP additional subpoena response, circulate; corr re next steps with Drago; review additional docs produced by SHP | 2.00 |
| 10/08/2021 | 10/8 -- review SHP policies for Drago; review new reconstruction documents; corr w/ Williams re new SHP reconstruction production/next steps; confs w/ BB; review old e-mails | 2.50 |
| 10/10/2021 | 10/10 -- corr re next steps re Bill W | 0.30 |
| 10/11/2021 | 10/11 -- conf w/ Bill Williams re: expert report (2.0); conf w/ BC re: update and thoughts re extension (.1); conf w/ NG re: update and | 3.90 |

| | | |
|---|---|---|
| | thoughts (.2); pre- and post- Williams confs w/ BB re experts, extensions, Collins depo; review SHP supplemental production | |
| 10/12/2021 | 10/12 -- draft motion to extend discovery; corr w/ OC re same; confs w/ NG and BB | 2.90 |
| 10/13/2021 | 10/13 -- revise, finalize, and file extension motion; conf w/ NG and BB re: whether to continue with Collins' depo given the number of evidentiary issues; conf w/ BB re follow up with SHP and DOJ; corr w/ Angel Grey at SBI re status of supplemental production; revise BB's letter to SHP re another round of follow-up | 5.50 |
| 10/14/2021 | 10/14 -- Conf w/ BB re subpoenas; corr w/ Williams re pending extension for expert reports | 0.80 |
| 10/15/2021 | 10/15 -- conf w/ team, call court re: status of pending extension motion | 0.20 |
| 10/18/2021 | 10/18 -- confs w/ BB and NG re next steps, discovery follow ups, etc; corr w/ experts re extension | 1.20 |
| 10/19/2021 | 10/19 -- call off depo; draft supplemental disclosures; corr w/ SBI re update; corr w/ team | 0.80 |
| 10/20/2021 | 10/20 -- corr re general litigation approach; corr w/ expert, corr w/ Ryan re minimart access | 0.70 |
| 10/21/2021 | 10/21 -- various corr re: minimart access, conf w/ BB re same | 0.70 |
| 10/27/2021 | 10/27 -- corr w/ Bill Williams | 0.30 |
| 11/01/2021 | 11/1 -- corr re: need to access the Mini-mart ASAP; research/draft subpoena for inspection of premises, finalize and issue; corr w/ minimart owner re same | 1.50 |
| 11/02/2021 | 11/2 -- research witness Hewett & corr re same; corr re: damages witnesses and next steps; corr w/ expert re subpoena, site visit; corr w/ Ben Del Re re minimart subpoenaa; conf w/ Bill Williams and debrief with team, corr w/ Boo re Bill Williams | 2.60 |
| 11/03/2021 | 11/3 -- conf w/ Boo Moore re Williams, corr re same | 1.00 |
| 11/04/2021 | 11/4 -- corr w/ Williams and Boo Moore; check service rules; conf w/ Minimart clerk and corr re same; conf w/ Boo, conf w/ NG; reach out to new experts, research new trajectory experts | 2.50 |
| 11/05/2021 | 11/5 -- multiple confs re status of the case; conf w/ Arden re medical expert testimony; pull files for Arden; corr w/ Williams re next week's visit; research trajectory experts and circulate findings; corr with NC DOI re: policy and corr w/ OC re same; corr w/ NC DPS re oustanding discovery requests | 5.40 |
| 11/08/2021 | 11/8 -- conf w/ trajectory expert re retention and next steps; conf w/ Webster's family re: plans for Williams's site visit Tuesday night; conf w/ NG re: trajectory expert; conf w/ Nashat A. re the site work tomorrow, corr w/ Williams re same | 1.00 |
| 11/09/2021 | 11/9 -- corr w/ expert Williams re tonight's visit, corr w/ Hueske re same; cong w/ Bryan Heckle and DOI and corr re insurance policy, review policy (all prior amount to 1.2); drive to Brunswick County (3 hours); meet with family (.3); confs w/ minimart staff and owner re subpoena compliance and our plans (.5); observe Bill Williams | 10.50 |

