**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**Case No. 7:20-cv-00248-FL**

|  |  |
|---|---|
| MARY TOWANDA WEBSTER-REED, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) |
| SCOTT ANTHONY COLLINS, | ) ) |
| *Defendant*. | ) ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR APPROVAL OF REVISED SETTLEMENT AGREEMENT**

## INTRODUCTION

This case arises out of the fatal shooting of Brandon Webster by Defendant Scott Collins, a former patrolman with the North Carolina State Highway Patrol. Mr. Collins shot and killed Mr. Webster in the course of an attempted traffic stop in Brunswick County, North Carolina.

Plaintiffs filed their original complaint on December 15, 2020. In March 2022, after the close of discovery, the parties executed a mediated settlement agreement in which Plaintiffs would recover $2.2 million. Because the sole beneficiaries of Mr. Webster's estate are his three minor children, judicial approval of the settlement is necessary. *See* Local Civil Rule 17.1; N.C. Gen. Stat. § 28A-13-3(a)(23); *In re Abrams & Abrams, P.A.*, 605 F.3d 238 (4th Cir. 2010). The parties jointly move that the Court approve the proposed settlement agreement.

## FACTS

### I. The Shooting

On January 1, 2019, Brandon Webster, accompanied by his girlfriend, drove to the Civietown Mini-Mart in Brunswick County, North Carolina. (Doc. No. 36 ¶¶ 11-12.) Defendant

1

Collins was a patrolman with the State Highway Patrol on duty that night . *Id.* ¶¶ 10, 15. Collins activated his lights and followed Webster into the Mini-Mart's parking lot. *Id.* ¶ 15.

Webster attempted to avoid the traffic stop by backing around Collins and driving out of the parking lot. *Id.* ¶¶ 20-24. Collins fired his gun twice as Webster exited the parking lot, with one bullet hitting Webster in his side. *Id.* ¶ 25. Low-quality video footage of the encounter was captured through a surveillance camera and a bystander's cell phone. Collins claimed he shot Webster because he thought Webster was going to hit him with his truck. Plaintiffs contend Collins' decision to shoot Webster was unnecessary and unreasonable because Webster's driving did not endanger Collins or anyone else.

After being shot, Webster drove to his parents' house, who then drove him to a nearby hospital. *Id.* ¶ 28. Webster's mother, Plaintiff Webster-Reed, held him in the backseat of the car on the way to the hospital. *Id.* ¶ 28. He lost consciousness in his mother's lap and died later that night. *Id.* ¶¶ 25, 28.

## II.    Litigation History

Mr. Webster's parents—Plaintiffs Webster-Reed and Aldridge Reed—were the co-representatives of his estate. They incurred $7,523.85 in funeral expenses. *See* Declaration of Paul E. Smith ("Smith Decl") ¶ 16. On March 5, 2019, they retained attorney Ira Braswell to litigate claims arising from Mr. Webster's death. Attorney Braswell filed the initial complaint in this action on December 15, 2020. (Doc. No. 1.)

In March 2021, Attorney Braswell and Patterson Harkavy LLP began consulting regarding joint representation of the Plaintiffs. *See* Smith Decl. ¶ 5. On May 21, 2021, the Plaintiffs executed a representation agreement through which both Patterson Harkavy LLP and Attorney Braswell would represent the Plaintiffs, with Patterson Harkavy as lead counsel. *See*

Smith Decl., Ex. A. Patterson Harkavy attorneys Brad Bannon, Narendra Ghosh, and Paul Smith filed notices of appearance on May 24, 2021. (Doc Nos. 23-25.) Soon thereafter, Plaintiffs served interrogatories, requests for production of documents, and requests for admission on Defendant Collins, along with subpoenas *duces tecum* issued to nine third parties. *See* Smith Decl ¶ 6.

Over the next several months, there were numerous disputes over the sufficiency of Collins's discovery responses, which at times reached the point where Plaintiffs' counsel began preparing motions to compel. *Id.* ¶ 7. However, the parties were eventually able to resolve each of these disputes without turning to the Court. *Id.* There were also several disputes over the adequacy of third parties' subpoena responses, which also required significant follow-up, and which were also resolved without resorting to the Court. *Id.*

In particular, subpoenas issued to the State Highway Patrol did not initially result in the production of a scene reconstruction prepared by the Highway Patrol. *Id.* ¶ 8. After review of the Highway Patrol's initial production revealed the possible existence of undisclosed documents, and after extensive follow-up, the reconstruction report was eventually produced to Plaintiffs' counsel on October 7, 2021. *Id.*; (*see also* Doc No. 41.) The previously undisclosed report was consistent with Plaintiffs' contention that Defendant Collins had not been in the trajectory of Mr. Webster's truck at key points during the encounter. *See* Smith Decl. ¶ 8.