| | reconstruction and multiple confs throughout to understand the procses (4.5); travel part ways back (1) | |
|---|---|---|
| 11/10/2021 | 11/10 -- travel back (2.0); debrief w/ team, follow up call w/ team re next steps, conf w/ Bill re how the rest of the night went, next steps (.8); conf w/ NG re: additional medical records and e-mail SBI (.2) | 3.00 |
| 11/12/2021 | 11/12 -- Corr w/ Williams and conf w/ family re: taking the truck to SC for further analysis, conf w/ Bill (all prior .7); joint conf w/ Bill W and Hueske (.5) | 1.20 |
| 11/17/2021 | 11/17 -- review preliminary docs from Bill Williams and corr re same | 0.10 |
| 11/18/2021 | 11/18 -- corr w/ SBI re: Collins' unique identifier and supplementing their subpoena response; conf w/ Hueske | 0.70 |
| 11/19/2021 | 11/19 -- corr w/ Hueske, flag docs for KS to pull and send to Hueske, pull docs re estate and circulate | 0.70 |
| 11/22/2021 | 11/22 -- corr w/ Bill and Ed; review SBI production and flag for possible follow-up; corr w/ Drago; conf w/ expert Arden and NG | 3.20 |
| 11/23/2021 | 11/23 -- corr w/ NC SHP re discovery; conf w/ expert Hueske; conf w/ expert Drago, have Kim pull additional documents requested by Drago; | 2.70 |
| 11/24/2021 | 11/24 -- corr w/ KS and Hueske re additional docs for his review | 0.30 |
| 11/30/2021 | 11/30 -- research other cases re: scene reconstruction/reverse projection experts, and e-mail re same, re Bill Webster (1.0); Conf w/ Mary Alice Webster re serving as a damages witness, draft/circulate notes (.4); draft/update supplemental disclosures and circulate (.8) | 2.20 |
| 12/01/2021 | 12/1 -- finalize supplemental disclosures and file; conf w/ NG re Hueske, Williams, and Arden draft report and next steps for each; corr w/ experts; conf w/ Drago; research standards re: Williams, Hueske, and their interplay | 3.10 |
| 12/02/2021 | 12/2 -- conf w/ Hueske re draft report (.2) conf w/ BB and NG re: status of expert reports (.3); review Drago expert report and map out comments (1.6) | 2.10 |
| 12/03/2021 | 12/3 -- conf w/ Williams, working on Williams report | 2.10 |
| 12/06/2021 | 12/6 -- review revisions to Hueske report, revise, circulate; revise Drago report | 1.90 |
| 12/07/2021 | 12/7 -- propose revisions to Williams' report (credentials, background) and circulate revisions; corr and attempted confs w/ Hueske, corr w/ Drago; general corr re preparation of expert reports | 4.00 |
| 12/08/2021 | 12/8 -- propose revisions to Hueske report and circulate; conf w/ NG re state of reports, need for expert extension, corr w/ OC re consent; revise Drago report and circulate; confs w/ KS re: pulling together doc production & adding Bates numbers to expert reports; general corr w/ experts; draft motion to modify scheduling order & prop order | 4.50 |
| 12/09/2021 | 12/9 -- file motion for an extension of expert deadline; general work/corr for experts; edit/comment re Drago report | 2.10 |
| 12/10/2021 | 12/10 -- propose revisions to Drago report and circulate, conf w/ Drago and BB & follow-up e-mails, incorporate Drago's changes & circulate to team; corr w/ Hueske; corr w/ Williams; conf w/ court re: pending extension, confs w/ BB re general expert report approach and extension | 4.60 |