On September 23, 2021, Plaintiffs filed their Amended Complaint, alleging the following claims against Defendant Collins: (1) federal constitutional wrongful death claims under 42 U.S.C. § 1983; (2) state law wrongful death claims under North Carolina's wrongful death statute, N.C. Gen. Stat § 28A-18-2; and (3) negligent infliction of emotional distress by Plaintiff Webster-Reed under North Carolina common law. (Dkt. No. 36 at 7-16.) Plaintiffs' primary

3

wrongful death claims alleged that Collins used excessive force in shooting Brandon Webster because Webster did not pose a threat to Webster or anyone else.

In December 2021, Plaintiffs designated four experts: Dr. Jonathan L. Arden, MD, an expert in forensic pathology; Charles Drago, an expert in police practices; Edward E. Hueske, a bullet trajectory expert; and William A. Williams, an expert in scene reconstruction. *See* Smith Decl ¶ 10.

Preparation of these experts required significant time and financial resources. This was especially the case for expert Williams, who required access to the Civietown Minimart parking lot for an entire night so that he and his staff could recreate the exact location of all relevant actors at the moments leading up to and at the time of the shooting based on the surveillance and bystander videos. *Id.* ¶ 11. Mr. Williams' methodology was significantly more comprehensive and accurate than that employed by the Highway Patrol. *Id.* Mr. Williams' work resulted in a scene reconstruction placing Defendant Collins notably outside the trajectory of Mr. Webster's truck at crucial moments of the encounter, including at the moments he fired his gun. *Id.*; *see also* Smith Decl. Ex. E.

Expert Hueske supported Williams' reconstruction with his analysis of the trajectories of the bullets fired by Collins. *Id.* Ex. D. Expert Drago concluded that Collins did not follow generally accepted police practices in how he conducted the traffic stop and in using deadly force against Webster. *Id.* Ex. C. Expert Dr. Arden concluded that Webster suffered very significant conscious pain and suffering until he lost consciousness. *Id.* Ex. B.

Following their expert disclosures, Plaintiffs took six depositions in January and February 2022, including depositions of Collins, his supervisors, and the Deputy Commander of the Highway Patrol. *Id.* ¶ 12. These depositions resulted in the development of favorable testimony.

4

*Id.* While the Highway Patrol claimed to have absolved Collins of any wrongdoing after the shooting, his supervisor and the Deputy Commander of the Highway Patrol each testified that if Collins fired or decided to fire his gun at the location shown in the State's reconstruction, he acted contrary to the Highway Patrol's internal policies and their understanding of the Fourth Amendment. *Id.*

Discovery closed on February 28, 2022.

## III.    Settlement

The Highway Patrol had a $1,000,000 indemnification obligation to Defendant Collins under N.C. Gen. Stat. § 143-300.6, and had purchased an insurance policy providing for an additional $2,000,000 of coverage. *Id.* ¶ 13. Defendant Collins' personal assets were negligible. *Id.* Neither the Plaintiffs nor the Defendant identified any opportunities for financial recovery outside the $3,000,000 in coverage from the Highway Patrol and its insurance carrier. *Id.*

The parties held their first mediation on March 4, 2022, which failed. *Id.* ¶ 14. The parties held a second mediation on March 31, 2022. After a full day of negotiations, the parties agreed to resolve the case for payment of $2,200,000, which Plaintiffs and their counsel determined to be a fair and reasonable amount given the risks and costs associated with continued litigation. *See id.*; Argument Section I, *infra*. The parties executed a mediated settlement agreement at the conclusion of the mediation on March 31. Smith Decl. Ex. F.

At the time of the settlement, the claims at issue were the wrongful death claims brought on behalf of Mr. Webster's estate and the single claim for negligent infliction of emotional distress on behalf of Mr. Webster's mother, Plaintiff Webster-Reed. *Id.* ¶ 15. The parties have agreed to divide the amount payable to the Plaintiffs with 95% of the Plaintiffs' share going to Mr. Webster's estate, and 5% going to Ms. Webster-Reed. *Id.*

5

Plaintiffs were at all times represented under a contingency fee agreement. Under the terms of their contingency fee agreement with Attorney Braswell and Patterson Harkavy LLP, the attorneys would recover 40% of any amounts recovered, and Patterson Harkavy LLP would advance all litigation costs and expenses. *Id.* Ex. A. To date, Patterson Harkavy LLP has advanced $75,638.72 in litigation costs and expenses. *Id.* Ex. H.

The representation agreement provided that the attorneys' fee would be divided between Attorney Braswell and Patterson Harkavy LLP based on when the case resolved. *Id.* Ex. A. In relevant part, if the case resolved after the close of substantial discovery but before the filing of a summary judgment brief, Patterson Harkavy would receive 65% of the total fee, and Attorney Braswell would receive 35% of the total fee. *Id.* Given the settlement amount, this amounts to a $572,000 fee for Patterson Harkavy LLP, and a $308,000 fee for Attorney Braswell.