| | | |
|---|---|---|
| 12/12/2021 | 12/12 -- conf w/ NG re Williams report, conf w/ BB re same | 0.50 |
| 12/13/2021 | 12/13 -- conf w/ Ed Hueske; confs w/ BB re: Williams report, corr re same; confs w/ NG re Williams/Hueske/general approach to expert witnesses | 2.20 |
| 12/14/2021 | 12/14 -- conf w/ Heuske and corr re same; edits to Williams report and corr/confs re splitting Williams' report into more appendices | 2.30 |
| 12/15/2021 | 12/15 -- conf w/ KS re pulling Hueske docs, corr w/ Hueske, prep for Williams conf; corr/call Williams, edit Williams methodology appendix | 1.60 |
| 12/16/2021 | 12/16 -- expert reports | 1.80 |
| 12/17/2021 | 12/17 -- conf w/ Wanda, Aldridge, Ira, and BB re general update (.2); finalizing and submitting expert reports (remainder) | 7.40 |
| 12/27/2021 | 12/27 -- review Williams invoice and corr re same | 0.20 |
| 01/03/2022 | 1/3 -- confs re depos w/ BB, corr re same | 0.60 |
| 01/05/2022 | 1/5 -- confs re: outstanding tasks, next steps re depos, subpoenas, witnesses; corr w/ Bill W re invoice | 1.00 |
| 01/06/2022 | 1/6 -- conf w/ Bill W and BB | 0.30 |
| 01/10/2022 | 1/10 -- conf w/ BB, NG, and BC re: Whitney; corr w/ Matt Ballew re: touching base on conflict issues, past experiences with State defendants/indemnification | 1.30 |
| 01/11/2022 | 1/11 -- conf w/ BB re depo strategy; corr w/ OC re doc production | 0.80 |
| 01/12/2022 | 1/12 -- figuring out problems with OC accessing expert docs; reviewing docs re additional depos to notice and corr re same; draft RFAs re video authentication; conf w/ Matt Ballew re various issues | 3.50 |
| 01/13/2022 | 1/13 -- corr re video authentication approaches and strategy, corr & conf w/ Shawn Hewett's criminal counsel re possible meeting with their client re: a declaration, and internal corr re same and next steps; following up about DOJ's problem accessing files; conf w/ NG re supplementation, focus groups, next steps | 3.00 |
| 01/18/2022 | 1/18 -- corr re: supplemental disclosures; corr w/ KS re setting up witness Hewitt call; multiple confs w/ BB and NG re depo dates, strategy; confs w/ KS, BB, and NG re supplemental disclosures | 1.40 |
| 01/19/2022 | 1/19 -- drafting, finalizing, and submitting second supplemental disclosures, confs and corr re same | 1.80 |
| 01/21/2022 | 1/21 -- finalize and issue RFA; finalize and issue doc production; conf w/ BB | 1.50 |
| 01/24/2022 | 1/24 -- re-watching evans and williams interviews, drafting declarations and circulating | 2.80 |
| 01/25/2022 | 1/25 -- draft letter to Shawn Hewett | 0.20 |
| 01/27/2022 | 1/27 -- revise Evans and Williams declarations and circulate; conf w/ Wanda and Aldridge about general updates, witnesses, mediation, etc.; | 0.70 |
| 01/31/2022 | 1/31 -- conf w/ BB re Collins' deposition strategy | 0.30 |
| 02/02/2022 | 2/2 -- conf w/ BB re Collins' depo; try to contact witness Lauren Williams, research contact info; contact private investigator | 1.20 |
| 02/02/2022 | 2/2 -- pull doc w/ Collins' stats for BB, corr w/ PI re locating witness | 0.40 |