After the parties reached the preliminary settlement agreement, Plaintiffs' counsel provided portions of the case file to attorneys Carlos Mahoney and Matthew Ballew, each of whom have extensive experience litigating comparable cases in the Eastern District of North Carolina. Mr. Mahoney and Mr. Ballew concluded that the total settlement was reasonable, that the division of the settlement between the Plaintiffs was reasonable, that the amount of attorneys' fees was reasonable, and that the reimbursement of expenses was reasonable. *See* Declaration of Carlos Mahoney ("Mahoney Decl.") ¶¶ 13-14, 17-18; Declaration of Matthew Ballew ("Ballew Decl.") ¶¶ 6-7, 11-12.

Under North Carolina law, wrongful death claims are brought by the personal representatives of the decedent's estate, and the proceeds of the claims are distributed to the decedent's beneficiaries according to the Intestate Succession Act. N.C. Gen. Stat § 28A-18-2(a). For wrongful death claims under 42 U.S.C. § 1983, the North Carolina wrongful death

statute likewise determines how the claims are brought and how damages are to be distributed. *Olvera v. Edmundson*, No. 1:01-cv-74-C, 2001 WL 1160351, at *2 (W.D.N.C. Sept. 21, 2001); *Bowling v. Oldham*, 753 F. Supp. 588, 591 (M.D.N.C. 1990).

Mr. Webster was unmarried at the time of his death and he was survived by his three minor children, K.W., B.W., and Z.L. *See* Smith Decl. ¶ 18. Mr. Webster's three minor children are therefore the sole beneficiaries of his estate under the Intestate Succession Act. *See* N.C. Gen. Stat § 29-15. Accordingly, this Court appointed attorney Ryan Smithwick to serve as guardian ad litum for minor beneficiary B.W., attorney Rick Parrotte to serve as guardian ad litum for minor beneficiary K.W., and attorney Preston Hilton to serve as guardian ad litum for minor beneficiary Z.L. (Doc. Nos. 53, 74.)

In consultation with the minor children's families, an expert in structuring settlements, and a trusts attorney, guardians Smithwick, Parrotte, and Hilton have developed a settlement structure to maximize the near-term and long-term benefits of the proposed settlement to Mr. Webster's minor children. *See* Declaration of Ryan Smithwick ("Smithwick Decl.") ¶¶ 7-10; Declaration of Rick Parrotte ("Parrotte Decl.") ¶¶ 7-10; Declaration of Preston Hilton ("Hilton Decl.") ¶¶ 9-12. Each of the guardians has concluded that the settlement structure will protect their minor's interests in the short and long term, and is reasonable, appropriate, and in their minor's best interest.

Under the proposed settlement, after accounting for Plaintiffs' attorneys' fees and reimbursed expenses, minor beneficiary B.W. will receive $391,655.68. Of that amount, $120,125.10 will be placed in a trust administered by The Directed Benefits Foundation, Inc. as trustee. Smithwick Decl. ¶ 9. This amount in trust will be used to provide for B.W.'s needs starting immediately and until he reaches the age of 18. *Id.* The trust is designed so that B.W.,

who currently receives health insurance through Medicaid, will remain Medicaid-eligible until he reaches 18. *Id.*

$268,538.00 of the settlement will be used to purchase an annuity for B.W. through USAA Life Insurance Company, which is rated A++ by A.M. Best's rating service. *Id.* ¶ 8. The annuity will provide benefits to B.W. as follows:

- $25,000 payable semi-annually, guaranteed for four years, beginning on June 1, 2036 at age 18, with the last payment guaranteed on 12/1/2039;

- $500 payable monthly, beginning on June 1, 2036 at age 18, with the last payment guaranteed on May 1, 2040;

- $25,000 paid as a lump sum on June 1, 2040, guaranteed, at age 22; and

- $1,488.79 payable monthly, for life, guaranteed for 30 years, beginning on 7/1/2040, at age 22, with the last guaranteed payment on 6/1/2070, at age 52.

*Id.*

Under the proposed settlement, after accounting for Plaintiffs' attorneys' fees and reimbursed expenses, minor beneficiary K.W. will likewise receive $391,655.68. Of that amount, $50,190.58 will be placed in a trust administered by The Directed Benefits Foundation, Inc. as trustee. Parrotte Decl. ¶ 9. This amount in trust will be used to provide for K.W.'s needs starting immediately and until she reaches the age of 18. *Id.* The trust is designed so that K.W., who currently receives health insurance through Medicaid, will remain Medicaid-eligible until she reaches 18. *Id.*

$338,145.10 of the settlement will be used to purchase an annuity for K.W. through United of Omaha Life Insurance Company, which is rated A+ by A.M. Best's rating service. *Id.* ¶ 8. The annuity will provide benefits to K.W. as follows:

- $15,000 payable semi-annually, guaranteed for four years, beginning on June 1, 2027 at age 18, with the last payment guaranteed on 12/1/2030;