| | | |
|---|---|---|
| 02/03/2022 | 2/3 -- conf w/ NG re witnesses; corr w/ PI re Lauren Williams, attempting to contact Williams | 0.30 |
| 02/04/2022 | 2/4 -- corr re depos; call Lauren W; call PI re further investigation; pull doc for BB | 0.30 |
| 02/05/2022 | 2/5 -- review and revise Collins depo outline, conf w/ BB re same | 3.00 |
| 02/07/2022 | 2/7 -- Colilns depo and related confs | 5.00 |
| 02/09/2022 | 2/9 -- review Whaley outline, conf w/ BB re Collins depo and thoughts re Whaley depo | 0.80 |
| 02/10/2022 | 2/10 -- second half of Collins depo, confs w/ BB and NG re same, debrief, conf re Whaley | 4.80 |
| 02/11/2022 | 2/11 -- Whaley depo, debrief; confs re strategy for next depositions; corr re: extending mediation | 5.70 |
| 02/14/2022 | 2/14 -- King depo and confs re same | 2.50 |
| 02/15/2022 | 2/15 -- Sanders & Ward depo prep, depos, debrief | 5.50 |
| 02/16/2022 | 2/16 -- conf w/ team re next steps for discovery, mediation | 1.40 |
| 02/17/2022 | 2/17 -- start letter to mediator, conf w/ BB re client/mediation | 1.00 |
| 02/18/2022 | 2/18 -- letter to mediator | 0.70 |
| 02/22/2022 | 2/22 -- conf w/ team re witness declarations, conf w/ Wanda re Lauren Williams and case; corr w/ team re Williams approach | 0.60 |
| 02/23/2022 | 2/23 -- conf w/ BB and NG re next steps, mediation; confs w/ insurance policy limits; review indemnification statutes and cases, draft e-mail to OC re coverage and circulate | 1.60 |
| 02/24/2022 | 2/24 -- drafting letter to mediator and confs re same; confs re insurance limitations and corr w/ OC re same | 2.50 |
| 02/25/2022 | 2/25 -- prep for pre mediation meeting with Wanda, meeting | 1.20 |
| 02/28/2022 | 2/28 -- Ransom depo; legal research in advance of the mediation, reviewing letter to mediator; conf w/ team re settlement and mediation strategy | 3.90 |
| 03/01/2022 | 3/1 -- review mediator's letter, corr w/ Ira, corr w/ teams re mediation prep and confs w/ clients | 0.70 |
| 03/02/2022 | 3/2 -- mediation prep; pre-mediation conf w/ Wanda, Aldridge, Ryan Smithwick; corr re family photos | 2.40 |
| 03/03/2022 | 3/3 - mediation prep, reviewing possible video excerpts for mediation, reviewing Whaley and Ward depositions for key clips for presentation | 1.90 |
| 03/04/2022 | 3/4 -- mediation prep; mediation;  debrief | 4.00 |
| 03/07/2022 | 3/7 -- conf w/ BB and NG re next steps; corr re: rene's schedule, conf w/ BB, corr w/ Rene and OC re second mediation option | 0.50 |
| 03/10/2022 | 3/10 -- corr w/ Rene re mediation | 0.10 |
| 03/15/2022 | 3/15 -- conf w/ witness Hewett; conf w/ NG re same; prepare draft affidavit and circulate; conf w/ hewett | 1.00 |
| 03/16/2022 | 3/16 -- finalize and have KS send out Hewett declaration | 0.10 |
| 03/17/2022 | 3/17 -- confs w/ BB and NG re the wisdom of providing further info in advance of mediation; drafting e-mail to Bryan N and send | 1.40 |
| 03/21/2022 | 3/21 -- corr re mediation | 0.20 |

| 03/23/2022 | 3/23 -- revise mediator letter; corr w/ IRA re mediation | 0.50 |
|---|---|---|
| 03/30/2022 | 3/30 -- conf w/ mediation, run through with BB and conf re changes | 1.10 |
| 03/31/2022 | 3/31 -- mediation | 11.50 |
| 04/01/2022 | 4/1 -- debrief from mediation, conf re next steps re structuring, corr w/ Ryan S re same | 1.20 |
| 04/05/2022 | 4/5 -- corr re finding the right structured settlement person | 0.50 |
| 04/07/2022 | 4/7 -- confs w/ NG, Leto re cleaning up the GALs | 1.20 |
| 04/12/2022 | 4/12 -- confs re GAL, structuring | 1.00 |
| 04/18/2022 | 4/18 -- conf w/ Ryan and Rick, conf w/ NG, conf w/ Wanda, Conf w/ Whitney, Conf w/ Kristy, all re GAL work; corr w/ NG re potential meeting time | 0.90 |
| 04/20/2022 | 4/20 -- corr w/ Bill Williams re case update, final logistics re: the truck | 0.20 |
| 04/21/2022 | 4/21 -- conf w/ BC re settlement approval process, conf w/ Whitney re GAL, corr w/ Kristy re: same, corr w/ GALs, corr w/ Ira | 1.20 |
| 04/27/2022 | 4/27 -- travel to Brunswick; meet with Kamea and Brandon Jr's moms re GAL, confs w/ GALs | 10.50 |
| 05/02/2022 | 5/2 -- conf w/ NG re Webster issues | 0.30 |
| 05/03/2022 | 5/3 -- confs w/ NG, NG and BC, BC re: status of heirs, next steps; legal research re same; corr w/ Ira re update | 2.50 |
| 05/04/2022 | 5/4 -- confs w/ NG, BC, BB re: settlement/estate/heir issues; pull cases and send to BC | 1.60 |
| 05/10/2022 | 5/10 -- edit motion to appoint GALs | 0.10 |
| 05/11/2022 | 5/11 -- internal confs re: need to update Wanda and Aldridge, topics to address; conf w/ BB, Wanda, and Aldridge re status of everything, GALs, next steps | 0.80 |
| 05/23/2022 | 5/23 -- conf w/ NG re extension, review extension motion | 0.20 |
| 06/21/2022 | 6/21 -- conf w/ Ira B | 0.10 |
| 06/29/2022 | 6/29 -- conf w/ Ira and NG, follow up conf w/ NG; conf re: division of labor for settlement approval motion, next steps; pull example motions for approval and start drafting | 3.30 |
| 06/30/2022 | 6/30 -- motion to approve settlement | 2.80 |
| 07/05/2022 | 7/5 -- legal research re settlement approval | 1.20 |
| 07/12/2022 | 7/12 -- motion to approve settlement | 1.50 |
| 07/29/2022 | 7/29 -- conf re: status of settlement negotiations, next steps for pulling together settlement approval motion | 0.30 |
| 08/01/2022 | 8/1 -- conf w/ NG, e-mail re corr w/ Ira | 0.30 |
| 08/05/2022 | 8/5 -- conf w/ Wanda re status of Brandon's truck, corr w/ Bill Williams re same | 0.30 |
| 08/08/2022 | 8/8 -- conf w/ NG re status of settlement, next steps; corr w/ Agan re possible affidavit | 0.60 |
| 08/11/2022 | 8/11 -- conf w/ NG re status of trusts, corr w/ attorneys re affidavits, pull examples, draft Matt Ballew affidavit; revise motion to approve | 2.40 |
| 08/16/2022 | 8/16 -- confs w/ NG re: settlement, setting up a trust, status of DNA testing, next steps | 0.40 |