8

- $500 payable monthly, guaranteed for 4 years, beginning on June 1, 2027 at age 18, with the last guaranteed payment on May 1, 2031;
- $25,000.00 paid as a lump sum on June 1, 2031, guaranteed
- $50,000.00 paid as a lump sum on March 31, 2034, guaranteed
- $50,000.00 paid as a lump sum on March 31, 2039, guaranteed
- $100,000.00 paid as a lump sum on March 31, 2044, guaranteed
- $1,284.83 payable monthly, for life, guaranteed for 30 years, beginning on March 31, 2042 at age 33;

*Id.*

Under the proposed settlement, after accounting for Plaintiffs' attorneys' fees and reimbursed expenses, minor beneficiary Z.L. will likewise receive $391,655.68. Of that amount, $101,580.78 will be placed in a trust administered by The Directed Benefits Foundation, Inc. as trustee. Hilton Decl. ¶ 11. This amount in trust will be used to provide for Z.L.'s needs starting immediately and until he reaches the age of 18. *Id.* The trust is designed so that Z.L., who currently receives health insurance through Medicaid, will remain Medicaid-eligible until he reaches 18. *Id.*

$271,655.00 of the settlement will be used to purchase an annuity for Z.L. through USAA Life Insurance Company, which is rated A++ by A.M. Best's rating service. *Id.* ¶ 8. The annuity will provide benefits to Z.L. as follows:

- $2,395.83 payable monthly, for life, guaranteed for 40 years, beginning on May 12, 2027, at age 18.

*Id.*

Plaintiffs retained Matthew Thompson, a Board Certified Specialist in Estate Planning and Probate Law at Ward & Smith, P.A., to draft the trust instruments. Smith Decl. ¶ 20. The creation of the trusts for each minor beneficiary requires the entry of a separate court order. *See* N.C. Gen. Stat. §§ 36C-4-401(4), 36C-4-401.2. The Court has previously issued orders creating

the trusts for K.W. and B.W.  (Doc. Nos. 72, 73.)  A Motion for Creation of Trust for Z.L. has been filed contemporaneously with this motion.

The parties have now executed a formal settlement agreement, which is submitted for this Court's approval as Exhibit 1.  Under the agreement, the North Carolina Department of Public Safety agrees to pay Plaintiffs a total of $2,200,000 as follows: (1) $540,193.00 shall be paid to USAA Annuity Services Corporation to fund the purchase of the two structured settlement annuities for B.W. and Z.L.; (2) $338,145.10 shall be paid to Mutual of Omaha Structured Settlement Company to fund the purchase of the structured settlement annuity for K.W.; and (3) $1,321,661.90 shall be paid to the Trust Account of Patterson Harkavy LLP, which will cover the amount for B.W.'s trust, the amount for K.W.'s trust, the amount for Z.L.'s trust, the payment to Ms. Webster-Reed, the fees for Plaintiffs' counsel, the fees for the guardians ad litem, and the reimbursement of expenses.  In exchange, Plaintiffs and the Estate of Brandon Webster agree to waive all claims related to the death of Brandon Webster and to dismiss this lawsuit following payment of the amounts above.

## ARGUMENT

Approval of the settlement, including of the Plaintiffs' attorneys' fees and litigation expenses, is required because Mr. Webster's heirs—and thus the beneficiaries of the wrongful death claims brought by the Estate—are three minor children.  *See* Local Civil Rule 17.1; N.C. Gen. Stat. § 28A-13-3(a)(23); *In re Abrams & Abrams, P.A.*, 605 F.3d 238 (4th Cir. 2010).  The Court should approve the settlement because it is fair, reasonable, and in the best interests of the minor children.  *See Blow v. Murphy-Brown, LLC*, No. 7:14-cv-232-BR, 2021 WL 6106212, at *1 (E.D.N.C. May 28, 2021) (approving settlement under Local Rule 17.1).

## I.    The Total Settlement is Reasonable.

The total settlement of $2.2 million is reasonable in light of the strengths and weaknesses of Plaintiffs' claims, and given that possible recovery was limited by available insurance and indemnification coverage.

Plaintiffs have strong excessive force claims against Collins under 42 U.S.C. § 1983 and North Carolina law.  Plaintiffs developed compelling evidence from the videos at the scene and their experts supporting their view that Collins was not endangered by Webster's driving and thus acted unreasonably in shooting him.  *See Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019) (holding that officers violate the Fourth Amendment if they employ deadly force against a driver once if they are not in the vehicle's trajectory).  Plaintiffs' position was corroborated by the Highway Patrol's reconstruction report eventually produced in discovery, as well as by the admissions of Collins' supervisors elicited during their depositions.

However, Plaintiffs still had downside risks in pursuing their claims.  Before trial, Plaintiffs faced the risk Collins would prevail on summary judgment if the Court did not find Plaintiffs' evidence sufficient.  As in almost all police misconduct cases, Plaintiffs faced the risk that the Court would find Collins entitled to qualified immunity and public official immunity, which would preclude recovery.  As in every jury case, Plaintiffs faced the risk that the jury would find against their claims by crediting Collins' account of the events.  And even if the jury found for Plaintiffs, they faced the risk that the jury would award only a small amount in damages because the economic loss from Webster's death was hard to quantify.