| | | |
|---|---|---|
| 08/18/2022 | 8/18 -- drafting motion to approve settlement; conf w/ Wanda re truck pickup from Bill W | 3.40 |
| 08/19/2022 | 8/19 -- cleaning up time; reviewing expenses and reformatting for submission, conf w/ AW re same; r | 3.70 |
| 08/22/2022 | 8/22 -- reaching out to OC, OC's paralegal, trying to get response to request for extension consent | 0.40 |
| 08/23/2022 | 8/23 -- working on fee petition, affidavits | 1.30 |
| 08/23/2022 | 8/23 -- finalize and file motion for extension of settlement deadline | 0.50 |
| 08/24/2022 | 8/24 -- pull and send example atty affidavits to Ira | 0.20 |
| 08/24/2022 | 8/24 -- working on affidavits for settlement confirmation (.4); cleaning up expenses, my time (1.1) | 1.50 |
| 08/25/2022 | 8/25 -- drafting affidavits re settlement approval motion and circulate; cleaning up my time re sam | 2.40 |
| 08/31/2022 | 8/31 -- review paternity order, conf w/ NG re revisions and general approach | 0.40 |
| 09/01/2022 | 9/1 -- conf w/ NG re state of progress on settlement motion, outstanding tasks | 0.10 |
| 09/07/2022 | 9/7 -- conf w/ NG re motion to approve, aff'ts; revise draft atty aff'ts and send; corr and conf w/ | 1.30 |
| 09/08/2022 | 9/8 -- conf w/ Wanda, Aldridge, and NG re: general update, funeral expenses | 0.20 |
| 09/09/2022 | 9/9 --- response to Carlos M's questions about affidavit | 0.40 |
| 09/13/2022 | 9/13 -- conf w/ Carlos re attorney affidavit, follow-up w/ NG | 0.40 |
| 09/15/2022 | 9/15 -- review and revise Braswell dec'n | 0.20 |
| 09/16/2022 | 9/16 -- working on motion to approve settlement, incorporating atty affidavits | 1.00 |
| 09/16/2022 | 9/16 -- working on motion to approve settlement, incorporating atty affidavits | 2.00 |
| 09/19/2022 | 9/19 -- drafting settlement approval motion, send draft to NG | 2.80 |
| 09/21/2022 | 9/21 -- drafting GAL declarations | 1.20 |
| 09/22/2022 | 9/22 -- finalize draft GAL affidavits and send to NG | 0.50 |
| 09/23/2022 | 9/23 -- drafting local rule 17.1 section to motion to approve settlement, drafting proposed order, | 5.50 |
| 09/26/2022 | 9/26 -- revising mot to approve settlement, compiling docs, expanding primary atty declaration, rev | 3.30 |
| | **Total:** | **361.9** |

Exhibit H

**Peoples Funeral Home of S⌐ 'lotte, Inc.**
5190 Ocean Highway W
Shallotte, NC 28459
Office (910) 754-6242   Fax (910) 754-6246
Establishment License #443



Charges are only for those items that you selected or that are required.If we are required by law or by a cemetery or crematory to use any items, we will explain the reasons in writing below.