More significantly, even if Plaintiffs fully prevailed at trial and the jury awarded a large amount in damages, Plaintiffs' recovery was capped at $3 million.  Collins had negligible personal assets, so the only funds available to pay a judgment against him would be the $1

11

million from the State's indemnification obligation and the $2 million from the department's insurance policy. Moreover, in pursuing their claims all the way to judgment—which might have included an interlocutory appeal on qualified immunity—Plaintiffs would have spent much more time waiting for the recovery and would have incurred additional litigation expenses, further reducing the ultimate recovery. *See* Smith Decl. ¶ 14.

In light of these risks and the hard limit on any possible recovery, Plaintiffs and Plaintiffs' counsel concluded that settling their claims for $2.2 million before summary judgment was the right decision. This settlement amount is over 73% of the maximum possible recovery. And settling at this stage of litigation provides the certainty of a strong recovery without having to continue with months or years of litigation.

After reviewing the pertinent materials, attorney Carlos Mahoney concluded that "the result obtained in this matter is excellent" and that the "proposed settlement is reasonable in light of the strength of the various claims and defenses, the damages alleged by Plaintiffs, and the available indemnification and liability insurance coverage." Mahoney Decl. ¶¶ 13, 17. Attorney Matt Ballew concurred, noting that it was "reasonable to settle this case for $2.2 million, and Plaintiffs were justified in accepting that settlement," and that in his opinion, "settlement of this case for $2.2 million before the submission of dispositive motions was a very strong resolution for the Plaintiffs." Ballew Decl. ¶ 6. The guardians ad litem evaluated the overall settlement from the perspective of the minors. Mr. Smithwick, Mr. Parrotte, and Mr. Hilton all agree that the decision to settle this case for $2.2 million is reasonable. Smithwick Decl. ¶ 3; Parrotte Decl. ¶ 3; Hilton Decl. ¶ 5.

Accordingly, the Court should conclude that the overall settlement amount is fair and reasonable.

12

## II.    The Division of the Settlement Between Mr. Webster's Estate and Ms. Webster-Reed Is Reasonable.

The division of the Plaintiffs' share of the settlement between Ms. Webster-Reed individually and Mr. Webster's estate is also reasonable. Ms. Webster-Reed suffered a profound trauma as she watched her son die in her lap. But all Plaintiffs recognized that Mr. Webster's children, in losing a father, suffered far greater loss, and that liability for the wrongful death would be more easily established than liability for negligent infliction of emotional distress.

Attorneys Mahoney and Ballew each agree that it was reasonable to divide the Plaintiffs' share of the settlement so that 95% would go to Mr. Webster's estate, and 5% would go to Ms. Webster-Reed. Mahoney Decl. ¶ 14; Ballew Decl. ¶ 7. The guardians ad litem for all of the minors concur. Smithwick Decl. ¶ 3; Parrotte Decl. ¶ 3; Hilton Decl. ¶ 5.

Accordingly, the Court should conclude that the division of the total settlement amount between Mr. Webster's Estate and Ms. Webster-Reed is fair and reasonable.

## III.    The Attorneys' Fees for Plaintiffs' Counsel Are Reasonable.

The Court should also approve payment of the 40% contingency fee to Plaintiffs' counsel. "[C]ourts evaluate attorney's fees under a reasonableness standard." *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 243 (4th Cir. 2010). Courts are to consider twelve factors in assessing the reasonableness of a fee:

> (1) the time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case, (5) the customary fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship between the lawyer and the client, and (12) the fee awards made in similar cases.

*Id.* at 244. Here, each factor supports the reasonableness of a forty percent contingency fee.

13

First, Plaintiffs' counsel expended significant "time and labor" litigating this case. Attorneys Ghosh, Bannon, and Smith have submitted with their declarations detailed time records documenting their work and showing that they collectively spent about 1,070 hours litigating this case. Ghosh Decl. Ex. A; Bannon Decl. Ex. A; Smith Decl. Ex. G. Attorney Braswell also spent significant "time and labor" litigating this case, particularly in investigating the facts, interviewing witnesses, collecting evidence, and drafting the initial complaint. Braswell Decl. ¶ 5.

Second, police shooting cases involve "difficult" legal questions not present in other personal injury contexts. They "are often more factually and legally complicated than other personal injury and wrongful death cases and typically require extensive litigation due to the availability of qualified immunity and public officer immunity." Mahoney Decl. ¶ 16.

Third, these legal issues make it more challenging to competently "perform the necessary legal services" in police shooting cases; as a result, cases involving "federal civil rights liability . . . require[] a high degree of specialized skill and knowledge on the part of counsel." *Blackwell v. Palmer*, No. 1:20-cv-00146, 2022 WL 19790, at *3 (W.D.N.C. Jan. 3, 2022).

Fourth, the case took substantial amounts of Plaintiffs' counsel's time, necessarily resulting in the preclusion of other employment.