If you selected a funeral that may require embalming, such as a funeral with viewing, you may have to pay for embalming.You do not have to pay for embalming you did not approve if you selected arrangements such as a direct cremation or immediate burial. If we charged for embalming, we will explain why below.

DECEASED  Brandon Lovell Webster

STATEMENT DATE  January 04, 2019          # 2018-53

DATE OF DEATH     January 01, 2019

PLACE OF DEATH  Bolivia, NC

## A. CHARGE FOR SERVICES SELECTED

**1. Professional Services:**

| | | |
|---|---|---|
| Basic Services of Funeral Director & Staff | $ | 2095.00 |
| Embalming | $ | 550.00 |
| Dressing & Casketing of remains | $ | 125.00 |
| Cemetery Equipment | $ | 75.00 |
| TOTAL  $ | | 2845.00 |

**3. Transportation & Automotive Equipment:**

| | | |
|---|---|---|
| Transfer of Remains to Funeral Home | $ | 250.00 |
| Funeral Coach (Hearse) | $ | 200.00 |
| (2) Limousine @ 200.00ea. | $ | 400.00 |
| Flower/Lead Car/Utility Vehicle | $ | 175.00 |
| TOTAL  $ | | 1025.00 |

TOTAL OF SERVICES SELECTED.............$_____ 3870.00

## B. CHARGE FOR MERCHANDISE SELECTED

| | | |
|---|---|---|
| Casket | $ | 1695.00 |
| *20 Gauge Casketed Bible White Casket* | | |
| Concrete Container (Grave Liner) | $ | 850.00 |
| Extra Vault Top | $ | 475.00 |

*Disclaimer of Warranties: The only warranty on the casket or any merchandise sold in connection with this service is the express written warranty, if any, granted by the manufacturer. This funeral home makes no warranty, express or implied, including an implied warranty of merchantability and an implied warranty of fitness for a particular purpose, with respect to the merchandise.*

TOTAL OF MERCHANDISE SELECTED.................$_____ 3020.00

## C. SPECIAL CHARGES

TOTAL OF SPECIAL CHARGES.............................$_____ 0.00

TOTAL FUNERAL HOME CHARGES......................$ 6890.00
*(This total does not include Cash Advances)*

## D. CASH ADVANCES

| | | |
|---|---|---|
| Open/Closing | $ | 450.00 |
| Death Certificate | $ | 10.00 |

* We charge you for our services in obtaining those *Cash Advance* items designated with an asterisk.

Total Cash Advances (D).............................$_____ 460.00

## SUMMARY

| | | |
|---|---|---|
| TOTAL FUNERAL HOME CHARGES.................. $ | | 6890.00 |
| Sales Tax (if applicable) | $ | 203.85 |
| Total Cash Advances (D) | $ | 460.00 |
| **GRAND TOTAL** $ | | 7553.85 |

**LESS PAYMENTS & ADJUSTMENTS**

**AMOUNT DUE $** 7553.85

## DISCLOSURES

If any legal, cemetery, or crematory requirement has required the purchase of any items listed, we will explain the requirement below:

**Cemetery / Crematory:**  None
**Reason for Embalming:**  Public Viewing

## ACKNOWLEDGEMENT & AGREEMENT

I hereby acknowledge that I have the legal right to arrange the final services for the deceased, and I authorize this funeral establishment to perform services, furnish goods and incur outside charges specified on this statement.  I acknowledge that I have received the General Price List and have been offered for review the Casket and Outer Burial Container Price List.  This Statement of disclosure is provided under the requirements of North Carolina G.S. 90-210.25 (e)

Payment due in full at time of service

PAID
1/5/2019 CS

Bill To: Mary Reed - (910) 685-5840
2353 Shell Point Rd.
Shallotte, NC 28470

Signature
X _Mary Reed_      SSN  24 31 7479
X

*This funeral establishment agrees to provide all services, merchandise and cash advances indicated on this Statement.*