Fifth, the statements of Carlos Mahoney and Matthew Ballew—both experienced litigators familiar with customary practices regarding contingency fees in comparable cases— confirm that a 40% contingency fee for a police shooting case is consistent with the "customary fee" in such cases. Mr. Mahoney explained that "a 40% contingent attorneys' fee is a customary fee for civil rights cases involving personal injury and/or wrongful death in the Eastern District of North Carolina." Mahoney Decl. ¶ 16. Mr. Ballew agreed that "a 40% contingency fee is

customary for cases such as this one" and noted that his firm "regularly charges a 40% contingency fee for similar § 1983 law enforcement misconduct" cases. Ballew Decl. ¶ 14.

Sixth, Plaintiffs' attorneys' fee in this case was purely based on contingency. Plaintiffs' counsel engaged in the representation with the risk that no fee would be obtained. "[C]ontingency fees provide access to counsel for individuals who would otherwise have difficulty obtaining representation" and "transfer a significant portion of the risk of loss to the attorneys taking a case." *Abrams*, 605 F.3d at 245-46. A contingency fee therefore may be reasonable even if it affords the attorney greater compensation than their standard hourly rate. Otherwise, "plaintiffs may find it difficult to obtain representation if attorneys know their reward for accepting a contingency case is merely payment at the same rate they could obtain risk-free for hourly work, while their downside is no payment whatsoever." *Id*. at 246.

Seventh, Patterson Harkavy accepted the case after it had already been filed and the discovery period had commenced, increasing the "time pressures" in developing a litigation strategy, pursuing discovery, developing witnesses, and identifying and developing experts.

Eighth, the ultimate result obtained is favorable to the Plaintiffs as it over 73% of the maximum possible recovery. *See* Mahoney Decl. ¶¶ 13, 17; Ballew Decl. ¶ 6; Section I, *supra*.

Ninth, Plaintiffs' attorneys have extensive experience litigating civil rights cases. Attorneys Bannon, Ghosh, and Smith have successfully litigated many comparable cases brought under 42 U.S.C. § 1983, including in the Eastern District of North Carolina. *See Centeno v. Tripp*, No. 4:20-cv-33-D (E.D.N.C.) (excessive force); *Doe v. Boone-Lee*, No. 5:19-ct-03264-BO (E.D.N.C.) (jailer misconduct); *Sledge v. Little*, No. 7:15-cv-180-D (E.D.N.C.) (wrongful conviction); *Frails v. Riley*, No. 5:15-cv-665-FL (E.D.N.C.) (unreasonable search); *Taylor v. Deaver*, No. 5:11-CV-341 (E.D.N.C.) (wrongful conviction); *Dail v. City of Goldsboro*,

No. 5:10-CV-00451-BO (E.D.N.C.) (wrongful conviction). They have excellent reputations in the field, *see* Ballew Decl. ¶ 9, and in addition to their trial level work, have extensive experience litigating Fourth Amendment disputes in criminal and civil appeals. *See, e.g.*, *Betton v. Belue*, 942 F.3d 184 (4th Cir. 2019) (finding no qualified immunity for officer in a police shooting case). And as noted by Mr. Mahoney, the "excellent" result obtained is itself "an indication of the skill and legal expertise of Plaintiffs' counsel." Mahoney Decl. ¶ 17.

Tenth, this case was less "desirable" than many other wrongful death cases given the various immunities present in police misconduct cases. Moreover, "'[u]ndesirability' and relevant risks of a case must be evaluated from the standpoint of plaintiff's counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight." *Williams v. Old HB, Inc.*, No. 7:13-CV-00464, 2015 WL 127862, at \*9 (W.D. Va. Jan. 8, 2015). While Plaintiffs obtained a significant recovery, many of the strongest pieces of evidence were developed in discovery and were not apparent when the case was accepted.

Eleventh, Attorney Braswell has represented the Plaintiffs since early 2019; attorneys Smith, Bannon, and Ghosh have represented the Plaintiffs since early 2021. The "nature" of their relationship is also demonstrated by the Plaintiffs' support for the approval of the underlying settlement agreement. *Accord Williams v. Old HB, Inc.*, No. 7:13-CV-00464, 2015 WL 127862, at \*10 (W.D. Va. Jan. 8, 2015).

Twelfth, a 40% contingent fee is consistent with those approved in comparable cases. *See* Mahoney Decl. ¶ 16; Ballew Decl. ¶ 14; *accord Blackwell v. Palmer,* No. 1:20-cv-00146-MR-WCM, 2022 WL 19790 (W.D.N.C. Jan. 3, 2022) (approving a 40% contingency fee in a § 1983 wrongful death suit that settled for $1.8 million after the completion of a significant amount of discovery but before summary judgment), *id* at Doc. No. 45 (providing further description of

the terms of settlement); *Kent v. Duncan*, No. 1:18-cv-00322-MR-WCM, 2020 WL 118599 (W.D.N.C. Jan. 9, 2020) (approving a 40% contingency fee in jailer misconduct wrongful death suit that settled for $2 million after the completion of significant discovery but before summary judgment), *id* at Doc. No. 58 (providing further description of the terms of settlement).