Funeral Home Representative      License Number      Signature      Dated

William E. Shannon  FD-3230

# Exhibit I

# Litigation Expenses Advanced by Patterson Harkavy

*Webster v. Collins*, 7:20-cv-00248-FL

| Memo | Category | Paid Amount |
|---|---|---|
| 6/14/21 -- Drago Retainer | Expert | 2,500.00 |
| 7/6/21 -- UPS to NC Dept of Public Safety and to NCSBI | Postage -- Subpoena Service | 23.10 |
| 7/9/21 -- UPS to Novant, Columbus and Brunswick Cty Sherriffs | Postage -- Subpoena Service | 33.03 |
| 10/6/21 -- medical records from Novant Health | Medical Records | 30.00 |
| 10/10/21 -- Williams September 2021 (site visit and review) | Expert | 7,762.08 |
| 10/10/21 -- Williams August 2021 (file review and video anlysis) | Expert | 3,144.00 |
| 9/24/21-- UPS to Cumberland DA, Brunswick County and NC Dept | Postage -- Subpoena Service | 31.40 |
| 10/1/21-- UPS to NC DPS Highway Patrol | Postage -- Subpoena Service | 9.62 |
| 11/9/21 -- Dr. Arden retention | Expert | 1,000.00 |
| 11/10/21 -- Hueske retention | Expert | 2,500.00 |
| 11/7/21 -- UPS to Civietown Mini Mart | Postage -- Subpoena Service | 17.71 |
| 12/13/21 -- additional Novant medical records | Medical Records | 67.50 |
| 11/10-12/13/21 Hueske expenses | Expert | 3,050.00 |
| 11/10/21 – Mileage to/from Shallote, 380 miles x .56 (scene reconstruction) | Mileage | 212.80 |
| 11/10/21-- hotel room for overnight scene reconstruction | Lodging | 70.00 |
| 1/7/2021 -- Drago expense | Expert | 1,381.25 |
| 12/9/21-- Dr. Arden expenses | Expert | 275.00 |
| 11-16-11/30/21 -- Dr. Arden expenses | Expert | 2,162.50 |
| 1/27/2022 -- Williams Oct-Dec (Scene Reconst., Analysis, Drafting) | Expert | 40,378.52 |
| 2/8/2022 -- Hueske expenses | Expert | 3,000.00 |
| 3/4/22 -- Mediation | Mediation | 565.00 |
| 2/15/22 -- depo of Patrick Sanders & CV Ward | Deposition/Transcript | 963.05 |
| 2/7/22 -- depo of Scott Collins (Day 1) | Deposition/Transcript | 920.55 |
| 2/10/22 -- depo of Scott Collins (Day 2) | Deposition/Transcript | 929.75 |
| 2/14/22 -- depo of Matt King | Deposition/Transcript | 492.30 |
| 211/22 -- depo of Shannon Whaley | Deposition/Transcript | 1,011.30 |
| 3/1/22 -- UPS to Sumrell Sugg | Postage -- Mediator | 10.60 |
| 3/24/22 -- Trehy mediation bill | Mediation | 2,395.00 |
| 2/28/22 -- John Ransom depo | Deposition/Transcript | 450.00 |
| 3/24/22 -- UPS to Rene Trehy | Postage -- Mediator | 10.84 |
| 4/27/22 -- Mileage to/from Shallote, 380 miles (client & GAL meetings) | Mileage | 222.30 |
| 5/9/22 -- Postage | Postage | 4.44 |
| 5/9/22 -- Postage | Postage | 3.79 |
| 6/3/22 -- Postage | Postage | 4.62 |
| 7/5/22 -- Postage | Postage | 6.67 |
| | | |
| | **TOTAL** | **75,638.72** |

Exhibit J



WARD AND SMITH, P.A.
ATTORNEYS AT LAW

<u>PERSONAL AND CONFIDENTIAL</u>

Patterson Harkavy, LLP
Mr. Narenda Ghosh
100 Europa Dr Ste 420
Chapel Hill, NC 27517

Invoice Date:      February 24, 2023
Invoice Number:      3888107
Client:      221191

Ward and Smith is committed to providing professional services of superior quality.  If you need assistance with your statement, please contact Client Services at 252-672-5544.  Thank you for allowing us to serve you.