Finally, the guardians ad litem have evaluated Plaintiffs' attorneys' fee from the perspective of their minors. Mr. Smithwick, Mr. Parrotte, and Mr. Hilton all agree that the 40% contingent fee for Plaintiffs' counsel is reasonable. Smithwick Decl. ¶ 5; Parrotte Decl. ¶ 5; Hilton Decl. ¶ 7.

Accordingly, the Court should conclude that the 40% contingent fee for Plaintiffs' counsel is fair and reasonable.

## IV. The Expenses to be Paid from the Settlement Are Reasonable.

Reimbursement of Plaintiffs' litigation expenses is also reasonable. *See* Smith Decl. ¶ 19; Ballew Decl. ¶¶ 11, 13. Most of Plaintiffs' litigation expenses related to expert witnesses. Smith Decl. Ex. I. Of these, the largest expense was for the scene reconstruction performed by expert Williams. Given that the position of Webster's truck relative to Collins was the central issue in this case, Mr. Ballew agreed that retaining the reconstruction expert was a "wise and appropriate expense" that "meaningfully strengthened Plaintiffs' case." Ballew Decl. ¶ 13. Mr. Mahoney agreed, noting that he has "used expert witnesses for forensic scene reconstructions in every police shooting case that I have handled[.]" Mahoney Decl. ¶ 18.

The remaining litigation expenses were for postage, mileage, medical records, deposition transcripts, and mediation costs. These expenses are customarily borne by the party and were necessary for the proper litigation of the case. *See Williams v. Old HB, Inc.*, No. 7:13-CV-00464, 2015 WL 127862, at *9 (W.D. Va. Jan. 8, 2015) (approving the reimbursement of costs

for items "such as copying charges, telephone charges, travel, and expert fees" as these expenses are "routinely billed to clients").

An additional non-litigation expense to be paid from the settlement is the reimbursement of the funeral expenses for Brandon Webster. Smith Decl. Ex. H. Funeral expenses are required to be paid under the North Carolina wrongful death statute. N.C. Gen. Stat. § 28A-13-3(a)(23) (requiring allocation for "funeral" and "burial" expenses). Webster's parents, Ms. Webster-Reed and Mr. Reed, are to be reimbursed for the funeral expenses they incurred.

Creation of the trusts for K.W., B.W., and Z.L. required the services of attorney Matt Thompson, a Board-certified specialist. Smith Decl. ¶ 20. As discussed below, implementing trusts for the funds directed to the minor beneficiaries is in their best interests, and using the services of an experienced trust attorney is particularly valuable because the trusts have to be drafted to protect the minors' eligibility for Medicaid. Each trust will pay from its funds the fee for Mr. Thompson for drafting the trust instrument.

Finally, the appointed guardians ad litem have fees for the services they have rendered. Mr. Smithwick is charging $200/hour and has provided an accounting of his work; his total fee is $2,992.58. Smithwick Decl. ¶ 11. Mr. Parrotte is charging about $127/hour and has provided an accounting of his work; his total fee is $2,600.00. Parrotte Decl. ¶ 11. Mr. Hilton has requested that he and Paul Ekster be compensated for their work on behalf of Z.L and his mother in the action establishing Z.L.'s paternity, as well as Mr. Hilton's services as guardian ad litem. Hilton Decl. ¶ 13. He is requesting a fee of $250/hour for his services and $300/hour for the services of Mr. Ekster, which is based in part on the fact that they began representing Z.L. and his mother before they knew whether Z.L.'s paternity would in fact be established. Hilton Decl. ¶ 13. Mr.

18

Hilton has provided an accounting of his work and Mr. Ekster's work; their total requested compensation is $18,419.90. Hilton Decl. ¶ 14.

Plaintiffs have provided a Disbursement Statement, showing the proposed disbursement of the settlement as set forth above. Smith Decl. Ex. J (Disbursement Statement)

Accordingly, the Court should conclude that the expenses to be paid out of the settlement are fair and reasonable, including the litigation expenses, funeral expenses, Mr. Thompson's fee, and the fees of the guardians ad litem.

## V. The Settlement Structure Is Reasonable.

The settlement structure is also reasonable. For each minor, a significant portion of their share of the settlement will be placed in a trust for their benefit. This amount in trust will ensure that the minors are able to receive the financial support they need during their childhood. The trusts are structured such that each minor's eligibility for Medicaid benefits is preserved. Administration of the funds in a trust is also advantageous for the reasons specified in the Motions for Creation of Trust for K.W., B.W., and Z.L.

For each minor, the majority of their share of the settlement proceeds will be used to fund structured annuities that will pay them significant amounts from age 18 and throughout their entire lives. Use of these annuity structures ensures that the beneficiaries will benefit from this settlement over the long term, while increasing the overall financial value of the settlement.