*For Professional Services through* **February 20, 2023**

| | | |
|---|---|---|
| Previous Balance: | $ | 0.00 |
| Payments Received: | $ | 0.00 |
| Current Fees for Professional Services: | $ | 12,000.00 |
| Current Expenses: | $ | 0.00 |
| **Balance Due:** | **$** | **12,000.00** |

**Please Remit To**

**Mail To:**
Post Office Box 867
New Bern, NC 28563-0867
Ph:  252.672.5400

**Pay your invoice online:**
www.wardandsmith.com/onlinepayment

**Wiring Instructions:**
First-Citizens Bank & Trust Company
Raleigh, NC
Account #: 1112454087
ABA #:  053100300
Include Invoice or Client Number

Payment due upon receipt.  A late payment charge of 1.50% per month will be added to amounts
Outstanding for more than 30  days.  0168

### Services

Conferences and correspondence related to Settlement and Trust planning for B. Webster; preparation of Trust; preparation of language for Motion and proposed Order for creation and funding of Trust

Conferences and correspondence related to Settlement and Trust planning for K. Webster; preparation of Trust; preparation of language for Motion and proposed Order for creation and funding of Trust

Conferences and correspondence related to Settlement and Trust planning for Z. Lea; preparation of Trust; preparation of language for Motion and proposed Order for creation and funding of Trust

**Total Fees for Services:**      **$12,000.00**

**Total Fees for Services and Expenses for this Matter:**      **$12,000.00**



WARD AND SMITH, P.A.
ATTORNEYS AT LAW

Patterson Harkavy, LLP
Mr. Narenda Ghosh
100 Europa Dr Ste 420
Chapel Hill, NC 27517

| | |
|---|---|
| Invoice Date: | February 24, 2023 |
| Invoice Number: | 3888107 |
| Client: | 221191 |

### Remittance

Ward and Smith is committed to providing professional services of superior quality. If you need assistance with your statement, please contact Client Services at 252-672-5544. Thank you for allowing us to serve you.

*For Professional Services through **February 20, 2023***

| | | |
|---|---|---|
| Previous Balance: | $ | 0.00 |
| Payments Received: | $ | 0.00 |
| Current Fees for Professional Services: | $ | 12,000.00 |
| Current Expenses: | $ | 0.00 |
| **Balance Due:** | **$** | **12,000.00** |

**Please Remit To**

**Mail To:**
Post Office Box 867
New Bern, NC 28563-0867
Ph: 252.672.5400

**Pay your invoice online:**
www.wardandsmith.com/onlinepayment

**Wiring Instructions:**
First-Citizens Bank & Trust Company
Raleigh, NC
Account #: 1112454087
ABA #: 053100300
Include Invoice or Client Number

Payment due upon receipt. A late payment charge of 1.50% per month will be added to amounts
Outstanding for more than 30 days. 0168

Exhibit K

**Proposed Disbursement of Settlement Funds**

*Webster v. Collins*, 7:20-cv-00248-FL

| | Amount | Sub-Amount |
|---|---|---|
| **Total Settlement** | $2,200,000.00 | |
| | | |
| Total Funds for K.W. | $ 391,655.68 | |
| Funding for Structured Annuity | | $ 338,145.10 |
| Payment to Rick Parrotte for GAL Services | | $2,600.00 |
| Funding for Trust | | $50,910.58 |
| (Trust will pay legal expense for trust drafting to Ward & Smith) | | $4,000.00 |
| | | |
| Total Funds for B.W. | $ 391,655.68 | |
| Funding for Structured Annuity | | $268,538.00 |
| Payment to Ryan Smithwick for GAL Services | | $2,992.58 |
| Funding for Trust | | $120,125.10 |
| (Trust will pay legal expense for trust drafting to Ward & Smith) | | $4,000.00 |
| | | |
| Total Funds for Z.L. | $ 391,655.68 | |
| Funding for Structured Annuity | | $271,655.00 |
| Payment to P. Hilton and P. Ekster for Representation/GAL Services | | $18,419.90 |
| Funding for Trust | | $101,580.78 |
| (Trust will pay legal expense for trust drafting to Ward & Smith) | | $4,000.00 |
| | | |
| Payment to Ms. Webster-Reed for Individual Claim | $61,200.75 | |
| | | |
| Payment of Attorneys' Fees to Plaintiffs' Counsel (40% of Total Settlement) | $880,000.00 | |
| Payment to Patterson Harkavy LLP | | $572,000.00 |
| Payment to Braswell Law PLLC | | $308,000.00 |
| | | |
| Payment to Patterson Harkavy LLP for Litigation Expenses | $75,638.72 | |
| | | |
| Payment to Ms. Aldridge-Reed and Mr. Reed for Funeral Expenses | $7,553.85 | |
| | | |
| | | |
| | | |