The guardian ad litem for each of the minor beneficiaries is an experienced attorney. Each has worked to develop these terms to best provide for the minor beneficiaries' near-term and long-term interests, and to maximize the benefits each will receive from the settlement.

Accordingly, the Court should conclude that the structure of the settlement is fair and reasonable, and is in the best interests of the minor beneficiaries.

19

**VI.    The Settlement Complies with Local Civil Rule 17.1.**

The settlement agreement is consistent with each of the requirements established by

Local Civil Rule 17.1.

First, all parties are properly represented and before the Court, no questions exist as to

misjoinder or nonjoinder of parties, and the Court has jurisdiction over the subject matter and the

parties.  *See* Local Civil Rule 17.1(b)(1).  The Estate of Brandon Webster, through its co-

representatives, is the sole proper party to pursue the state law wrongful death claims.  *See* N.C.

Gen. Stat § 28A-18-2.  Although Plaintiffs believe the Estate is also the sole proper party to

pursue the corresponding federal claims, Webster's heirs, B.W. and K.W., are nevertheless

additionally included as separate Plaintiffs in an abundance of caution.  The Court has appointed

guardians ad litem to represent each of the minors.  (Doc. Nos. 51, 74.)

This Court has subject matter jurisdiction over Plaintiffs' § 1983 claims pursuant to 28

U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over Plaintiffs' state law claims pursuant

to 28 U.S.C. § 1367 because the claims arise from a common nucleus of operative facts that are

so intertwined that they cannot be reasonably separated.  This Court has personal jurisdiction

over all parties because all reside in this district, because the operative facts occurred in this

district, and because all parties have voluntarily submitted to the Court's jurisdiction.

Second, the Complaint states a claim upon which relief can be granted.  *See* Local Civil

Rule 17.1(b)(2).  Officers violate the Fourth Amendment when they "employ deadly force

against [a] driver once they are no longer in [a fleeing] car's trajectory."  *Williams v. Strickland*,

917 F.3d 763, 770 (4th Cir. 2019).  This right was clearly established in 2005.  *Id.* (citing

*Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)).  Plaintiffs allege, *inter alia*, that Collins

shot Webster while Webster was driving out of a parking lot, despite the fact that Collins was

"standing outside of Webster's path of travel, removed from any threat of harm."  (Doc. No. 36, ¶ 27.)  The allegations therefore state a claim for relief under 42 U.S.C. § 1983.

The Complaint also states wrongful death claims under North Carolina law.  *See* N.C. Gen. Stat § 28A-18-2.  Public officer immunity does not shield law enforcement officers from negligence liability when they use deadly force without legal justification.  *See Wilcox v. City of Asheville*, 222 N.C. App. 285, 294, 730 S.E.2d 226, 234 (2012) (finding a police officer was not entitled to public officer immunity when he fired his gun into a moving car "despite the absence of a clear public threat[.]").  Moreover, officers can be held liable for battery when they use deadly force against a suspect who does not pose an imminent threat of death or serious physical injury.  *See Hart v. Brienza*, 246 N.C. App. 426, 429, 784 S.E.2d 211, 214 (2016).  Plaintiffs have thus stated wrongful death claims premised on both battery and negligence.

Third, as discussed above, Plaintiffs' counsel have set forth the services they have rendered and this settlement is fair and reasonable.  *See* Local Civil Rule 17.1(b)(3).  Plaintiffs' counsel Bannon, Ghosh, and Smith have submitted detailed time records showing the services they have rendered in this matter, and counsel Braswell has described his work in the case. Ghosh Decl. Ex. A; Bannon Decl. Ex. A; Smith Decl. Ex. G; Braswell Decl. ¶ 5.  The settlement terms are fair and reasonable, and in the best interests of the minors.  *See* Sections I-V, *supra*.

Finally, none of Plaintiffs' claims relate to personal injuries suffered directly by the minors.  There are thus no "medical, hospital and related expenses" resulting from the allegations providing the basis for Plaintiffs' claims.  *See* Local Civil Rule 17.1(b)(4).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the final settlement agreement.

21

Respectfully submitted, this the 23rd day of March, 2023.


           PATTERSON HARKAVY LLP

           /s/ Narendra K. Ghosh
           Narendra K. Ghosh, NC Bar No. 37649
           nghosh@pathlaw.com
           Paul E. Smith, NC Bar No. 45014
           psmith@pathlaw.com
           Bradley J. Bannon, NC Bar No. 24106
           bbannon@pathlaw.com
           100 Europa Dr., Suite 420
           Chapel Hill, North Carolina 27517
           (919) 942-5200


           /s/ Ira Braswell IV
           Ira Braswell IV, NC Bar No. 41799
           BRASWELL LAW, PLLC
           P.O. Box 703 Louisburg, NC 27549
           Telephone: (252) 458-2203
           Facsimile: (980) 225-0132

           *Counsel for Plaintiffs*